# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | |
|---|---|
| TEXAS TOP COP SHOP, INC.; DATA COMM FOR BUSINESS, INC.; RUSSELL STRAAYER; MUSTARDSEED LIVESTOCK, LLC; LIBERTARIAN PARTY OF MISSISSIPPI; and NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC., | Case No: 4:24-cv-478 |
| *Plaintiffs*, | **COMPLAINT** |
| v. | |
| MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES; JANET L. YELLEN, SECRETARY OF THE TREASURY; U.S. DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; FINANCIAL CRIMES ENFORCEMENT NETWORK, | |
| *Defendants*. | |

## INTRODUCTION

Corporate formation, whether employed by a profit-making corporation, a small partnership, or an advocacy association, is a critical aspect of modern American law. "The corporate form is now the foundation of the modern market economy. Its benefits are well appreciated: permanent capital grants an autonomous and indefinite life, and a capacity for long-term investment." Giuseppe Dari-Mattiacci, Oscar Gelderblom, Joost Jonker & Enrico C. Perotti, *The Emergence of the Corporate Form*, 33 J.L. ECON. & ORG. 193, 225 (2017).

1

The corporate form also serves critical social goals. "Political speech is indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual." *Citizens United v. FEC*, 558 U.S. 310, 349 (2010) (citation omitted). Indeed, modern advocacy invariably relies on the corporate form to magnify its impact on public discourse. *See id.* And other aspects of the corporate form, including "identity shielding[,] is foundational to the very existence of many business enterprises that benefit society at large, including the supply of desirable products and services for consumers. Identity shielding particularly has a potential to unlock innovation because it may encourage the flow of capital and human collaboration for enterprises that may foster critical perspective about the status quo. Anonymity in the financing of business enterprises is also intimately connected to personal autonomy, such as safeguarding personal reputations and, in some cases, the physical safety of business owners." William J. Moon, *Anonymous Companies*, 71 DUKE L.J. 1425, 1433–34 (Apr. 2022).

As important as these corporate functions are to a free and flourishing society, it is a unique feature of our federalist system that the national government has no constitutional authority over general corporate formation. Instead, the several States have competed amongst themselves in their creation and supervision of corporate forms. "Throughout the history of American law, the definition and supervision of business entities has been the task of the states. At the Constitutional Convention, during the Progressive Era, and at the height of the New Deal, the federal government debated whether to enter the corporate area itself and every time declined." Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 OHIO ST. L.J. 1037, 1037–38 (1986).

At the founding, corporations were almost always "agencies of government . . . for the furtherance of community purposes." Pauline Maier, *The Revolutionary Origins of the American Corporation*, 50 Wm. & Mary Q. 51, 55–56 (1993). As corporate forms began to evolve and the use of private corporations grew, often through state-chartered enterprises engaged in transportation and finance, the States maintained exclusive control over governance and formation. Brian Phillips Murphy, *Building the Empire State: Political Economy in the Early Republic* 12 (2015).

It is unsurprising, therefore, that the Framers both implicitly understood that the federal constitution lacked any control over state corporate law and even explicitly rejected a call for such authority. At the 1787 Constitutional Convention, James Madison proposed to grant Congress an enumerated power to charter federal corporations. Madison sought a general power "to grant charters of incorporation where the interest of the U.S. might require & the legislative provisions of individual States may be incompetent." 2 *The Records of the Federal Convention of 1787* 615 (Max Farrand ed., 1911) (Madison's notes). Rufus King of Massachusetts and George Mason of Virginia immediately protested that the States would not stand for it. *See id.* at 615–16. Madison's enlargement of congressional authority was soundly rejected and did not even get a vote. *See id.* at 616. Thus, "[t]he delegates were aware that leaving business regulation primarily to the individual states might cause friction within the overall American economy. They were more reluctant, however, to allow concentrations of economic power, which they visualized as a government-sponsored monopoly, and therefore chose this course." Boyer, *supra* at 1041.

The national government was delegated certain enumerated powers that may be used to regulate specific activities of individuals and corporations that are created under state law—for instance, when such entities issue securities in interstate commerce or generate income subject to

federal tax. But the national government lacks any general power over corporate governance or control over how corporations operate. Indeed, this understanding has continued well into the modern era, with federal law forming an "overlay" on corporate conduct that deals "with the transfer of interests in those business entities" in interstate commerce, but never addressing corporate formation or governance itself. *See id.* at 1056. "The era of Populism, Theodore Roosevelt, and Woodrow Wilson, which produced the Sherman and Clayton Acts, the Pure Food and Drug Act, and the Federal Trade Commission, considered the matter, but ultimately chose to leave corporation law under state authority." *Id.* at 1050. Or, as the Supreme Court put it: "No principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987).

And yet, buried within almost 1500 pages of statutory text as a part of an end-of-the-year budget bill, the Corporate Transparency Act (CTA or Act) threatens to upend these time-honored principles. The Act seeks to federalize the internal affairs of tens of millions of entities, whether they constitute for-profit commercial enterprises, political advocacy organizations, or even religious groups, while compelling invasive disclosures to federal regulators for the express purpose of criminal investigation. By so doing, the Act threatens cherished privacy and associational interests in those entities, upsets the careful balance between state and federal actors, and imposes chilling criminal consequences for millions of presumptively innocent people.

