**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>        Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY<br>GENERAL OF THE UNITED STATES,<br>ET AL.,<br>        Defendants. | CIVIL ACTION NO.: 4:24-CV-00478<br><br>**<u>MOTION FOR PRELIMINARY<br>INJUNCTION</u>** |

Pursuant to Fed. R. Civ. P. 65(a), Plaintiffs move for a preliminary injunction, prohibiting Defendants[1] from enforcing the Corporate Transparency Act, 31 U.S.C. § 5336, and its implementing regulations, 31 CFR § 1010.380, pending further proceedings. The Act and regulations are likely unconstitutional for three reasons. First, the federal government lacks the power to regulate entities organized under state law merely because they have registered with their home state. Congress has no enumerated power to regulate state corporate organization and other purely local activities that have always been regulated exclusively by the states. Second, the Act restricts associational rights protected by the First Amendment because it forces entities to disclose the identities of individuals associated with the entity's expressive activities. Finally, the Act violates the Fourth Amendment because it mandates invasive disclosures on pain of criminal punishment without any particularized suspicion or precompliance review from a neutral party. Despite these constitutional defects, the Act and associated regulations require Plaintiffs to file reports with the U.S. Department of Treasury prior to January 1, 2025. Unless Defendants are enjoined, Plaintiffs must incur substantial compliance costs prior to that filing deadline in service of an unconstitutional statute. This Court should therefore enter an injunction as soon as possible.

---

[1] Defendants are collectively the federal officers and agencies responsible for enforcing the Act and its regulations.

## FACTS AND LEGAL BACKGROUND

On January 1, 2021, Congress enacted the Corporate Transparency Act (CTA), 31 U.S.C. § 5336, which was a federal attempt to regulate in an area of traditional state control. The CTA mandated that any "reporting company," file with the Financial Crimes Enforcement Network (FinCEN) reports of all its "beneficial ownership information." 31 U.S.C. § 5336(b)(1)(A).

A "reporting company" is "a corporation, limited liability company, or other similar entity that is" "created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe;" or "formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* at § 5336(a)(11). The CTA exempts large companies (those employing more than 20 people and generating more than $5,000,000 per year in gross revenue), all publicly-traded companies, and essentially all businesses involved in finance. *See id.* at § (a)(11)(B). A non-profit is exempt only if it has an active exemption under section 501(c) of the Internal Revenue Code or if it is a "political organization (as defined in section 527(e)(1) of such Code) that is exempt from tax under section 527(a) of such Code." *Id.* at § (a)(11)(B)(xix).

Both pre-existing and newly formed entities are required to identify each "beneficial owner" of the entity, by providing the "full legal name," "date of birth," and current address of every natural person who "directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise—(i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity[.]" *Id.* at §§ (a)(3), (b)(1). Each beneficial owner must also provide a non-expired photo identification to FinCEN to prove their identity. *Id.* at § (a)(1). Entities must update this information regularly if it changes. *Id.* at § (b)(1)(D). Failures to file reports or update reports can be criminally enforced. *Id.* at § (h)(3).

FinCEN must disclose this information when requested "from a Federal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity" or "from a State, local, or Tribal law enforcement agency," if authorized by a court. *Id.* at § (c)(2)(B). The CTA also delegates to the Secretary of Treasury the discretion to authorize additional disclosures "to financial institutions and regulatory agencies." *Id.* at § (c)(2)(C).

There is significant evidence that the CTA was intended, at least in part, to compel disclosures of the identities of political donors. The original version of the Act was introduced in 2017, and its co-sponsor Senator Sheldon Whitehouse was explicit about his goals. In a speech Senator Whitehouse gave on the Senate floor in 2017, he explained that a beneficial ownership reporting regime would provide a means of stopping what he saw as the "unprecedented dark money [that] flow into our elections from anonymous dark money organizations, groups that we allow to hide the identities of their big donors," such as "American dark money emperors, like the Koch brothers." Congressional Record, Vol. 163, No. 101 at S3469 (Senate, June 14, 2017). By tracking "the actual owners of companies" law enforcement could stop entities from "funneling money into our elections through faceless shell companies," and allow the government to determine "the identities behind big political spending." *Id.* Since the Act was passed, it has even been hailed by commentators because it "can shine light on dark money in U.S. elections." Devon Himelman, *How the Corporate Transparency Act Can Shine Light on Dark Money U.S. Elections*, Global Anticorruption Blog (April 15, 2022) *available at* https://globalanticorruptionblog.com/2022/04/15/how-the-corporate-transparency-act-can-shine-light-on-dark-money-in-u-s-elections/.

FinCEN has issued regulations implementing the CTA. *See* 31 CFR § 1010.380. Every non-exempt corporate entity in the United States must register its beneficial ownership information

with FinCEN prior to January 1, 2025. *See id.* at § (a)(1). Once filed, reports must be updated within 30 days for any change in reported information. *Id.* at § (a)(2). FinCEN rejected the argument that the exemption for tax-exempt entities should extend to "entities that had applied to the IRS for tax-exempt status but were still awaiting a determination" or other "nonprofits ... that did not qualify for tax-exempt status under section 501(c)." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59542 (Sept. 30, 2022) (Reporting Rule). Instead, FinCEN pointed to "concerns raised about potential exploitation of this exemption as well as the following exemption for entities assisting tax-exempt entities." *Id.* at 59542-43.

**The Effect on Plaintiffs**

As FinCEN recognized, the CTA and its Reporting Rule "will have a significant economic impact on a substantial number of small entities." 87 Fed. Reg. at 59550. "FinCEN estimates that there will be approximately 32.6 million existing reporting companies and 5 million new reporting companies formed each year." *Id.* at 59585. "Assuming that all reporting companies are small businesses, the burden hours for filing BOI [beneficial ownership information] reports would be 126.3 million in the first year of the reporting requirement (as existing small businesses come into compliance with the rule) and 35 million in the years after. FinCEN estimates that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after." *Id.* at 59585-86. Plaintiffs are just some of those affected entities.