In short, the Act is an unconstitutional affront to the individual rights of Americans. This Court should therefore enter a declaratory judgment and permanent injunction prohibiting defendants from enforcing the Act and vacating its implementing regulations.

## PARTIES

1.      Texas Top Cop Shop, Inc., is a Texas corporation, registered with the Texas Secretary of State, with all operations and its principal place of business in Conroe, Texas.

2.      Plaintiff Data Comm for Business, Inc. (Data Comm), is a Delaware corporation with operations in Illinois and Texas. Data Comm is registered to do business as a foreign corporation with the Illinois Secretary of State. Data Comm's principal place of business is in Collin County, Texas.

3.      Plaintiff Russell Straayer is an individual residing in Collin County, Texas.

4.      Plaintiff Mustardseed Livestock, LLC (Mustardseed), is a Wyoming limited liability company registered with the Wyoming Secretary of State. Mustardseed's principal place of business is Lingle, Wyoming, and each of its members reside in Wyoming.

5.      Plaintiff Libertarian Party of Mississippi (MSLP) is a non-profit corporation organized under the laws of Mississippi and registered to do business with the Mississippi Secretary of State. MSLP's principal place of business is in Biloxi, Mississippi.

6.      Plaintiff National Federation of Independent Business, Inc. (NFIB) is the nation's leading small business advocacy organization. Founded in 1943 as a nonprofit, nonpartisan organization, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. It represents approximately 300,000 independent business owners located throughout the United States and in a wide variety of industries. NFIB is a nonprofit corporation headquartered in Tennessee.

7.      Plaintiffs Texas Top Cop Shop and Data Comm are members of NFIB.

8.      Defendant Merrick Garland is the Attorney General of the United States and is sued in his official capacity as the chief law enforcement officer of the United States.

9.      AG Garland is responsible for the uniform administration and enforcement of federal criminal law in the United States, including the offenses created by the CTA.

10.     Defendant Janet L. Yellen is the United States Secretary of the Treasury and is sued in her official capacity as the head of the U.S. Department of the Treasury.

11.     Defendant U.S. Department of the Treasury is an executive agency of the United States tasked with administration and enforcement of the CTA and its implementing regulations.

12.     Defendant Andrea Gacki is the Director of the Financial Crimes Enforcement Network (FinCEN), a bureau of the U.S. Department of the Treasury, and is sued in her official capacity as head of FinCEN.

13.     Defendant Financial Crimes Enforcement Network is a bureau of a federal agency tasked with administration and enforcement of the CTA and its implementing regulations.

14.     Throughout this Complaint, Defendants are referred to jointly as the United States or Treasury except where otherwise specified.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331.

16.     This Court has the authority to grant an injunction and declaratory judgment in this matter pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706(2).

17.     Venue for this action properly lies in this district pursuant to 5 U.S.C. § 703 and 28 U.S.C. §§ 1391(b)(2), (e)(1), because a defendant resides in this district, certain plaintiffs reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and in this division.

## STATEMENT OF FACTS

### I. LEGAL BACKGROUND

#### A. The Corporate Transparency Act

18.    On January 1, 2021, the Corporate Transparency Act (CTA or Act) was enacted as Section 6401 of the William M. (Mac) Thornberry National Defense Authorization Act (NDAA) for Fiscal Year 2021, Pub. L. 116-283.

19.    Section 6402(5) of the NDAA provided the "sense of Congress that" "Federal legislation providing for the collection of beneficial ownership information for corporations, limited liability companies, or other similar entities formed under the laws of the States is needed to— (A) set a clear, Federal standard for incorporation practices; (B) protect vital Unites (sic) States national security interests; (C) protect interstate and foreign commerce; (D) better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity; and (E) bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards."

20.    Section 6403 created new "beneficial ownership information reporting requirements" codified at 31 U.S.C. § 5336.

21.    "In accordance with regulations prescribed by the Secretary of the Treasury," the CTA provided that "each reporting company shall submit to FinCEN a report" "identify[ing] each beneficial owner of the applicable reporting company and each applicant with respect to that reporting company by" "full legal name," "date of birth," "current, as of the date on which the report is delivered, residential or business street address," and "unique identifying number from an acceptable identification document" or "FinCEN identifier." 31 U.S.C. §§ 5336(b)(1)(A), (b)(2)(A).

22.     "Acceptable identification" is a nonexpired passport, or an identification document issued by a U.S. state, local government, or Indian Tribe, or a U.S. state driver's license. *Id.* at § (a)(1).

23.     For "existing entities," *i.e.*, "any reporting company that has been formed or registered before the effective date of the regulations prescribed under" the CTA, their reports must be filed in "accordance with regulations prescribed by the Secretary of the Treasury," and not later than 2 years after the effective date of regulations prescribed by the Secretary. *Id.* at § (b)(1)(B).

24.     "In accordance with regulations prescribed by the Secretary of the Treasury, any reporting company that has been formed or registered after the effective date of the regulations promulgated under this subsection shall, at the time of formation or registration, submit to FinCEN" relevant reports. *Id.* at § (b)(1)(C).

25.     Reporting companies must file "updated report[s] for changes in beneficial ownership" in "accordance with regulations prescribed by the Secretary of the Treasury," "and not later than 1 year after the date on which there is a change" in relevant information. *Id.* at § (b)(1)(D).