Texas Top Cop Shop, Inc., is an existing Texas corporation, which operates as a family-run retail storefront in Conroe, Texas, selling uniforms and equipment for first responders, such as police officers and emergency services personnel. Ex. A at ¶¶ 3-4 (Schneider Decl.). It sells its merchandise locally and does not sell any items out of state or through the internet. *Id.* at ¶ 5. It has four employees, including its owners. *Id.* at ¶ 6. It is also a member of the National Federation

of Independent Business (NFIB). *Id.* at ¶ 3. Texas Top Cop Shop is a reporting company under the CTA, and must file its initial report with FinCEN before 2025. *Id.* at ¶ 9.

Texas Top Cop Shop is also licensed dealer of firearms. *Id.* at ¶ 7. To obtain such a license, its owners were thoroughly investigated and determined to be law-abiding U.S. citizens. *Id.*

Data Comm for Business, Inc., is an existing Delaware Corporation, registered in Illinois, with its principle place of business in Plano, Texas. Ex. B at ¶¶ 3, 5 (Data Comm Decl.). Data Comm is a small business that provides technical support, information technology, and communications products and services to other small businesses and individuals. *Id.* at ¶ 4. Data Comm has 10 employees, and is a member of NFIB. *Id.* at ¶¶ 3, 6. Data Comm is a reporting company under the CTA and must file initial BOI reports before 2025. *Id.* at ¶ 8.

Russell Straayer is an individual who resides in Collin County, Texas, and is a "beneficial owner" of multiple "reporting companies" as those terms are defined by the CTA. Ex. C at ¶¶ 2-3 (Straayer Decl.). Straayer is both a part owner and serves as the Chief Executive Officer of Data Comm, although he is not the only beneficial owner. *Id.* at ¶¶ 4-5. He is also a beneficial owner of other reporting companies that are not a party to this litigation. *Id.* at ¶ 6.

Straayer has been a vocal opponent of the CTA, and has publicly stated his individual opposition to the Act. *Id.* at ¶ 7. One of the reporting companies for which Straayer is a beneficial owner does not take a public stance on the validity or wisdom of the CTA, and does not wish to be associated with Straayer's advocacy. *Id.* at ¶ 8.

Mustardseed Livestock, LLC, is a limited liability company registered in Wyoming, which operates as a small dairy farm in Lingle, Wyoming. Mustardseed is a family farm that sells raw milk directly to consumers in Wyoming (and no other state). Ex. D at ¶¶ 3-6 (Goulart Decl.). It does not have a permanent storefront. *Id.* at ¶ 6. Its typical gross revenue for milk sales is less than

$50,000 annually. *Id.* at ¶¶ 7-8. Mustardseed is a reporting company under the CTA, and must file its initial report with FinCEN before 2025. *Id.* at ¶ 11.

The Libertarian Party of Mississippi is a political organization that is registered as an entity with the State of Mississippi. Ex. E at ¶¶ 3-4 (Lewis Decl.). MSLP is not currently regarded as a political organization pursuant to Section 527 of the Internal Revenue Code, and thus is required to comply with the CTA. *Id.* at ¶¶ 11, 22.

MSLP is a political organization that receives donations from individuals and entities, which it uses to promote political candidates for state office and policies affecting Mississippi residents. *Id.* at ¶ 13. MSLP has no physical office or employees, instead conducting its activities through its volunteer members. *Id.* at ¶ 12. It has less than $20,000 in assets, which it derived from donations, and which it uses solely for political expenditures for local candidates for office in the State of Mississippi, or state and local public policy issues affecting Mississippi residents. *Id.* at ¶ 14. MSLP does not engage in economic activities outside of Mississippi, and does not make political expenditures for candidates or issues outside of the state. *Id.* at ¶ 15.

MSLP is an existing entity that must comply with the CTA before 2025. *Id.* at ¶ 22. Under its bylaws, no individual owns the entity or its assets, but it is controlled by its members, officers, delegates, volunteers, and major donors. *Id.* at ¶¶ 17-19. Its bylaws authorize MSLP to make expenditures only with the authorization of its executive committee, or at the direction of 2/3 of its voting delegates, which are registered members of the state party. *Id.*

The National Federation of Independent Business, Inc. is a membership organization that advocates on behalf of nearly 300,000 member businesses. Ex. F at ¶¶ 4, 6 (Milito Decl.). While NFIB is exempt from the CTA, large numbers of its members must comply, including Texas Top Cop Shop and Data Comm. *Id.* at ¶ 4.

NFIB has advocated publicly for the CTA's repeal on behalf of its members. *Id.* at ¶ 6. For example, on April 30, 2024, NFIB sent a letter on behalf of its members to the U.S. House Committee on Small Business, urging Congress to repeal the CTA. *Id.* at ¶ 7. Several members, including Data Comm, and non-party member Grazing Systems Supply, Inc., also sent letters to the Committee on their own behalf, also advocating for the CTA's repeal. *Id.* at ¶ 8.

All of the plaintiffs oppose the CTA, and wish to protect the relevant information from disclosure. Each objects to the Act's intrusion into state sovereignty, restriction on First Amendment rights, and intrusion into matters protected by the Fourth Amendment. Each corporate plaintiff has also advocated for the repeal of the CTA as an entity, in part, to protect the associational privacy interests of its beneficial owners. None have filed BOI reports with FinCEN.

## DISCUSSION

For a preliminary injunction, "a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm she will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022)

## A. PLAINTIFFS HAVE STANDING TO CHALLENGE THE CTA

"At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020). An association has standing when: "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Ctr. for Bio. Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019) (citation omitted). A member must have "(1) suffered an injury in

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Gill v. Whitford*, 585 U.S. 48, 65 (2018).

"An increased regulatory burden typically satisfies the injury in fact requirement." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (citation omitted). If a "new Rule requires at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols," this is sufficient to permit a pre-enforcement challenge. *Career Colls. & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024) (citation omitted). Moreover, when challenging a law or regulation imposing such burdens, an injunction blocking the law or regulation typically satisfies the traceability and redressability tests. *See id.*

Separately, a plaintiff has standing to raise a pre-enforcement challenge to a law or regulation if he (1) has an "intention to engage in a course of conduct arguably affected with a constitutional interest," (2) his intended future conduct is "arguably ... proscribed by a statute," and (3) "the threat of future enforcement of the [challenged] statute is substantial." *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161-64 (2014) (citations omitted).