26.     An entity's "applicant" is the person who filed relevant organizing documents with the state secretary, and this person must also be identified in the FinCEN report regardless of whether he or she is also a "beneficial owner" of the entity. *See id.* §§ (a)(2), (b)(2)(A).

27.     "The term 'reporting company'—[] means a corporation, limited liability company, or other similar entity that is—(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe[.]" *Id.* at § (a)(11)(A).

28.     However, the CTA statutorily exempts 23 types of entities from this definition, including:

      a.   issuers of securities,

b.  government entities,

c.  banks,

d.  credit unions,

e.  bank holding companies,

f.  money transmitting businesses,

g.  brokers or dealers of securities,

h.  securities exchanges or clearing agencies,

i.  any other entity registered with the Securities and Exchange Commission,

j.  registered investment companies,

k.  investment advisers,

l.  insurance companies,

m.  insurance producers,

n.  entities registered with the Commodity Futures Trading Commission,

o.  public accounting firms,

p.  public utilities,

q.  financial market utilities,

r.  pooled investment vehicles,

s.  organizations with an active tax-exempt status under section 501(c) or 527(a) of the Internal Revenue Code, or trusts described in section 4947(a) of the Internal Revenue Code,

t.  certain holding companies related to those tax-exempt entities,

u.  any entity that "employs more than 20 employees on a full-time basis in the United States," had "more than $5,000,000 in gross receipts or sales in the aggregate," in

> its last tax year and "has an operating presence at a physical office within the United States,"
>
> v.  entities that own or control exempt entities, and
>
> w.  dormant entities – those "in existence for over 1 year," "not engaged in active business," "not owned, directly or indirectly, by a foreign person" "that has not, in the preceding 12-month period, experienced a change in ownership or sent or received funds in an amount greater than $1,000 (including all funds sent to or received from any source through a financial account or accounts in which the entity, or an affiliate of the entity, maintains an interest)" and "that does not otherwise hold any kind or type of assets, including an ownership interest in any corporation, limited liability company, or other similar entity." 31 U.S.C. §§ 5336(a)(11)(B)(i)-(xxiii).

29.    The CTA also delegates to the Secretary of the Treasury the discretion to exempt additional classes of entities when filing requirements "would not serve the public interest" and "would not be highly useful in national security, intelligence, and law enforcement agency efforts to detect, prevent, or prosecute money laundering, the financing of terrorism, proliferation finance, serious tax fraud, or other crimes." *Id.* at § (a)(11)(B)(xxiv).

30.    The term "beneficial owner" in the Act—"means, with respect to an entity, an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id.* at § (a)(3).

31.    The Act's coverage is both wildly over- and under-inclusive of the entities that are arguably important to serve the Act's stated purposes. It is over-inclusive because the Act's coverage

formula is extraordinarily broad with respect to the approximate 32.6 million existing small entities that it captures in its dragnet. And yet, the Act is under-inclusive of large corporations and especially financial institutions that would seem to be prime targets for those engaging in knowing or unwitting money laundering—given that these institutions succeeded in securing exemptions from coverage when the Act was added to the NDAA legislation.

32.     And yet, no further exemptions have been granted under the constitutionally questionable delegation of lawmaking power to determine who is and is not subject to potential criminal liability. Thus, the Act covers countless millions of small entities, with or without commercial or international trade activities, that bear proportionally higher compliance costs than larger corporations (assuming they are even aware of the Act's existence).

33.     Once reports are filed, FinCEN must retain the information for "not fewer than 5 years after the date on which the reporting company terminates," and "may disclose" the information upon request "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity" or "from a State, local, or Tribal law enforcement agency, if a court of competent jurisdiction, including any officer of such a court, has authorized the law enforcement agency to seek the information in a criminal or civil investigation." 31 U.S.C. §§ 5336(c)(1), (2)(B).

34.     FinCEN may also disclose beneficial ownership information upon certain requests from foreign entities, "financial institution[s] subject to customer due diligence requirements," or "a Federal functional regulator or other appropriate regulatory agency." *Id.* at § (c)(2)(B).

35.     Willful failures "to report complete or updated beneficial ownership information," or willfully "provid[ing], or attempt[ing] to provide, false or fraudulent beneficial ownership information" is unlawful, and punishable by "a civil penalty of not more than $500 for each day

that the violation continues or has not been remedied" and criminal penalties of a fine of "not more than $10,000," or a sentence of imprisonment "for not more than 2 years, or both." *Id.* at §§ (h)(1)-(3).

36.     Beneficial ownership information is also presumptively "confidential," and disclosure except as authorized by the Act is likewise subject to civil and criminal penalties. 31 U.S.C. § 5336(h)(2).