But the rules for standing are relaxed in the First Amendment context. A "First Amendment challenge has unique standing issues because of the chilling effect, self-censorship, and in fact the very special nature of political speech itself. It is not hard to sustain standing for a pre-enforcement challenge in the highly sensitive area of public regulations governing bedrock political speech." *Speech First, Inc.*, 979 F.3d at 331 (citation omitted). Moreover, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling contrary evidence." *Id*. at 335 (citation omitted).

Plaintiffs have standing, first, because the CTA and the Reporting Rule result in increased compliance obligations. Each individual plaintiff is required to comply with the CTA and the Reporting Rule, and thus they are all within the 32.6 million existing entities that FinCEN estimated will face "significant economic impact[s]" from the Act. Reporting Rule, 87 Fed. Reg. at 59550, 59585. In fact, FinCEN says "that the total cost of filing BOI reports is approximately $22.7 billion in the first year and $5.6 billion in the years after." *Id.* at 59585-86. Each has confirmed that they will incur such costs unless the Act is enjoined. *See* Ex. A at ¶ 10, Ex. B. at ¶ 9, Ex. C at ¶ 10, Ex. D at ¶ 12, Ex. E at ¶ 23, Ex. F at ¶ 5.

Even without considering the increased compliance issues, Plaintiffs have standing to raise constitutional rights that are threatened by future enforcement. As discussed below, the Act encroaches on constitutional interests, including infringing First Amendment interests in refusing to make these disclosures. The CTA's "mere existence risks chilling First Amendment rights" and thus enables a pre-enforcement challenge. *See N.C. Right to Life, Inc.*, 168 F.3d at 710.

NFIB also has associational standing to sue on behalf of its members. It has identified several of its members who must comply with the CTA and the Reporting Rule, including Plaintiffs Texas Top Cop Shop and Data Comm, and NFIB member Grazing Systems Supply, Inc. Ex. F. at ¶ 4. This challenge to the CTA is also plainly germane to NFIB's purposes, as it regularly advocates for small businesses. *Id.* at ¶ 6. The claim and the requested relief don't require participation of individual members, even though several are participating in this suit.

## B. THE CTA IS LIKELY UNLAWFUL IN SEVERAL WAYS

### 1. THE CTA EXCEEDS CONGRESS' ENUMERATED POWERS

"In our federal system, the National Government possesses only limited powers; the States and the people retain the remainder." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533

(2012). The Tenth Amendment confirms that the federal Constitution reserves all "powers not delegated to the United States by the Constitution, nor prohibited by it to the States," "to the States respectively, or to the people." An individual plaintiff may challenge federal action as exceeding Congress's limited, enumerated, powers. *See Bond v. United States*, 564 U.S. 211, 222 (2011). But, as one district court has already ruled, "the CTA exceeds the Constitution's limits on the legislative branch and lacks a sufficient nexus to any enumerated power to be a necessary or proper means of achieving Congress' policy goals." *Nat'l Small Bus. United v. Yellen*, No. 5:22-cv-1448-LCB, 2024 U.S. Dist. LEXIS 36205, at *4 (N.D. Ala. Mar. 1, 2024), *appeal filed* at No. 24-10736 (11th Cir.).

In that other case, the Government unsuccessfully offered three sources of constitutional authority: (1) the foreign affairs power, (2) the commerce clause, and (3) the necessary and proper clause combined with the taxing power. *Id.* at *18-19. None passed muster. *Id.* at *59.

### a. The States Have Always Had Exclusive Control Over Corporate Formation and Registration

"Throughout the history of American law, the definition and supervision of business entities has been the task of the states. At the Constitutional Convention, during the Progressive Era, and at the height of the New Deal, the federal government debated whether to enter the corporate area itself and every time declined." Allen D. Boyer, *Federalism and Corporation Law: Drawing the Line in State Takeover Regulation*, 47 OHIO ST. L.J. 1037, 1037-1038 (1986).

Even as the Court recognized an increasing role for Congress to regulate interstate commerce, the Supreme Court emphasized that "state law governs in the corporate area. Federal law forms an overlay, significant but secondary, upon state law. It does not provide for business organization, nor does it define or create trusts, partnerships, or corporations. It deals only with the transfer of interests in those business entities." *Id.* at 1056. As the Supreme Court said, "No

principle of corporation law and practice is more firmly established than a State's authority to regulate domestic corporations." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 89 (1987).

### b. The CTA Is Not an Exercise in Foreign Affairs

The "foreign affairs powers" are not enumerated in the Constitution, but are inferred as a necessary aspect of a unified federal government. *See Hines v. Davidowitz*, 312 U.S. 52, 62 (1941). More precisely, this authority is comprised of "the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations[.]" *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). On the latter point, it is typically presumed that the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [relevant] policies are consistent with this Nation's foreign policy with respect to these and other realities." *Id.* at 397.

Not everything implicates foreign affairs or threatens war with foreign nations merely because it has an international element. Thus, when confronted with a statutory reading of an international treaty that threatened to "dramatically intrude[] upon traditional state criminal jurisdiction," the Supreme Court unanimously adopted a narrow interpretation to avoid such constitutional doubt. *Bond v. United States*, 572 U.S. 844, 859-60 (2014). As Justice Scalia wrote in a concurring opinion, "to interpret the Treaty Power as extending to every conceivable domestic subject matter—even matters without any nexus to foreign relations—would destroy the basic constitutional distinction between domestic and foreign powers." *Id*. at 883.

The CTA is not an exercise of some ill-defined, yet plenary, foreign affairs power, as it applies *exclusively* to entities that register "with a secretary of state or a similar office under the law of a State or Indian Tribe." *See* 31 U.S.C. § 5336(a)(11). It is a purely domestic statute, affecting only entities that are registered to do business domestically, and only requires that these

entities file reports with the federal government. *See id*. It has no extraterritorial reach and does not purport to be premised on a treaty or implement an international agreement to which the United States is a party. *See id.* Its only incidental connection to international affairs is that certain entities "formed under the law of a foreign country" must comply if and only if they are "registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.*[2] This case raises the Court's precise concern in *Bond* that the purported exercise of foreign affairs would improperly intrude into state police power. *See* 572 U.S. at 859-60; *accord Dunbar v. Seger-Thomschitz*, 615 F.3d 574, 579 (5th Cir. 2010) (issues "within the realm of traditional state responsibilities" not barred by deference on issues of foreign affairs). The CTA cannot be justified as an exercise of the federal power to conduct foreign affairs.