37.     There is significant evidence that the CTA was intended, at least in part, to compel disclosures of the identities of political donors. The original version of the Act was introduced in 2017, and its co-sponsor Senator Sheldon Whitehouse was explicit about his goals. In a speech Senator Whitehouse gave on the Senate floor in 2017, he explained that a beneficial ownership reporting regime would provide a means of stopping what he saw as the "unprecedented dark money flow into our elections from anonymous dark money organizations, groups that we allow to hide the identities of their big donors," such as "American dark money emperors, like the Koch brothers." Congressional Record, Vol. 163, No. 101 at S3468 (Senate, June 14, 2017). Senator Whitehouse blamed this perceived problem on "the *Citizens United* decision," which "permit[ed] big money to flow through dark money channels." *Id.* Requiring disclosures of "beneficial ownership" information was the antidote to anonymous political donations. *Id.* By tracking "the actual owners of companies" law enforcement could stop entities from "funneling money into our elections through faceless shell companies," and allow the government to determine "the identities behind big political spending." *Id.* at S3469. Since the Act was passed, it has even been hailed by commentators because it "can shine light on dark money in U.S. elections." Devon Himelman, *How the Corporate Transparency Act Can Shine Light on Dark Money in U.S. Elections*, Global Anticorruption Blog (April 15, 2022), *available at*

https://globalanticorruptionblog.com/2022/04/15/how-the-corporate-transparency-act-can-shine-light-on-dark-money-in-u-s-elections/.

### B. Implementing Regulations

38.    On September 30, 2022, Treasury and FinCEN issued implementing regulations, Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498 (Sept. 30, 2022) (Reporting Rule).

39.    According to Treasury: "These regulations implement Section 6403 of the Corporate Transparency Act (CTA), enacted into law as part of the National Defense Authorization Act for Fiscal Year 2021 (NDAA), and describe who must file a report, what information must be provided, and when a report is due. These requirements are intended to help prevent and combat money laundering, terrorist financing, corruption, tax fraud, and other illicit activity, while minimizing the burden on entities doing business in the United States." Reporting Rule, 87 Fed. Reg. at 59498.

40.    The Reporting Rule mostly tracked the CTA's statutory language, and set out comprehensive requirements at 31 C.F.R. Part 1010.

41.    The Reporting Rule also provided that any "reporting company created on or after January 1, 2024 shall file a report within 30 calendar days of the earlier of the date on which it receives actual notice that its creation has become effective or the date on which a secretary of state or similar office first provides public notice . . . that the [] reporting company has been created." 31 C.F.R. §§ 1010.380(a)(1)(i), (ii).

42.    "Any domestic reporting company created before January 1, 2024 and any entity that became a foreign reporting company before January 1, 2024 shall file a report not later than January 1, 2025." *Id.* at § (a)(1)(iii).

43.    Corrected or updated information must be filed "within 30 calendar days" of changes of reportable information. *Id.* at §§ (a)(2), (3).

44.    The Reporting Rule further defined a beneficial owner's "substantial control" in non-exhaustive terms, including where an individual: "(A) Serves as a senior officer of the reporting company; (B) Has authority over the appointment or removal of any senior officer or a majority of the board of directors (or similar body); (C) Directs, determines, or has substantial influence over important decisions made by the reporting company, including decisions regarding: (1) The nature, scope, and attributes of the business of the reporting company, including the sale, lease, mortgage, or other transfer of any principal assets of the reporting company; (2) The reorganization, dissolution, or merger of the reporting company; (3) Major expenditures or investments, issuances of any equity, incurrence of any significant debt, or approval of the operating budget of the reporting company; (4) The selection or termination of business lines or ventures, or geographic focus, of the reporting company; (5) Compensation schemes and incentive programs for senior officers; (6) The entry into or termination, or the fulfillment or non-fulfillment, of significant contracts; (7) Amendments of any substantial governance documents of the reporting company, including the articles of incorporation or similar formation documents, bylaws, and significant policies or procedures; or (D) Has any other form of substantial control over the reporting company." 31 C.F.R. § 1010.380(d)(1)(i).

45.    The Reporting Rule adopts a similarly expansive definition of "direct or indirect exercise of substantial control," providing that an "individual may directly or indirectly, including as a trustee of a trust or similar arrangement, exercise substantial control over a reporting company through: (A) Board representation; (B) Ownership or control of a majority of the voting power or voting rights of the reporting company; (C) Rights associated with any financing arrangement or

interest in a company; (D) Control over one or more intermediary entities that separately or collectively exercise substantial control over a reporting company; (E) Arrangements or financial or business relationships, whether formal or informal, with other individuals or entities acting as nominees; or (F) any other contract, arrangement, understanding, relationship, or otherwise." *Id.* at § (d)(1)(ii).

46.     The Reporting Rule also declined to create additional categories of exemptions; instead, it merely set out the 23 categories found in the statute. *See id.* at § (c)(2).

47.     With respect to exemptions for tax-exempt entities, the rule adopts the statutory exemption verbatim. *See id.* at § (c)(2)(xix). FinCEN also pointedly rejected the argument that the exemption extend to "entities that had applied to the IRS for tax-exempt status but were still awaiting a determination" or other "nonprofits . . . that did not qualify for tax-exempt status under section 501(c) of the Internal Revenue Code." Reporting Rule, 87 Fed. Reg. at 59541. Instead, FinCEN relied on "concerns raised about potential exploitation of this exemption as well as the following exemption for entities assisting tax-exempt entities." *Id*. at 59541–42.

## II. THE EFFECT ON PLAINTIFFS

48.     As FinCEN recognized, the Act and its Reporting Rule "will have a significant economic impact on a substantial number of small entities." *Id.* at 59549.

49.     "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id.* at 59584.

50.     "Assuming that all reporting companies are small businesses, the burden hours for filing [beneficial ownership information] BOI reports would be 126.3 million in the first year of the reporting requirement (as existing small businesses come into compliance with the rule) and 35

million in the years after. FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after." *Id.* at 59585–86.