### c. The CTA Is Not a Valid Exercise of the Commerce Power

"Because the CTA does not regulate commerce on its face, contain a jurisdictional hook, or serve as an essential part of a comprehensive regulatory scheme, it falls outside Congress' power to regulate non-commercial, intrastate activity." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at *55.

Article 1, Section 8, Clause 3 of the U.S. Constitution gives Congress the power "to regulate commerce ... among states." The Court has articulated "three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e.,

---

[2] More obliquely, the Act provides the "sense of Congress," which pointed to a desire to "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards," but this is simply a goal of conforming to policies adopted by other countries, not an invocation of any specific relations with a foreign state, much less an obligation imposed by a formal treaty. *See* 31 U.S.C. § 5336 note § 5(E).

those activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (cleaned up).

The Commerce Clause "must be read carefully to avoid creating a general federal authority akin to the police power." *NFIB*, 567 U.S. at 536. After all, "The founding generation understood the term 'commerce' to mean only 'trade or exchange of goods.'" William J. Seidleck, *Originalism and the General Concurrence*, 3 U. PA. J. L. & PUB. AFFS. 263, 269 (2018).

With respect to the first two categories, the text of the CTA does not regulate the channels and instrumentalities of interstate commerce. The CTA applies to "reporting companies," defined (with a list of exceptions) as entities "created by the filing of a document" "with a secretary of state or a similar office under the law of a State or Indian Tribe." 31 U.S.C. § 5336(a)(11). The CTA then mandates that those entities report information about their beneficial owners and applicants to FinCEN. *Id*. § 5336(b)(1)-(2)(A). The word "commerce," or references to any channel or instrumentality thereof, are nowhere to be found in the CTA. *See* 31 U.S.C. § 5336.

Merely "filing [] a document" with a state registrar is not a sufficient use of the means or instrumentalities of *interstate* commerce to justify the Act. Indeed, the Government conceded as much in prior litigation. *See NSBU*, 2024 U.S. Dist. LEXIS 36205, at *39 ("The Government wisely ... concedes that '[i]t is the activities of these entities, not the mere fact that they submitted documents to a Secretary of State, that implicates the Commerce Clause and permits Congress to exercise its authority.'"). Similarly, it is insufficient that the CTA mandates filing with FinCEN, as Congress can't engineer the relevant interstate nexus by demanding conduct that would not otherwise occur. *See NFIB*, 567 U.S. at 549.

The CTA also cannot be justified by purported aggregate effects on interstate commerce. When a statute relies on this third category the question is whether the statute regulates "an

economic class of activities" or "non-economic activity." *Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 505 (5th Cir. 2011). When "a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute" does not deprive Congress of the ability to regulate that activity. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005). This is true only if the regulated activities "are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Id.*

If, however, the class of activities is *non*-economic, then aggregation is impermissible, and intrastate conduct is beyond the reach of Congress. *See Taylor v. United States*, 579 U.S. 301, 306 (2016) ("While this final category is broad, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature."). In *United States v. Morrison*, 529 U.S. 598, 613 (2000), the Court rejected aggregation because the statute at issue, which punished "[g]ender-motivated crimes of violence," did "not, in any sense of the phrase, [target] economic activity." The *Raich* decision upheld this "pattern of analysis," noting that the statute in *Morrison* was "unconstitutional because . . . it did not regulate economic activity." 545 U.S. at 25; *accord Lopez*, 514 U.S. at 567 (The "possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce.").

A class of *future* economic activity is also not subject to aggregation. "The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions." *NFIB*, 567 U.S. at 557. The Court has always required "preexisting economic activity." *Id*.; *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021) (federal vaccine mandate "likely exceeds the federal government's

authority under the Commerce Clause because it regulates noneconomic inactivity that falls squarely within the States' police power"), *aff'd* 142 S.Ct. 661 (2022).

The CTA does not regulate an "economic class of activity." It regulates the act of registration under state law, irrespective of the presence or absence of any commercial activity. *See* 31 U.S.C. § 5336(a)(11). No goods are sold, no services are provided. The Act applies to non-profit entities, even if they have no assets whatsoever, and even if they don't engage in *any activity*, commercial or otherwise. As FinCEN noted, "nonprofits ... that did not qualify for tax-exempt status under section 501(c)" must still file reports, regardless of their activities. *See* 87 Fed. Reg. at 59542. The government has even admitted in other litigation that the mere act of registering with a state is not economic. *See NSBU*, 2024 U.S. Dist. LEXIS 36205, at *39.

Nor is the CTA a comprehensive regulatory scheme over commerce. "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Raich*, 545 U.S. at 18. The regulatory scheme should, however, "directly regulate economic, commercial activity." *See id*. at 26.

The CTA is not part of a larger regulatory scheme, and Congress did not identify any such regulatory scheme in passing it. A vague goal of "protecting commerce" or "deterring money laundering" is not such a scheme. The CTA's organization also disproves Congress' pretense. Congress chose to require all entities to file reports once they registered with a state, regardless of their activities or non-economic purposes, and then created exemptions that broadly, and irrationally, excluded businesses that were the most likely culprits of international money laundering, such as money transmitters, public companies and large private businesses. *See* 31 U.S.C. § 5336(a)(11)(B). Many non-profits or entities with no assets or activities must still file

reports. This structure makes one thing perfectly clear—the CTA's vague goals would not be undermined if the Act couldn't reach entities engaged in *no* commercial activity and with *no* assets.

Reading *Raich* as a justification for the CTA would bless federal control of every person and entity in the country. Everyone registers with a state or local government at some time in their life—when they attend school, pay taxes, obtain identification, etc. If Congress can use that as a means to prop up a vast federal regulatory scheme, then what could possibly be beyond reach? *Morrison* spoke of "the but-for causal chain from" isolated activities "to every attenuated effect upon interstate commerce" as being impermissible. 529 U.S. at 615. The Court in *Lopez* also warned that courts may not "pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." 514 U.S. at 567. The Court in *NFIB* likewise said, "No matter how inherently integrated" the activity actually regulated (or mandated) by the law is with commerce in the abstract, "they are not the same thing: They involve different transactions, entered into at different times, with different" parties. 567 U.S. at 558. A court should look to the face of the law at issue, and should require, at least, some level of "proximity and degree of connection" between the statute and commerce at large. *Id.* There is no such direct link between filing a document in a state and the CTA's broad concern with international money laundering and illicit finance, and there is indeed, no direct link with registration and any commercial activity that can be extrapolated on a grand scale. The "connection between incorporation and criminal activity is far too attenuated to justify the CTA." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at *41.