51.     Plaintiffs are just some of those affected entities.

### A. Texas Top Cop Shop, Inc.

52.     Plaintiff Texas Top Cop Shop, Inc., is a corporation organized under the laws of Texas and registered with the Texas Secretary of State since 2017.

53.     Texas Top Cop Shop is a family-run business that operates a single retail storefront in Conroe, Texas, which sells uniforms and equipment for first responders, such as police officers and emergency services personnel.

54.     Texas Top Cop Shop sells its merchandise locally and does not sell any items out of state or through the internet.

55.     Texas Top Cop Shop has four employees, including its owners.

56.     Texas Top Cop Shop is a licensed dealer of firearms. To obtain such a license, its owners were thoroughly investigated and determined to be law-abiding U.S. citizens.

57.     Texas Top Cop Shop has designated a registered agent and office location with the State of Texas, but has not disclosed the identities of each of its officers, shareholders, and beneficial owners.

58.     Under Texas law, "[a] corporation is presumed to be a separate entity from its officers and shareholders. As a result, the corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations." *Durham v. Accardi*, 587 S.W.3d 179, 184 (Tex. App.—Houston [14th Dist.] 2019) (citations omitted).

59.    While a corporation must register with the Texas Secretary of State, it need not disclose the identities of all of its beneficial owners. *See* Texas Business Organizations Code § 20.001 (filing requirements).

60.    As a pre-existing corporation registered with the Texas Secretary of State, Texas Top Cop Shop would be required to comply with the CTA and must file beneficial ownership reports with FinCEN before January 1, 2025.

61.    Texas Top Cop Shop would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

62.    Texas Top Cop Shop has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because Texas Top Cop Shop objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

63.    Texas Top Cop Shop advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

**B. Data Comm for Business, Inc.**

64.    Plaintiff Data Comm for Business, Inc., is a Delaware corporation with operations in Illinois and Texas. Data Comm is registered to do business as a foreign corporation with the Illinois Secretary of State.

65.    Data Comm is a small business that provides technical support, information technology, and communications products and services to other small businesses and individuals, as well as utility companies and federal agencies.

66.    Data Comm conducts many of its operations in Illinois, but several of its officers, directors, and owners reside in Texas. Its principal place of business is in Plano, Texas.

67.    Data Comm has 10 employees.

68.    As a Delaware corporation, Data Comm is a distinct legal entity from its officers, directors, and owners. *See Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973) (discussing corporate veil).

69.    Data Comm is not required to disclose the identities of its beneficial owners as a condition of registering to do business in Illinois. *See* 805 ILCS 5/13.05 (filing requirements for foreign corporations).

70.    As a pre-existing corporation registered with the Illinois Secretary of State, Data Comm would be required to comply with the CTA, and must file beneficial ownership reports with FinCEN before January 1, 2025.

71.    Data Comm would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

72.    Data Comm has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because Data Comm objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

73.    Data Comm advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

### C. Russell Straayer

74.    Plaintiff Russell Straayer is an individual residing in Collin County, Texas.

75.     Straayer is a "beneficial owner" of multiple "reporting companies" as those terms are defined by the CTA.

76.     For example, Straayer is a beneficial owner and officer of Data Comm, where he serves as Chief Executive Officer.

77.     Straayer is not the only beneficial owner of Data Comm, however.

78.     Straayer is also a beneficial owner of other reporting companies that are not a party to this litigation.

79.     Straayer has been a vocal opponent of the CTA, and has publicly stated his individual opposition to the Act.

80.     One of the reporting companies for which Straayer is a beneficial owner, does not take a public stance on the validity or wisdom of the CTA, and does not wish to be associated with Straayer's advocacy.

81.     Straayer has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose all of his beneficial ownership interests in various entities (as defined by the CTA) absent a judicial declaration that he is required to comply with the CTA and the Reporting Rule, because he objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

### D. Mustardseed Livestock LLC

82.     Plaintiff Mustardseed Livestock LLC is a limited liability company organized under the laws of Wyoming and registered with the Wyoming Secretary of State since 2020.

83.     Mustardseed operates a small dairy farm in Lingle, Wyoming, and does business only in the State of Wyoming.

84.     Mustardseed operates primarily as a small family farm and does not engage in interstate commercial activities.

85.     Mustardseed consumes most of its production on its own property, but it occasionally sells surplus raw milk directly to customers in Wyoming.

86.     In 2023, Mustardseed's gross income from milk sales did not exceed $30,000.

87.     Mustardseed's gross income for all sources in 2024 is not expected to exceed $50,000.

88.     Mustardseed has designated a registered agent and registered office, but has not disclosed to the State of Wyoming the identities of each of its members.

89.     A Wyoming LLC "is an entity distinct from its members," and "may have any lawful purpose regardless of whether for profit." Wyo. Stat. §§ 17-29-104(a),(b).

90.     Wyoming law "governs . . . [t]he internal affairs of a limited liability company[.]" Wyo. Stat. § 17-29-106.

91.     Wyoming state law permits anonymous ownership in LLCs, and requires only that an LLC disclose a registered agent, who may or may not have an ownership interest in the company, and a registered office within the state where it will accept service of process. *See* Wyo. Stat. §§ 17-28-106 (registration requirements generally), 17-29-113(a) (rules for LLCs).