### d. The CTA Is Not a Legitimate Exercise of the Taxing Power

The taxing power also does not justify the CTA. The federal government has the enumerated power to "lay and collect Taxes." U.S. Const., Art. I, § 8, cl. 1. But that power only

allows the government to impose "exaction[s]" that "produces at least some revenue for the Government." *NFIB*, 567 U.S. at 564. The CTA imposes no such taxes, though, so it cannot be justified as a direct exercise of that power. *NSBU*, 2024 U.S. Dist. LEXIS 36205, at \*56-57.

This means that the CTA could only be upheld if it was "necessary and proper for carrying into Execution" the taxing power. *See* U.S. Const., Art. I, § 8, cl. 18. But the Necessary and Proper Clause will not justify an act of Congress unless it "involve[s] exercises of authority derivative of, and in service to, a granted power." *NFIB*, 567 U.S. at 560. Rather than provide an independent source of power, the clause merely allows execution of existing powers, and, at most, forgives borderline questions concerning "individual *applications* of a concededly valid statutory scheme." *See id.* (citing *Raich*, 545 U.S. at 72). "When the inquiry is whether a federal law has sufficient links to an enumerated power to be within the scope of federal authority, the analysis depends not on the number of links in the congressional-power chain but on the strength of the chain." *United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring); *but see* Randy E. Barnett, *The Original Meaning of the Necessary and Proper Clause*, 6 U. PA. J. CONST. L. 183, 186 (2003) (the Founders believed the Clause "did not go 'a single step beyond the delegated powers.'").

The connection between the taxing power and the CTA is far too attenuated to pass scrutiny. "It would be a 'substantial expansion of federal authority' to permit Congress to bring its taxing power to bear just by collecting 'useful' data and allowing tax-enforcement officials access to that data." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at \*58 (quoting *NFIB*, 567 U.S. at 560). That kind of unfettered legislative power "is in no way an authority that is 'narrow in scope,' or 'incidental' to the exercise of the [taxing] power." *See NFIB*, 567 U.S. at 560 (citations omitted). Indeed, "even if" the CTA's provisions were "necessary," "such an expansion of federal power is not a 'proper' means for making those [policy goals] effective." *NSBU*, 2024 U.S. Dist. LEXIS 36205, at \*58.

### e. The CTA Is Invalid As-Applied to Certain Plaintiffs

Even if the CTA could be upheld for certain entities with significant interstate commercial activities, as applied to other entities with no meaningful interstate commercial ties, particularly MSLP and Mustardseed, the CTA likely falls outside of the scope of any enumerated power. MSLP is a political party that can only operate within the State of Mississippi, and it can only do so to support local candidates for political office and local issues. Ex. E at ¶¶ 13-15. Moreover, it has very few assets, which it only uses to make local political expenditures. *Id.* Certainly, the federal government has no foreign affairs interests in regulating a state political party. Nor does it have any conceivable basis to use its commerce powers over the MSLP, as deeming its activities to be sufficiently commercial for federal control would require this Court to imaginatively aggregate some non-economic factor to such a degree that it is impossible to conceive of any entity that would be out of federal reach. Nor does the taxing power justify the CTA, as MSLP's tax obligations are well-established and the federal government already has significant, yet tailored, authorities to investigate the party and its finances.

Similarly, Mustardseed is a family dairy farm in the very center of our nation, thousands of miles from any foreign state, engaged in minimal economic activity, all of it completely local. Ex. D at ¶¶ 4-8. It is absurd to think that the federal government has a compelling international interest that would allow it to mandate the CTA's filing regime, much less a national economic interest in regulating the corporate entity itself, divorced from the farm's meager economic activity, or some overriding, yet totally obscured, interest in exacting federal taxes. Instead, MSLP and Mustardseed both demonstrate the extremity of the CTA's intrusion into state affairs.

## 2. THE ACT IMPERMISSIBLY BURDENS ANONYMOUS ASSOCIATION

"[I]mplicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984) (collecting cases). This includes a right to do so anonymously. *Americans for Prosperity v. Bonta*, 141 S.Ct. 2373, 2382-83 (2021) (plurality op.). "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as [other] forms of governmental action." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1958).

"To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association.'" *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The "First Amendment's protection of expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Id.*

Expressive association can come in myriad forms. When any "level" of an "organization ha[s] taken public positions on a number of diverse issues ... [like] civic, charitable, lobbying, fundraising, and other activities," these are all "worthy of constitutional protection under the First Amendment." *Jaycees*, 468 U.S. at 626-27 (citations omitted). Members involved in such endeavors are generally protected in expressing the "views that brought them together." *Id.* at 623. In this vein, the Supreme Court has recognized the expressive association rights of members of organizations that advocate for political, social, and cultural issues, see, e.g., *NAACP*, 357 U.S. at 462, political parties and organizations, see, e.g., *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973), and non-profit organizations of all types, see, e.g., *AFP*, 141 S. Ct. at 2383, *Boy Scouts*, 530 U.S. at

19

656, and *Jaycees*, 468 U.S. at 612. But groups need not engage in political advocacy in order to be protected. *See Boy Scouts*, 530 U.S. at 648. The organization need only have some "conception of the good life," such as advocating that a particular "reform is a good or bad idea." *McDonald v. Longley*, 4 F.4th 229, 245 n.20 (5th Cir. 2021). Furthermore, "[t]he membership is part of the message" when an organization takes such a stance, which means that individual members are free to refuse to associate with the message or conceal their association with it. *See id.* at 245-46.