92.     As a pre-existing LLC registered with the Wyoming Secretary of State, Mustardseed would be required to comply with the CTA, and must file beneficial ownership reports with FinCEN before January 1, 2025.

93.     Mustardseed would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

94.    Mustardseed has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because Mustardseed objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

95.    Mustardseed advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

### E. Libertarian Party of Mississippi

96.    MSLP is a political organization, whose members seek to advance the platform of the National Libertarian Party within the State of Mississippi, through advocacy and elections for state and local office.

97.    MSLP is organized under the laws of the State of Mississippi, and is currently registered with the Mississippi Secretary of State.

98.    MSLP is committed to individual liberty and personal responsibility, a free-market economy of abundance and prosperity, and a foreign policy of non-intervention, peace, and free trade. MSLP further seeks a world of liberty; a world in which all individuals control their own lives and are never forced to compromise their values or sacrifice their property.

99.    MSLP espouses and promotes a robust separation of the state and federal government, and believes that individual liberty can best be protected by a strictly-limited federal governmentthat does not interfere with or restrict the rights of individuals.

100.    MSLP espouses and advocates for the adoption of the National Libertarian Party's platform within Mississippi state and local government.

101.    MSLP specifically advocates for the promotion and protection of individual privacy and government transparency. MSLP is committed to ending the government's practice of spying on everyone. MSLP supports the rights recognized by the Fourth Amendment to be secure in our persons, homes, property, and communications. MSLP believes that protection from unreasonable searches and seizures should include records held by third parties, such as email, medical, and library records.

102.    MSLP also advocates and supports the right to liberty of speech and action—accordingly it opposes all attempts by government to abridge the freedom of speech and press, as well as government censorship in any form.

103.    MSLP has publicly advocated for the repeal of the CTA because its obligations impermissibly intrude on state sovereignty, it subjects law-abiding people to unconstitutional restrictions on free speech and association, and unlawfully intrudes into citizens' private papers and effects.

104.    MSLP is not currently regarded as a political organization pursuant to Section 527 of the Internal Revenue Code, and thus is required to comply with the CTA.

105.    MSLP has no physical office, instead conducting its activities through its members.

106.    MSLP is a political organization that receives donations from individuals and entities, which it uses to promote political candidates for office in Mississippi and policies affecting the residents of the state.

107.    MSLP has less than $20,000 in assets, which it derived from donations, and which it uses solely for political expenditures for local candidates for office in the State of Mississippi, or state and local public policy issues affecting the residents of Mississippi.

108.    MSLP does not engage in economic activities outside of the State of Mississippi, and does not make political expenditures for candidates or issues outside of the state.

109.    MSLP has designated a registered agent and registered address with the State of Mississippi, but has not disclosed the identities of each of its members, officers, delegates, volunteers, major donors, or others who have beneficial ownership interests or substantial control over MSLP.

110.    MSLP's bylaws control its corporate operations, and provide for governance by officers, each of whom must be a member of the state party and chosen by party members as officers, as well as appointment of governing committees, and voting delegates.

111.    MSLP's bylaws require that a majority of its executive committee, which is comprised of state party officials, must authorize the expenditure of any party money.

112.    MSLP's bylaws also provide for amendment of the bylaws at the suggestion of any member of the state party, and will be enacted by a 2/3 majority of voting delegates, which are registered members of the state party.

113.    Mississippi law regards MSLP as a distinct legal entity, separate from its members, and does not require disclosure of its members, officers, beneficial owners or control persons. *See* Miss. Code §§ 79-11-105 (requirements for filing of documents); 79-11-181 (liability of members).

114.    Mississippi also specifically forbids use and disclosure of "a membership list or any part thereof" of a nonprofit corporation, without the consent of the board. *See* Miss. Code § 79-11-291.

115.    As a pre-existing nonprofit corporation registered with the Mississippi Secretary of State, MSLP would be required to comply with the CTA, and must file beneficial ownership reports with FinCEN before January 1, 2025.

116.    MSLP would be forced to incur compliance costs should it be forced to file the required reports, including the cost of legal services related to reviewing relevant records and filings.

117.    MSLP has not filed any beneficial ownership reports with FinCEN, and does not intend to disclose the identities of its beneficial owners (as defined by the CTA) absent a judicial declaration that it is required to comply with the CTA and the Reporting Rule, because MSLP objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and invasion of private papers and effects protected by the Fourth Amendment.

118.    MSLP advocates for the repeal of the CTA, but does so as a corporate entity, in part, to protect the associational privacy interests of its beneficial owners.

### F. NFIB and Its Members

119.    The National Federation of Independent Business, Inc., is a tax-exempt organization under section 501(c) of the Internal Revenue Code and is exempt from the CTA and the Reporting Rule.

120.    While NFIB is exempt from the CTA, significant numbers of its approximately 300,000 members would be required to comply with the Act. These members include:

    a.    Plaintiffs Texas Top Cop Shop and Data Comm; and

    b.    Grazing Systems Supply, Inc., which is an Indiana corporation, registered to do business with the Indiana Secretary of State, with its principal place of business in Batesville, Indiana. Grazing Systems Supply, Inc. is a family-owned and family-run business. Started in 1989 as a part time business, it has successfully grown to a full-time agricultural supply business specializing in seed and fencing sales. Grazing Systems Supply, Inc. has five total employees. Because Grazing Systems Supply, Inc. has fewer than 20 full-time employees, it must comply with the reporting requirements of the CTA.