Moreover, a *for-profit* corporate entity still has the same right to expressive association as any other speaker. "[T]he Government may not suppress political speech on the basis of the speaker's corporate identity." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 365 (2010). And this applies equally to "nonprofit or for-profit corporations." *Id.* Thus, in *303 Creative LLC v. Elenis*, 143 S.Ct. 2298, 2316 (2023), the Court held that a single-member company, engaged in expressive "commercial" activity, had precisely the same expressive rights as any other entity, and thus could refuse to associate its commercial products with ideas it did not share.

"Government actions that may unconstitutionally burden this freedom may take many forms, one of which is intrusion into the internal structure or affairs of an association." *Boy Scouts*, 530 U.S. at 648. "Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *AFP*, 141 S.Ct. at 2383.[3] "Under that standard, there must be a substantial relation between the disclosure requirement and a sufficiently important governmental interest. To withstand this scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id*. Further, "a reasonable assessment

---

[3] This part of Justice Roberts' opinion was only joined by Justices Kavanaugh and Barrett. *Id.* However, a majority of the Court called for *at least* this level of scrutiny. Justice Thomas concurred that the statute was unlawful and argued that the correct standard was strict scrutiny. *Id.* at 2389-90 (Thomas, J., concurring). Justice Alito, joined by Justice Gorsuch, agreed that the statute violated the First Amendment under either standard, but believed it unnecessary to articulate which applied. *Id.* at 2392 (Alito, J., concurring).

of the burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary, and that requires narrow tailoring." *Id*. at 2385.

In applying this standard, the Court recently concluded that a law mandating that charitable organizations disclose the names and addresses of donors who had contributed more than $5,000 in a tax year violated the First Amendment. *Id*. Even though the disclosures were non-public, the Court held that the "disclosure requirement imposes a widespread burden on donors' associational rights. And this burden cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing, or that the State's interest in administrative convenience is sufficiently important." *Id*. at 2389. Because the statute chilled protected conduct, even though it was undoubtedly lawful in certain contexts, the Court held that it was facially invalid. *Id*.

Plaintiffs are engaged in expressive activities, and thus have First Amendment interests in maintaining anonymity of their members. MSLP, of course, is a political party that advocates positions on a wide range of public issues, including the protection of constitutional rights threatened by the CTA, see Ex. E at ¶¶ 3, 5-10, which is the paradigmatic example of an expressive association. *See Kusper*, 414 U.S at 57. As a corporation that makes expenditures that are purely political, it obviously also has an interest in maintaining the privacy of its officers, directors, beneficiaries of its ownership (whoever that might be), and significant donors who exert control over the local party and its platform. It also, unquestionably, has the right to refuse to disclose the identities of its members. *See NAACP*, 357 U.S. at 462.

The other plaintiffs have also been engaged in advocacy targeted at the CTA itself, using the corporate form. While it is itself exempt from the CTA's registration requirements, NFIB has lobbied Congress to repeal the CTA on behalf of its hundreds of thousands of affected members. Ex. F at ¶¶ 6-8. It presents a united voice on political issues affecting small businesses everywhere.

When an organization like NFIB takes such a stance, individual members are free to refuse to associate with the organization or conceal their association. *See McDonald*, 4 F.4th at 245-46.

Texas Top Cop Shop and Data Comm are examples of NFIB's members that have adopted NFIB's advocacy concerning the CTA as their own, see Ex. A at ¶¶ 3, 9, 12, Ex. B at ¶¶ 3, 11-12, meaning that their "membership is part of the message." *See id*. at 245. Further, each business has also publicly advocated for the repeal of the CTA, and Data Comm even sent a letter of its own to a Congressional Committee. Ex. A at ¶¶ 9, 12, Ex. B at ¶¶ 11-12. All are expressive acts, and all could be threatened if the members of each business were required to reveal their identities. *See McDonald*, 4 F.4th at 245-46 (opinion on whether "a reform is a good or bad idea").

While ostensibly neutral, the CTA still demands information that implicates the right to anonymous speech and association and must pass exacting scrutiny. Every reporting company, including charitable or advocacy organizations like MSLP, must disclose to FinCEN, and potentially to state and local law enforcement and federal regulators, its beneficial owners. And those "beneficial owners" include individuals who "indirectly" "exercise[] substantial control over the entity," even when that control might not be formalized. 31 U.S.C. § 5336 (a)(3)(A). Thus, each of the plaintiffs, regardless of their mission, would be required to not only disclose the names of any 25% owners, but also their directors, officers, influential members, or even donors. The Reporting Rule makes this clear, mandating disclosures for senior officers, any person with "substantial influence over important decisions," major expenditures or investments, "[a]mendments of any substantial governance documents of the reporting company, including the articles of incorporation or similar formation documents, bylaws, and significant policies or procedures," or even the scope of operations. 31 C.F.R. § 1010.380(d)(1)(i). This would mean that the plaintiffs would all be required to disclose significant information about their activities, and,

since all have been involved in direct political advocacy, most especially MSLP, they would need to disclose the identities of those people who made the decision to advocate at all. Indeed, because MSLP's bylaws can be amended at the urging of any single state party member, and adopted by a 2/3 majority of voting members, MSLP would need to disclose the identity of each of its registered members, Ex. E at ¶¶ 17-19, even though the Court struck down a law demanding disclosure of "the names and addresses" of NAACP "members" and "agents" more than 60 years ago. *See NAACP*, 357 U.S. at 453. Much less invasive laws have triggered exacting scrutiny. *See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1366 (11th Cir. 1999) (applying exacting scrutiny to "a provision that requires corporate applicants for adult business licenses to disclose the names of 'principal stockholders'"); *Buckeye Inst. v. IRS*, No. 2:22-cv-4297, 2023 U.S. Dist. LEXIS 201628, at *12 (S.D. Ohio Nov. 9, 2023) (holding that exacting scrutiny applied to federal law requiring disclosure of "substantial donors" for 501(c)(3) tax exemption).