121.     NFIB's members would be forced to incur compliance costs should they file the required reports, including the cost of legal services related to reviewing relevant records and filings.

122.     NFIB and its members oppose the CTA, and NFIB has advocated publicly for its repeal on behalf of its members that must comply with the Act and the Reporting Rule.

123.     As an example of NFIB's advocacy, on April 30, 2024, NFIB sent a letter on behalf of its members to the U.S. House Committee on Small Business, urging Congress to repeal the CTA. (Exhibit A).

124.     Individual NFIB members, including Plaintiff Data Comm and Grazing Systems Supply, Inc., likewise advocated on their own behalf for the CTA's repeal in an NFIB-led letter to the U.S. House Committee on Small Business. (Exhibit A at 5-6). Data Comm and Grazing Systems Supply, Inc., advocated for the CTA's repeal through their corporate entities in part to protect the associational privacy interests of their beneficial owners.

### COUNT I—VIOLATION OF U.S. CONSTITUTION
### The CTA Exceeds Congress's Authority Over the States
### (U.S. Const. Art. I, amends. IX, X)

125.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

126.     The federal government is one of limited, enumerated, powers.

127.     The Tenth Amendment confirms that the federal Constitution reserves all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States," "to the States respectively, or to the people."

128.     An individual plaintiff may challenge federal action as exceeding Congress's limited, and enumerated, powers. *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete,

particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.").

129.    "Throughout the history of American law, the definition and supervision of business entities has been the task of the states. At the Constitutional Convention, during the Progressive Era, and at the height of the New Deal, the federal government debated whether to enter the corporate area itself and every time declined." Boyer, *supra* at 1037–38.

130.    For the first time in our nation's history, however, Congress has attempted to "set a clear, Federal standard for incorporation practices" using the CTA. 31 U.S.C. § 5336 note (5)(A).

131.    The CTA thus displaces state control over corporate formation and internal affairs, regardless of whether a local entity engages in any interstate or national conduct.

132.    "The Corporate Transparency Act is unconstitutional because it cannot be justified as an exercise of Congress' enumerated powers." *Nat'l Small Bus. United v. Yellen*, --- F.Supp.3d ---, No. 5:22-cv-1448-LCB, 2024 WL 899372, at *21 (N.D. Ala. Mar. 1, 2024), *appeal filed* at No. 24-10736 (11th Cir.).

133.    This is because the Act, on its face, requires "reporting companies" to create records and file them with the federal government, regardless of whether those companies engage in *any activity* that is within the scope of Congress's enumerated powers, such as interstate or foreign commerce or incurring federal tax liability. Instead, the Act improperly compels action merely because an entity has been formed as a matter of state law. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012) (Congress may "anticipate the effects on commerce of an economic activity," but it has never been "permitted . . . to anticipate that activity itself in order to regulate individuals not currently engaged in commerce.").

134.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction declaring the Act to be unconstitutional on its face and/or as-applied to Plaintiffs, prohibiting Defendants from enforcing the Act, and awarding attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

**COUNT II—VIOLATION OF U.S. CONSTITUTION**
**The CTA Improperly Compels Speech and Burdens Association**
**(U.S. Const. amend. I)**

135.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

136.    The First Amendment prohibits Congress from "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

137.    The Supreme Court has "rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.'" *Citizens United v. FEC*, 558 U.S. 310, 343 (2010) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978)). "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (quoting *Bellotti*, 435 U.S. at 783).

138.    Implicit in the First Amendment's protections is the right of anonymous association. *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 605–08 (2021) (*AFP*) (plurality op.). Indeed, "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).

139.    "Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *AFP*, 594 U.S. at 608. "Under that standard, there must be a substantial

relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id*. at 607 (cleaned up). Further, "a reasonable assessment of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Id*. at 611.

140.    The CTA compels disclosure of "beneficial ownership" information to FinCEN, and potentially to state and local law enforcement and federal regulators—but those "beneficial owners" include individuals who "indirectly" "exercise[] substantial control over the entity," even when that control might not be formalized. 31 U.S.C. § 5336(a)(3)(A). Even the Act recognizes that beneficial ownership is presumptively "confidential" Information. *Id.* at § 5336(c)(2)(A).

141.    This means that key employees, directors, indirect beneficiaries, and significant donors must disclose their identities. *Id*.; *accord* 31 C.F.R. § 1010.380(d)(1)(ii).

142.    Furthermore, the Congressional record affirms that the Act was intended to allow the government to determine "the identities behind big political spending." Congressional Record, Vol. 163, No. 101 at S3469.

143.    Plaintiffs have engaged in expressive association through their corporate entities, such as advocating for the repeal of the Act.

144.    Plaintiffs have a protected interest in maintaining the anonymity of their beneficial owners (as defined by the Act), because they have chosen to engage in expressive advocacy through their corporate forms.

145.    The Act's stated goals are to "(A) set a clear, Federal standard for incorporation practices; (B) protect vital Unites (sic) States national security interests; (C) protect interstate and foreign commerce; (D) better enable critical national security, intelligence, and law enforcement efforts to

counter money laundering, the financing of terrorism, and other illicit activity; and (E) bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards."