The CTA fails exacting scrutiny. Like the statute in *AFP*, the CTA purports to thwart financial malfeasance, and specifically money laundering using shell companies. *See* 31 U.S.C. § 5336 note. In FinCEN's words, "These requirements are intended to help prevent and combat money laundering, terrorist financing, corruption, tax fraud, and other illicit activity, while minimizing the burden on entities doing business in the United States." Reporting Rule, 87 Fed. Reg. at 59498. But applying the statute to every entity registered with a state, no matter their size or purpose, and even when they lack any assets at all, is obviously a poor fit for that aim. Likewise, the fact that the statute exempts large corporations and more than a dozen other entities, almost all of which are primarily or even exclusively involved in financial transactions, shows that the statute is not narrowly tailored to investigating and preventing financial crimes. *See* 31 U.S.C. § 5336(a)(11)(B). Indeed, FinCEN rejected calls to narrow the statute's reach, because of its dubious

insistence that there remains the remote possibility that any charity may still be involved in illicit transactions. *See* 87 Fed. Reg. at 59542-43. If that's true, however, it's not clear why federally exempt organizations need not comply with the CTA, while others, like MSLP who could potentially qualify for federal exemption but still lack that status, must file reports. The Congressional record provides an answer—the Act was intended in part to allow the government to determine "the identities behind big political spending." *See* Congressional Record, Vol. 163, No. 101 at S3469. While that might be the real reason behind the Act, it is also an unconstitutional objective. *See AFP*, 141 S.Ct. at 2389. The CTA's exemption of the most obvious candidates for financial misconduct at the expense of local entities proves its lack of narrow tailoring.

MSLP once again drives this point home. It is virtually indistinguishable from the advocacy groups in *AFP*, but the federal government's interest is even weaker. Neither Congress nor FinCEN asserted a legitimate interest in policing political donations, claiming instead a broad need to investigate *everyone* including advocacy organizations, against "money laundering, terrorist financing, corruption, tax fraud, and other illicit activity." *See* 87 Fed. Reg. at 59498. But there is no rational reason why a party in charge of around $20,000 in local donations should be made to give up its expressive interests on the purely theoretical notion that it could possibly be involved in financial crimes. *See* Ex. E at ¶¶ 13-15. Applied in this context, the justification for the CTA bears a striking resemblance to the illegitimate excuses used by the State of Alabama in the 1950s: "The exclusive purpose was to determine whether [the NAACP] was conducting intrastate business in violation of the Alabama foreign corporation registration statute, and the membership lists were expected to help resolve this question." *NAACP*, 357 U.S. at 464. The other small businesses, particularly Texas Top Cop Shop, which has already been thoroughly vetted as it acquired a federal firearms license, Ex. A at ¶ 7, and Mustardseed, with its minimal income and

purely local reach, Ex. D at ¶¶ 4-8, are also highly unlikely culprits for international money laundering and terrorist financing. Indeed, the large number of NFIB members that must comply with the CTA, all small businesses, comprise a whole class of entities that are the *least likely* culprits for international money laundering. Given the intrusion into protected association, the CTA's vague goals, and the poor fit between the two, the CTA is facially unconstitutional.

### 3. THE ACT IS FACIALLY INVALID UNDER THE FOURTH AMENDMENT

"[A]n order for the production of books and papers may constitute an unreasonable search and seizure within the Fourth Amendment." *Hale v. Henkel*, 201 U.S. 43, 76 (1906); *see also Patel v. City of Los Angeles*, 738 F.3d 1058, 1061 (9th Cir. 2013) (*en banc*) ("The 'papers' protected by the Fourth Amendment include business records like those at issue here.") *aff'd* 576 U.S. 409 (2015). The "compulsory production of private papers," is both a search and seizure. *Hale*, 201 U.S. at 76. The "papers" protected by the Fourth Amendment include business records. *See id.* 76-77 (subpoena for "all understandings, contracts or correspondence" between corporation and others and "reports made, and accounts rendered by such companies from the date of the organization" was unreasonable under the Fourth Amendment). Thus, when a law mandates that a business compile private information and disclose it upon demand by law enforcement, this constitutes a "search." *See City of L.A. v. Patel*, 576 U.S. 409, 421 (2015).

The Fourth Amendment also has a strong preference for warrants. Thus, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *Id.* at 419 (cleaned up). "This rule applies to commercial premises as well as to homes." *Id.* at 419-20 (citation omitted).

In some circumstances, a warrantless "administrative search" may be permissible "where the primary purpose of the searches is distinguishable from the general interest in crime control." *Id*. at 419 (cleaned up). Even still, "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id*. And when administrative searches create criminal consequences for noncompliance, "[a]bsent an opportunity for precompliance review," there is an "intolerable risk" that such searches will be abused. *Id*.

In addition to the need for pre-compliance review, the government is obligated to demonstrate some level of individualized suspicion before it can demand a business entity's private papers. *See Patel*, 738 F.3d at 1064 ("The government may ordinarily compel the inspection of business records only through an inspection demand 'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'") (quoting *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1945)). Thus, while subpoenas for corporate records are usually permitted on a showing of need less than probable cause, judicial process is still required to determine that "the charge [against the target] is proper and the material requested is relevant," and that the subpoena not be "too indefinite," has not "been issued for an illegitimate purpose, [and is not] unduly burdensome." *McLane Co. v. EEOC*, 581 U.S. 72, 77 (2017); *see also See v. City of Seattle*, 387 U.S. 541, 544 (1967) ("It is now settled that, when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.").[4]

---

[4] Similarly, courts have "recognized the existence of a constitutionally protected interest in the confidentiality of personal financial information," which can only "be overcome by a sufficiently weighty government purpose." *Statharos v. N.Y.C. Taxi & Limousine Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999); *see also NASA v. Nelson*, 562

The blanket requirement that all reporting companies provide beneficial ownership information with no precompliance process and no individualized suspicion violates the Fourth Amendment. On one side of the equation, the CTA's broad disclosure requirements certainly implicate privacy concerns. Indeed, the Act itself recognizes that beneficial ownership information "shall be confidential and may not be disclosed" by FinCEN except in carefully limited ways. *See* 31 U.S.C. § 5336(c)(2)(A). And courts have recognized a "constitutionally protected interest in the confidentiality of personal financial information." *See Statharos*, 198 F.3d at 322-23 (collecting cases). Moreover, as discussed above, the reporting requirements implicate information protected by the First Amendment against disclosure. MSLP has an obvious First Amendment interest in this information, but so too do NFIB's members, including the named plaintiffs, because all have engaged in protected advocacy relying on their corporate forms. In a variety of ways, the CTA's disclosure requirements are therefore significantly more intrusive than a hotel's guest lists, which were protected by the Court in *Patel*, 576 U.S. at 419.