146.    The Act is not narrowly tailored to any of its goals, however, as applying the statute to every state corporation or limited liability company, such as Plaintiffs, no matter an entity's size or purpose, and even when they lack any assets at all, does not advance any of these aims.

147.    Likewise, the fact that the statute exempts large corporations and 22 other types of entities, almost all of which are primarily or even exclusively involved in financial transactions, shows that the statute is not narrowly tailored to investigating and preventing financial crimes. *See* 31 U.S.C. § 5336(a)(11)(B). Indeed, FinCEN rejected calls to narrow the statutes reach, because of its dubious insistence that there remains the remote possibility that any charity may still be involved in illicit transactions. *See* Reporting Rule, 87 Fed. Reg. at 59541–42.

148.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction declaring the Act to be unconstitutional on its face and/or as-applied to Plaintiffs, prohibiting Defendants from enforcing the Act, and awarding attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### COUNT III—VIOLATION OF U.S. CONSTITUTION
### The CTA Unconstitutionally Compels Disclosure of Private Information
### (U.S. Const. amend. IV)

149.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

150.    The Fourth Amendment protects the right of the people to be secure in their "persons, houses, papers, and effects" against unreasonable searches and seizures.

151.    "[A]n order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment." *Hale v. Henkel*, 201 U.S. 43, 76 (1906). The "compulsory production of private papers," is both a search and seizure. *Id*. The "papers" protected

by the Fourth Amendment include business records. *See id.* 76–77 (subpoena for "all understandings, contracts or correspondence" between corporation and others and "reports made and accounts rendered by such companies from the date of the organization" was unreasonable under the Fourth Amendment).

152.   The CTA compels disclosure of "sensitive" and "confidential" information to the government for the express purpose of criminal investigation.

153.   Plaintiffs have protected interests in their beneficial ownership information, including interests in the anonymity of their members for expressive purposes, and have protected the information subject to CTA disclosures.

154.   Under the Act, however, a reporting company cannot refuse to disclose private information to the government and can face criminal penalties for noncompliance.

155.   The Act requires disclosure without any particularized suspicion of wrongdoing and without any precompliance review process where a reporting company can challenge the Act's requirements. The Act also authorizes disclosure of private, personal information to foreign governments, federal regulators, and regulatory agencies for the purposes of law enforcement, without any court authorization or specific requirements regarding those agencies' need for the information.

156.   The CTA's mandatory reporting requirements violate the Fourth Amendment's protections against unreasonable searches and seizures. *See City of L.A. v. Patel*, 576 U.S. 409, 419–20 (2015).

157.   As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction declaring the Act to be unconstitutional on its face and/or as-applied to Plaintiffs, prohibiting Defendants from enforcing the Act, and awarding attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

### COUNT IV—VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT
### The Reporting Rule Is Not In Accordance With Law And Is Contrary to Constitutional Right
### (5 U.S.C. § 706(2))

158.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

159.    The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside" any agency rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

160.    The Reporting Rule is "final agency action," which is reviewable under the APA. *See* 5 U.S.C. § 704.

161.    The Reporting Rule, issued after notice and comment rulemaking, marks the consummation of Treasury's decision-making process concerning the implementation of the CTA.

162.    The Reporting Rule also determines rights and legal obligations, as it purports to establish filing deadlines, including the time to file initial reports and corrected reports, and sets out criteria for determining what information must be reported.

163.    The Act's reporting requirements exceed Congress's power, and violate First and Fourth Amendment protections. Thus the Reporting Rule is constitutionally invalid.

164.    As a result of the foregoing, Plaintiffs are entitled to a declaratory judgment and permanent injunction barring Defendants from enforcing the Reporting Rule, vacatur of the rule, attorneys' fees, expenses, costs and disbursements, and any other relief that may be appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiffs demand judgment against Defendants as follows:

(i) The issuance of an injunction prohibiting Defendants from enforcing the Corporate Transparency Act and the Reporting Rule pursuant to 5 U.S.C. § 705 and 28 U.S.C. § 2201;

(ii) A declaratory judgment, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. § 2202, invalidating the Corporate Transparency Act and holding unlawful and setting aside the Reporting Rule;

(iii) An award of attorneys' fees and costs to Plaintiffs; and

(iv) Any other relief as the Court deems just, equitable and proper.

May 28, 2024                                    Respectfully submitted,


                                               */s/ John C. Sullivan*
                                               John C. Sullivan
                                               Texas Bar No. 24083920
                                               **S|L LAW PLLC**
                                               610 Uptown Blvd, Suite 2000
                                               Cedar Hill, TX 75104
                                               T: 469.523.1351
                                               F: 469.613.0891
                                               john.sullivan@the-sl-lawfirm.com


                                               */s/ Caleb Kruckenberg*
                                               Caleb Kruckenberg*
                                               Todd Gaziano*
                                               **CENTER FOR INDIVIDUAL RIGHTS**
                                               1100 Connecticut Ave. NW
                                               Suite 620
                                               Washington, DC, 20036
                                               kruckenberg@cir-usa.org
                                               gaziano@cir-usa.org

                                               *Counsel for Plaintiffs*


                                               *Motion for Admission *Pro Hac
                                               Vice* Pending