On the other hand, the CTA provides *no* limitations. The Act applies to at least 32.6 million existing entities, including those entities with no assets and no operations, and regardless of whether the entity is likely to have committed a crime. Its express purpose is crime control, and the mandated reports are to be used by law enforcement simply to look for potential criminality. There is also no opportunity for precompliance review by *anyone*, yet refusing to file mandated reports comes with criminal liability. The CTA is thus facially invalid.

---

U.S. 134, 138 (2011) ("We assume, without deciding, that the Constitution protects a privacy right[.]"); *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (recognizing constitutional protections related to "individual interest in avoiding disclosure of personal matters," and "independence in making certain kinds of important decisions"); *Nat'l Treasury Emps. Union v. United States Dep't of the Treasury*, 25 F.3d 237, 242 (5th Cir. 1994) (recognizing the "individual interest in avoiding disclosure of personal matters ... which is properly called the right to confidentiality"). While the contours of this latter right are somewhat unclear, the Second Circuit has noted that mandatory financial disclosure laws for "heavily regulated" businesses must still pass "intermediate scrutiny" to be valid. *Statharos*, 198 F.3d at 323.

### 4. The Reporting Rule Must Be Vacated As Well

As discussed, the CTA imposes multiple unconstitutional requirements on Plaintiffs. The Reporting Rule implements these same unconstitutional provisions while also setting out compliance deadlines. *See* 31 C.F.R. § 1010.380(a)(1)(iii). The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action ... found to be ... contrary to constitutional right[s]." 5 U.S.C. § 706(2)(B). Thus, a "Final Rule is invalid to the extent it implements [] unconstitutional statutory provisions." *Brackeen v. Haaland*, 994 F.3d 249, 425 (5th Cir. 2021) (*en banc*) *overruled in part on other grounds by Haaland v. Brackeen*, 599 U.S. 255 (2023*); see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (explaining "unlawful" agency action "includes unconstitutional action"). Because the Reporting Rule implements the CTA's unconstitutional provisions, this Court should also enjoin the rule.

## B. PLAINTIFFS FACE IRREPARABLE HARM ABSENT AN INJUNCTION

"An irreparable harm is one for which there is no adequate remedy at law." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024) (citation omitted). "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Id.* (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012)). Indeed, the Supreme Court has said that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, when a law or regulation "threatens" First Amendment rights, a plaintiff suffers an irreparable injury. *See Book People Inc.*, 91 F.4th at 341.

Separately, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. United States DOL*, 66 F.4th 593, 597 (5th Cir. 2023). "Even purely economic costs may count as irreparable harm where they cannot be

recovered in the ordinary course of litigation," such as in regulatory challenges under the APA. *Id.* (citation omitted). Further, such costs need not be significant or reach "a specific dollar amount," and an agency's own estimation of compliance costs can satisfy this showing. *See id.* at 597-98.

Plaintiffs will suffer irreparable harm from the CTA unless this Court enjoins it and its implementing regulations prior to January 1, 2025. First, because the named plaintiffs (as well as large numbers of NFIB's other members) will be required to comply with the filing requirements, and must expend resources to do so, these "nonrecoverable compliance" costs constitute irreparable harm. *See Rest. Law Ctr.*, 66 F.4th at 597. Not only have plaintiffs each averred that they would need to spend time and effort to make the required filings, but they would also need to incur legal expenses to review their obligations and assist with the filings. *See* Ex. A at ¶ 10, Ex. B. at ¶ 9, Ex. C at ¶ 10, Ex. D at ¶ 12, Ex. E at ¶ 23, Ex. F at ¶ 5. This is something FinCEN itself recognized would affect the estimated 32.6 million small entities like the plaintiffs, resulting in an estimated burden of 126.3 million hours in the first year of the reporting requirement, for a total cost of approximately $22.7 billion in the first year. Reporting Rule 87 Fed. Reg. at 59585-86.

Second, because the CTA and the Reporting Rule infringe Plaintiffs' constitutional rights, including their First Amendment associational rights, the mere "threat[]" of such infringement causes them irreparable harm. *See Book People Inc.*, 91 F.4th at 341. As discussed above, each Plaintiff faces the unconstitutional threat of revealing protected information on pain of criminal punishment. This independently constitutes irreparable harm.

## C. THE EQUITIES FAVOR AN INJUNCTION

The third and fourth factors, "harm to the opposing party and weighing the public interest ... merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 420 (2009) (discussing identical factors for a stay). And whatever legitimate interest the government might

have in a challenged law or regulation, "neither [the government] nor the public has any interest in enforcing a regulation that violates federal law. Indeed, injunctions protecting First Amendment freedoms are always in the public interest." *Book People, Inc.*, 91 F.4th at 341 (cleaned up). If a plaintiff is likely to succeed in showing that a law or regulation is invalid, then the public interest accords with an injunction. *See id.*

Whatever legitimate interests the Government might have in deterring money laundering or other financial crimes, those cannot outweigh the constitutional invalidity of the CTA. Because the CTA and its implementing regulations are unlawful, the equities favor an injunction.

## CONCLUSION

This Court should preliminarily enjoin Defendants from enforcing the CTA and its implementing regulations.

DATED:  June 3, 2024.

Respectfully submitted,

*/s/ John C. Sullivan*
**JOHN C. SULLIVAN**
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Blvd, Suite 2000
Cedar Hill, TX 75104
T: 469.523.1351
F: 469.613.0891
john.sullivan@the-sl-lawfirm.com

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG***
**Center for Individual Rights**
1100 Connecticut Ave. NW
Suite 625
Washington, DC, 20036
T: 202.833.8400
kruckenberg@cir-usa.org

*Attorneys for Plaintiffs*

*Admitted *Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***

\*Admitted *Pro Hac Vice*

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel has complied with the meet and confer requirement in Local Rule CV-7(h); and that the motion is opposed. Counsel for Plaintiffs conferred with Counsel for Defendants, Faith E. Lowry and Stuart J. Robinson, regarding the relief requested and the grounds raised by Plaintiffs on June 3, 2024. Despite good faith efforts by counsel, the motion is opposed.

Respectfully,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG\***

\*Admitted *Pro Hac Vice*