# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

|  |  |
|---|---|
| TEXAS TOP COP SHOP, INC., *et al.*,<br><br>       Plaintiffs,<br><br>  v.<br><br>MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,<br><br>       Defendants. | Civil Action No. 4:24-cv-00478 (ALM) |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director
Federal Programs Branch

STUART J. ROBINSON
Senior Counsel
FAITH E. LOWRY
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Tel: (415) 436-6635
Email: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

    I.     Statutory Background .................................................................................................. 2

    II.    FinCEN's Rulemaking .............................................................................................. 6

    III.   This Litigation ........................................................................................................... 6

LEGAL STANDARD ................................................................................................................ 7

ARGUMENT .............................................................................................................................. 7

    I.     Plaintiffs Fail to Demonstrate Irreparable Harm ...................................................... 7

    II.    Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits of Their Claims ...................................................................................................................... 10

           A.    Congress Has Broad Authority to Enact Economic Regulations .................... 10

           B.    The CTA Permissibly Effectuates Prohibitions on Harmful Economic Activities ........................................................................................................ 11

           C.    The CTA's Disclosure Requirements Do Not Violate the First Amendment ........................................................................................................ 23

           D.    The CTA Does Not Violate the Fourth Amendment .................................... 26

    III.   The Balance of Equities and the Public Interest Disfavor a Preliminary Injunction . 29

    IV.   Plaintiffs' Proposed Injunction Is Improper ............................................................ 29

CONCLUSION ......................................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Ala. State Fed'n of Tchrs., AFL-CIO v. James,*
  656 F.2d 193 (5th Cir. 1981) ............................................................................................25

*Am. Co. v. SEC,*
  327 U.S. 686 (1946) ........................................................................................................19

*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) ..........................................................................................................19

*Ams. for Prosperity Found. v. Bonta,*
  594 U.S. 595 (2021) ................................................................................................. 22, 23

*Anyadike v. Vernon Coll.,*
  No. 7:15-cv-00157, 2015 WL 12964684 (N.D. Tex. Nov. 20, 2015) ................................8

*Aransas Project v. Shaw,*
  775 F.3d 641 (5th Cir. 2014) .............................................................................................8

*Bond v. United States,*
  572 U.S. 844 (2014) ........................................................................................................21

*Book People Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024) ..............................................................................................9

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
  345 F.3d 347 (5th Cir. 2003) ...........................................................................................23

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (2021) .........................................................................................................18

*BuzzBallz, LLC. v. JEM Beverage Co., LLC,*
  No. 3:15-cv-588, 2015 WL 3948757 (N.D. Tex. June 26, 2015)........................................8

*Cal. Bankers Ass'n v. Shultz,*
  416 U.S. 21 (1974) ....................................................................................................*passim*

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ........................................................................................................30

*Canal Auth. of State of Fla. v. Callaway,*
  489 F.2d 567 (5th Cir. 1974) .............................................................................................8

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir.), *cert. granted,* 144 S. Ct. 374 (2023) .......................................30

*Castro v. City of Grand Prairie,*
  No. 3:21-CV-885, 2021 WL 1530303 (N.D. Tex. Apr. 19, 2021) ......................................9

*Cent. & S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) ..........................................................................................30

*Chamber of Commerce of United States v. SEC,*
  85 F.4th 760 (5th Cir. 2023) ...........................................................................................24

*CIC Servs., LLC v. IRS,*
  593 U.S. 209 (2021) .........................................................................................................22

*Citizens United v. FEC,*
  558 U.S. 310 (2010) .........................................................................................................25

*City of Los Angeles v. Patel,*
  576 U.S. 409 (2015) .........................................................................................................28

*Data Mktg. P'ship LP v. U.S. Dep't of Labor,*
  45 F.4th 846 (5th Cir. 2022) ...........................................................................................30

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ......................................................................................29

*Def. Distributed v. U.S. Dep't of State,*
  838 F.3d 451 (5th Cir. 2016) ...........................................................................................29

*Dep't of Homeland Sec. v. New York,*
  140 S. Ct. 599 (2020) .......................................................................................................30

*Donovan v. Lone Steer, Inc.,*
  464 U.S. 408 (1984) .........................................................................................................26

*Duarte v. City of Lewisville,*
  136 F. Supp. 3d 752 (E.D. Tex. 2015), *aff'd* 858 F.3d 348, (5th Cir. 2017) ...................8

*Dunbar v. Seger-Thomschitz,*
  615 F.3d 574 (5th Cir. 2010) .....................................................................................21, 22

*Elec. Bond & Share Co. v. SEC,*
  303 U.S. 419 (1938) .........................................................................................................18

*GDF Realty Invs., Ltd. v. Norton,*
  326 F.3d 622 (5th Cir. 2003) ...........................................................................................15

*Gill v. Whitford,*
  585 U.S. 48 (2018) ...........................................................................................................29

*Gonzales v. Raich,*
　　545 U.S. 1 (2005) ....................................................................................*passim*

*Google, Inc. v. Hood,*
　　822 F.3d 212 (5th Cir. 2016) ..................................................................... 9

*Groome Res. Ltd., L.L.C. v. Par. of Jefferson,*
　　234 F.3d 192 (5th Cir. 2000) ............................................................... 11, 12

*Helvering v. Mitchell,*
　　303 U.S. 391 (1938) ................................................................................. 22

*Hernandez v. Mesa,*
　　589 U.S. 93 (2020) ................................................................................... 20

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.,*
　　452 U.S. 264 (1981) .......................................................................13, 14, 15

*Holder v. Humanitarian Law Project,*
　　561 U.S. 1 (2010) ..................................................................................... 20

*Japan Line, Ltd. v. Cnty. of Los Angeles,*
　　441 U.S. 434 (1979) ................................................................................. 20

*Jinks v. Richland Cnty.,*
　　538 U.S. 456 (2003) ................................................................................. 22

*Jordan v. Fisher,*
　　823 F.3d 805 (5th Cir. 2016) ..................................................................... 7

*Justin Indus., Inc. v. Choctaw Secs., L.P.,*
　　920 F.2d 262 (5th Cir. 1990) ..................................................................... 8

*Kennedy v. Mendoza-Martinez,*
　　372 U.S. 144 (1963) ................................................................................. 20

*Klayman v. Obama,*
　　805 F.3d 1148 (D.C. Cir. 2015) ............................................................... 28

*Lady J. Lingerie v. City of Jacksonville,*
　　176 F.3d 1358 (11th Cir. 1999)................................................................. 24

*Laird v. Tatum,*
　　408 U.S. 1 (1972) ............................................................................... 25, 27

*Leaf Trading Cards, LLC v. Upper Deck Co.,*
　　No. 3:17-CV-3200, 2019 WL 7882552 (N.D. Tex. Sept. 18, 2019) ...................... 8

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ............................................................................................................29

*Maryland v. King*,
  567 U.S. 1301 (2012) ..........................................................................................................29

*Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*,
  447 F. Supp. 3d 522 (N.D. Tex. 2020) ................................................................................29

*M'Culloch v. State*,
  17 U.S. (4 Wheat.) 316 (1819) ............................................................................................23

*Monumental Task Comm., Inc. v. Foxx*,
  157 F. Supp. 3d 573 (E.D. La. 2016), *aff'd*, 678 F. App'x 250 (5th Cir. 2017) ................ 7, 8

*Munaf v. Geren*,
  553 U.S. 674 (2008) ..............................................................................................................7

*NAACP v. Ala. ex rel. Patterson*,
  357 U.S. 449 (1958) ......................................................................................................24, 25

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ....................................................................................... 10, 11, 18, 23

*Nat'l Small Bus. United v. Yellen*,
  No. 5:22-cv-1448, 2024 WL 899372, (N.D. Ala. Mar. 1, 2024),
  *appeal filed*, No. 24-10736 (11th Cir. Mar. 11, 2024) ................................................14, 23

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................................................29

*NLRB v. Jones & Laughlin Steel Corp.*,
  301 U.S. 1 (1937) ................................................................................................................10

*RJ Reynolds Tobacco Co. v. FDA*,
  96 F.4th 863 (5th Cir. 2024) ...............................................................................................24

*Second Amend. Found., Inc. v. ATF*,
  No. 3:21-CV-0116, 2023 U.S. Dist. LEXIS 202589 (N.D. Tex. Nov. 13, 2023) ................9

*Second Amend. Found. v. ATF*,
  No. 3:21-cv-0116, 2023 WL 4304760 (N.D. Tex. June 30, 2023) ......................................30

*Sheffield v. Bush*,
  604 F. Supp. 3d 586 (S.D. Tex. 2022) ..................................................................................9

*Shenzhen Tange Li'An E-Commerce, Co. v. Drone Whirl LLC*,
  No. 1:20-CV-738-RP, 2020 WL 5237267 (W.D. Tex. Sep. 2, 2020) ...................................8

*Skinner v. Ry. Lab. Execs.' Ass'n,*
 489 U.S. 602 (1989) ...................................................................................................28

*Sonzinsky v. United States,*
 300 U.S. 506 (1937) .............................................................................................22, 23

*Tee & Bee, Inc. v. City of W. Allis,*
 936 F. Supp. 1479 (E.D. Wis. 1996) ........................................................................24

*Trump v. Hawaii,*
 138 S. Ct. 2392 (2018) ..............................................................................................30

*Ullmann v. United States,*
 350 U.S. 422 (1956) ..................................................................................................20

*United States v. Bolatete,*
 977 F.3d 1022 (11th Cir. 2020) .................................................................................23

*United States v. Brigham,*
 382 F.3d 500 (5th Cir. 2004) .....................................................................................28

*United States v. Comstock,*
 560 U.S. 126 (2010) ............................................................................... 11, 14, 22, 23

*United States v. Curtiss-Wright Exp. Corp.,*
 299 U.S. 304 (1936) ..................................................................................................21

*United States v. Darby,*
 312 U.S. 100 (1941) ..................................................................................................11

*United States v. Di Re,*
 332 U.S. 581 (1948) ..................................................................................................20

*United States v. Goodwin,*
 141 F.3d 394 (2d Cir. 1997) ......................................................................................12

*United States v. Gordon,*
 No. 14-CR-10304, 2016 WL 11668976 (D. Mass. Aug. 30, 2016) ..........................28

*United States v. Lopez,*
 514 U.S. 549 (1995) ............................................................................................11, 18

*United States v. Matthews,*
 438 F.2d 715 (5th Cir. 1971) .....................................................................................22

*United States v. McClaren,*
 13 F.4th 386 (5th Cir. 2021) ......................................................................................12

*United States v. Morrison,*
   529 U.S. 598 (2000) ........................................................................................................... 11, 18

*United States v. Salerno,*
   481 U.S. 739 (1987) ................................................................................................................... 10

*Univ. of Texas v. Camenisch,*
   451 U.S. 390 (1981) ................................................................................................................. 8, 9

*W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24,*
   751 F.2d 721 (5th Cir. 1985) ................................................................................................... 30

*White v. Carlucci,*
   862 F.2d 1209 (5th Cir. 1989) ................................................................................................... 8

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................................................. 7, 29

*Worthy v. United States,*
   328 F.2d 386 (5th Cir. 1964) ................................................................................................... 21

*Zauderer v. Office of Disciplinary Counsel of Supreme Court,*
   471 U.S. 626 (1985) ................................................................................................................. 24

*Ziglar v. Abbasi,*
   582 U.S. 120 (2017) ................................................................................................................. 20

## <u>Statutes</u>

5 U.S.C. § 701(a) ........................................................................................................................ 28

5 U.S.C. § 702(2) .......................................................................................................................... 7

5 U.S.C. § 706(2) ........................................................................................................................ 30

8 U.S.C. § 1324a ......................................................................................................................... 26

15 U.S.C. § 1 ............................................................................................................................... 19

15 U.S.C. § 45 ............................................................................................................................. 19

18 U.S.C. § 1001 ........................................................................................................................... 2

18 U.S.C. § 1341 ........................................................................................................................... 2

18 U.S.C. § 1343 ........................................................................................................................... 2

18 U.S.C. § 1956 ..................................................................................................................... 2, 12

18 U.S.C. § 1957 .................................................................................................... 2, 12

18 U.S.C. § 2339C ................................................................................................. 2, 12

26 U.S.C. § 6012 ................................................................................................. 18, 26

26 U.S.C. § 7201 .................................................................................................... 2, 12

29 U.S.C. § 201 .......................................................................................................... 19

31 U.S.C. § 5311 ..................................................................................................*passim*

31 U.S.C. § 5313 ......................................................................................................... 26

31 U.S.C. § 5336 ..................................................................................................*passim*

52 U.S.C. § 30104 ............................................................................................... 18, 26

Anti-Money Laundering Act of 2020 ("AMLA"),
    Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. 4547 (2021) .................................... 2

## Legislative Authorities

*Beneficial Ownership: Fighting Illicit International Financial Networks Through Transparency:*
*Hearing before the Senate Judiciary Comm.,*
    115th Cong. (2018) ................................................................................................... 20

166 Cong. Rec.  S7310 (2020) ............................................................................. 19, 20

166 Cong. Rec.  H6932 (2020) ............................................................................ 19, 20

H.R. Rep. No. 116-227 (2019) ........................................................................ 2, 12, 13

U.S. Const. art. I, § 8, cl. 3 ................................................................................. 10, 19

U.S. Const. art. I, § 8, cl. 18 .........................................................................11, 21, 22

## Regulations

31 C.F.R. § 1010.230(a) ............................................................................................ 14

31 C.F.R. § 1010.312 ................................................................................................. 26

31 C.F.R. § 1010.605(e) ............................................................................................ 14

*Beneficial Ownership Information Reporting Requirements*
    87 Fed. Reg. 59,498 (Sept. 30, 2022) ..............................................................*passim*

## <u>Other Authorities</u>

*Multiple Chancellors: Reforming the National Injunction*,
  131 Harv. L. Rev 417 (2017)..................................................................................................30

FinCEN FAQ B.3,
  https://perma.cc/LE24-SVRB..................................................................................................8

MSLP,
  https://perma.cc/UZY8-KV3X................................................................................................29

Press Release, U.S. Beneficial Ownership Information Registry Now Accepting Reports (Jan. 1,
2024),
  https://perma.cc/6NRG-CTZB ................................................................................................9

## INTRODUCTION

For decades, Congress has legislated to curb money laundering and terrorist financing.  As illicit actors find new ways to circumvent those laws, Congress has responded to ensure that the government possesses the information to counteract such evolving threats.  Most recently, these threats come from the exploitation of legal entities such as corporations to facilitate illicit activity that imperils the national security and foreign policy of the United States.  Criminals can easily create these entities under state laws and may generally do so without disclosing their involvement.  As a result, the United States has become a popular jurisdiction for criminals to create legal entities that facilitate and further fraud, human smuggling, corruption, drug trafficking, and terrorist financing.

To address these harms, Congress passed the Anti-Money Laundering Act of 2020, which includes the Corporate Transparency Act ("CTA").  This legislation requires certain domestic and foreign companies to report information concerning their beneficial owners and those individuals filing certain entity-creation forms to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury.  Congress assessed that this information—including a beneficial owner's name, address, date of birth, and a unique identifier such as a driver's license number—will prove highly useful to law enforcement and the intelligence community's efforts to counter the threat posed by criminals, terrorists, and others undermining U.S. interests.

Plaintiffs challenge the constitutionality of the limited reporting requirements established by the CTA.  But they have not shown a likelihood of success on the merits of these claims because the CTA (1) falls well within Congress's power, amplified by the Necessary and Proper Clause, to regulate commerce, ensure national security, and lay and collect taxes; (2) accords with the First Amendment; and (3) does not unreasonably invade any Fourth Amendment privacy interests.  Nor does consideration of the remaining preliminary injunction factors favor Plaintiffs.  The Court should deny Plaintiffs' motion for preliminary injunction.

# BACKGROUND

## I.    Statutory Background

Federal law has long prohibited money laundering, *see* 18 U.S.C. §§ 1956, 1957, financing terrorism, *see id.* § 2339C, evading taxes, *see* 26 U.S.C. § 7201, and a number of other harmful economic activities, *see*, *e.g.*, 18 U.S.C. §§ 1001, 1341, 1343.  According to one estimate, "domestic financial crime, excluding tax evasion, generates approximately $300 billion of proceeds" each year.  *Beneficial Ownership Information Reporting Requirements*, 87 Fed. Reg. 59,498, 59,579 (Sept. 30, 2022).[1]  Because financial crime is complex, easily concealed, and facilitated by an interconnected financial system, Congress has adopted various measures to aid enforcement.  *See*, *e.g.*, *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 26 (1974) (discussing Bank Secrecy Act of 1970, 31 U.S.C. § 5311 *et seq.*).

Despite these efforts, there remained a significant gap in the government's ability to detect and prosecute financial crime.  Under state law, "corporations, limited liability companies, [and] other similar entities" are generally not required to report "information about the[ir] beneficial owners." Anti-Money Laundering Act of 2020 ("AMLA"), Pub. L. No. 116-283, div. F, § 6402(2), 134 Stat. 4547, 4604 (2021).[2]  "A person forming a corporation or limited liability company within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license."  H.R. Rep. No. 116-227, at 2 (2019).  That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in "money laundering," "the financing of terrorism," and "serious tax fraud."  NDAA § 6402(3).

Congress and the Executive Branch identified "[t]his lack of transparency" as "a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. No. 116-227, at 10.  When investigators trace illicit funds to a corporation, they often cannot identify the corporation's owners

---

[1] Internal quotations marks and citations are omitted throughout this brief, unless noted.
[2] The AMLA and CTA were enacted as part of the National Defense Authorization Act ("NDAA").

from available sources because ownership records "do not exist." 87 Fed. Reg. at 59,504.  Instead, investigators must pursue "human source information, grand jury subpoenas, surveillance operations, witness interviews, search warrants, and foreign legal assistance requests to get behind the outward facing structure of the[] shell companies[.]"  *Id.*  The "strategic use" of such companies by criminals thus "makes investigations exponentially more difficult and laborious."  *Id.* at 59,505.  And because criminals may "layer" multiple shell companies, even the most thorough investigation may not yield results.  NDAA § 6402(4).

Criminals routinely exploit this enforcement gap.  Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." 87 Fed. Reg. at 59,503.  Likewise, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [drug traffickers] to launder their drug proceeds." *Id.*

In addition to facilitating domestic crime, the absence of company-ownership information threatens U.S. national-security and foreign-policy interests.  For instance, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation have attempted to use U.S. and non-U.S. shell companies to evade sanctions[.]"  *Id.* at 59,498; *see id.* at 59,502 (discussing use of shell companies by the Government of Iran).  And more broadly, the absence of company-ownership information in the United States undermines the federal government's longstanding diplomatic efforts to combat cross-border financial crime by "mak[ing] the United States a jurisdiction of choice for those wishing to create shell companies that hide their ultimate beneficiaries" and "a weak link in the integrity of the global financial system."  *Id.* at 59,506.  Because it did not collect ownership information, the United States fell out of "compliance with international anti-money laundering and countering the financing of terrorism standards."  NDAA § 6402(5)(E).

For similar reasons, criminals can use the government's lack of information about the

3

ownership of corporations to obscure their income and assets and thus perpetrate "serious tax fraud." NDAA § 6402(3). A "[Department of the] Treasury study based on a statistically significant sample of adjudicated [IRS] cases from 2016-2019 found legal entities were used in a substantial proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59,503.

To address this enforcement gap, Congress enacted beneficial ownership reporting requirements. The AMLA adopts various provisions designed to "modernize" federal laws concerning money laundering and terrorism financing. NDAA § 6002(2). Among those is the CTA, which aims to ensure that the United States uniformly collects beneficial ownership information notwithstanding the disparate corporate formation requirements imposed by states. *Id.* § 6002(5).

In enacted findings accompanying the CTA, Congress determined that "the collection of beneficial ownership information" is "needed" to "protect interstate and foreign commerce" and "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity[.]" *Id.* § 6402(5). Congress further determined that the reporting requirements would "facilitate important national security, intelligence, and law enforcement activities[,]" *id.* § 6402(6)(A), assist in improving "tax administration[,]" 31 U.S.C. § 5336(c)(5)(B), and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards[,]" NDAA § 6402(5)(E). And Congress described the reported information as "highly useful to national security, intelligence, and law enforcement agencies and Federal functional regulators." *Id.* § 6402(8)(C).

The CTA accordingly requires that certain businesses report information about their beneficial owners and applicants to FinCEN. A "beneficial owner" is "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise[] (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." 31 U.S.C. § 5336(a)(3)(A). *But see id.* § 5336(a)(3)(B) (establishing certain exceptions). And

an "applicant" is an individual who files documents to form or register the corporate entity.  *See id.*
§ 5336(a)(2).  For each applicant and beneficial owner, a covered business must report the individual's
legal name, date of birth, residential or business address, and driver's license number or other "unique
identifying number[.]"  *Id.* § 5336(a)(1), (b)(2)(A).

In addition to providing that covered businesses file reports when they first become subject
to the CTA, the statute also requires that those businesses submit updated reports when ownership
information changes.  In particular, when "there is a change with respect to any" ownership
information, a covered business must "submit to FinCEN a report that updates the information
relating to the change."  *Id.* § 5336(b)(1)(D).  A person who willfully violates either the initial or
ongoing reporting requirements is subject to civil and criminal penalties.  *See id.* § 5336(h).  *But see id.*
§ 5336(h)(3)(C) (providing certain safe harbors).

These requirements apply to "reporting compan[ies]."  *Id.* § 5336(a)(11).  That term generally
includes any "corporation, limited liability company, or other similar entity that is" either "created by
the filing of a document with a secretary of state or a similar office under the law of a State or Indian
Tribe[,]" or "formed under the law of a foreign country and registered to do business in the United
States by the filing of a document with a secretary of state or a similar office under the laws of a State
or Indian Tribe[.]"  *Id.* § 5336(a)(11)(A).

Congress exempted from the reporting requirements 23 categories of legal entities, such as
banks, public accounting firms, and other businesses already subject to reporting or recordkeeping
requirements.  *Id.* § 5336(a)(11)(B).  It excludes certain domestically owned entities no longer engaged
in business.  *Id.* § 5336(a)(11)(B)(xxiii).  It also excludes certain trusts, political organizations, and non-
profits.  *Id.* § 5336(a)(11)(B)(xix).

Consistent with Congress's purposes, the CTA generally contemplates that reported
information be used to facilitate the investigation and prosecution of financial crimes, among other

things.  For example, FinCEN may share ownership information with federal agencies "engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity[.]" *Id.* § 5336(c)(2)(B)(i)(I).   FinCEN may share the same information with state and local law enforcement agencies when a court "authorize[s] the law enforcement agency to seek the information in a criminal or civil investigation[.]" *Id.* § 5336(c)(2)(B)(i)(II).

## II.    FinCEN's Rulemaking

The CTA directs FinCEN to implement certain aspects of the statute by regulation.  *See id.* § 5336(b)(5).  FinCEN issued its final rule on beneficial ownership information reporting in September 2022.  87 Fed. Reg. at 59,509.  As relevant here, the rule, as amended, establishes the deadlines by which covered entities must comply with the statute.  For businesses created or registered before 2024, compliance is required by January 1, 2025.  *See* 31 C.F.R. § 1010.380(a)(1)(iii).

## III.    This Litigation

Plaintiffs filed this action on May 28, 2024.  Compl., ECF No. 1.  Plaintiffs consist of two corporations whose principal place of business is in Texas (Texas Top Cop Shop, Inc. and Data Comm for Business, Inc.), an individual residing in Texas (Russell Straayer), a Wyoming limited liability company (Mustardseed Livestock, LLC), a Mississippi non-profit corporation (Libertarian Party of Mississippi ("MSLP")), and a Tennessee non-profit organization (National Federation of Independent Business ("NFIB")).  Compl. ¶¶ 1-6.  They allege that Texas Top Cop Shop, Data Comm for Business, Mustardseed, and MSLP are subject to the CTA's reporting requirements by January 1, 2025, *id.* ¶¶ 60, 70, 92, 115; Mr. Straayer is a beneficial owner of Data Comm for Business and "has been a vocal opponent of the CTA," *id.* ¶¶ 76, 79; and NFIB is exempt from the CTA but brings this claim on behalf of its members, *id.* ¶ 120.  Plaintiffs first claim that the CTA exceeds Congress's powers under the Constitution.  *Id.* ¶¶ 126-34.  Second, Plaintiffs assert that the reporting requirements of the CTA compel disclosure of information in violation of the First Amendment.  *Id.* ¶¶ 136-48.  Third, in

6

Plaintiffs' view, the CTA constitutes an unreasonable search and seizure in violation of the Fourth Amendment. *Id.* ¶¶ 150-57. And fourth, Plaintiffs allege that FinCEN's final rule on reporting requirements contravenes the Administrative Procedure Act, 5 U.S.C. § 702(2). *Id.* ¶¶ 159-64.

Despite the fact that no Plaintiff must comply with the CTA until January 2025, Plaintiffs moved for a preliminary injunction on June 3, 2024. ECF No. 6 ("Pls.' Mot."). They seek a nationwide injunction prohibiting enforcement of the CTA and its implementing regulations. ECF No. 6-1.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff must show (1) "a substantial threat of irreparable injury[,]" (2) "a substantial likelihood of success on the merits," (3) "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and (4) "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016). The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Id.*

## ARGUMENT

## I.    Plaintiffs Fail to Demonstrate Irreparable Harm

As discussed below, Plaintiffs have not shown a likelihood of success on the merits of any of their claims. Their request that this court preliminarily enjoin an Act of Congress fails at the threshold, however, because Plaintiffs do not demonstrate any irreparable harm.

"Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 582-83 (E.D. La. 2016), *aff'd*, 678 F. App'x 250 (5th Cir. 2017). "To constitute irreparable harm, an

injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791 (E.D. Tex. 2015) (Mazzant, J.), *aff'd*, 858 F.3d 348, (5th Cir. 2017), and must also be "future or continuing," *Aransas Project v. Shaw*, 775 F.3d 641, 648 (5th Cir. 2014).  Plaintiffs must substantiate any claim of irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

As an initial matter, Plaintiffs' delay in seeking preliminary relief following passage of the CTA weighs heavily against any argument that they might suffer imminent, irreparable injury absent emergency relief.  "Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *Anyadike v. Vernon Coll.*, No. 7:15-cv-00157, 2015 WL 12964684, at *3 (N.D. Tex. Nov. 20, 2015).  "[A]nywhere from a three-month delay to a six-month delay [is] enough to militate against issuing injunctive relief." *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-3200, 2019 WL 7882552, at *2 (N.D. Tex. Sept. 18, 2019) (collecting cases).  Here, the bipartisan CTA was enacted in 2021, more than three years before Plaintiffs filed the instant suit.  And FinCEN has been accepting beneficial ownership reports for more than six months, since January 1, 2024.  *See* FinCEN FAQ B.3, https://perma.cc/LE24-SVRB.  Plaintiffs' actions "suggest[] a lack of urgency that militates against a finding of irreparable injury." *Shenzhen Tange Li'An E-Commerce, Co. v. Drone Whirl LLC*, No. 1:20-CV-738-RP, 2020 WL 5237267, at *4 (W.D. Tex. Sep. 2, 2020); *see BuzzBallz, LLC. v. JEM Beverage Co., LLC*, No. 3:15-cv-588, 2015 WL 3948757, at *6 (N.D. Tex. June 26, 2015).

And regardless of their delay, Plaintiffs have not demonstrated that a preliminary injunction is necessary because "the court's ability to render a meaningful decision on the merits would otherwise be in jeopardy," *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974); *see Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  No Plaintiff is required to comply with the CTA until January 1, 2025.  The parties therefore have more than six months to resolve this case through dispositive motions before any injury could be deemed imminent.

Plaintiffs nonetheless attempt to establish irreparable harm by refencing alleged compliance costs associated with the CTA's reporting requirements. But the evidence Plaintiffs cite in support is wholly conclusory, consisting of a single statement in the non-associational Plaintiffs' declarations. *See*, *e.g.*, Decl. of Russell Straayer ¶ 9, ECF No. 6-3. Plaintiffs have already, by their own admissions, determined that they are subject to the reporting requirements. *E.g.*, *id.* The form itself is simple and free. Press Release, U.S. Beneficial Ownership Information Registry Now Accepting Reports (Jan. 1, 2024), available at https://perma.cc/6NRG-CTZB. The information requested is, as Plaintiffs' exhibits describe it, "readily available." ECF No. 6-3 at p.6; *see also* 87 Fed. Reg. at 59,573. Because Plaintiffs have already determined that they are subject to the reporting requirements and given the evidence reflecting the simplicity of the form itself, Plaintiffs have not shown that their own alleged compliance costs are more than *de minimis*. *See Second Amend. Found., Inc. v. ATF*, No. 3:21-cv-0116, 2023 U.S. Dist. LEXIS 202589, at *48-49 (N.D. Tex. Nov. 13, 2023) (plaintiff failed to show irreparable harm where the record did not reflect compliance costs that were more than *de minimis*).

Plaintiffs next attempt to establish irreparable harm by arguing that "the CTA and the Reporting Rule infringe Plaintiffs' constitutional rights, including their First Amendment associational rights," citing *Book People Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024). Pls.' Mot. at 29. But the "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Courts have thus declined to find irreparable harm based solely on a plaintiff's allegation that his constitutional rights have been violated. *E.g.*, *Castro v. City of Grand Prairie*, No. 3:21-CV-885, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021); *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022). And, as explained below, Plaintiffs have not shown a likelihood of success on the merits of their claims.

Plaintiffs therefore fail to establish imminent, irreparable harm, and their motion for preliminary injunctive relief should be denied for this reason alone.

## II.     Plaintiffs Fail to Demonstrate a Likelihood of Success on the Merits of Their Claims

The CTA falls within Congress's authority for two independent reasons.  First, the statute regulates commercial entities and is thus directly authorized by the commerce power.  Second, corporate ownership reporting requirements effectuate a number of powers vested in the federal government, including the commerce, tax, and national-security powers, and are therefore authorized by the Necessary and Proper Clause.  Either of these bases suffices to defeat Plaintiffs' challenge, and Plaintiffs have failed to "establish that no set of circumstances exists under which the Act would be valid." *See United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 562 (2012) (op. of Roberts, C.J.) ("*NFIB*").  Because Plaintiffs have not "clearly demonstrated" that Congress lacked the constitutional authority to pass the CTA, *see NFIB*, 567 U.S. at 538, Plaintiffs fall well short of establishing a likelihood of success.

### A.  Congress Has Broad Authority to Enact Economic Regulations

Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "[T]he power to regulate commerce is the power to enact 'all appropriate legislation' for its 'protection or advancement' . . . ; to adopt measures 'to promote its growth and insure its safety' . . . ; 'to foster, protect, control and restrain.'"  *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-37 (1937); *see NFIB*, 567 U.S. at 549 (op. of Roberts, C.J.).  In addition to regulating the "channels of interstate commerce," "the instrumentalities of interstate commerce, and persons or things in interstate commerce[,]" Congress may "regulate activities that substantially affect interstate commerce."  *Gonzales v. Raich*, 545 U.S. 1, 16-17, 34 (2005).  When Congress acts in this third category, it has the power to "regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce."  *Id.* at 17.  And "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class."  *Id.*  A court "need not determine whether [the regulated] activities, taken in the aggregate,

substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* at 22 (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)).

The Necessary and Proper Clause, which authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its other enumerated powers and the powers vested in the Executive Branch, U.S. Const. art. I, § 8, cl. 18, also "grants Congress broad authority to enact federal legislation[,]" *United States v. Comstock*, 560 U.S. 126, 133 (2010).  It is therefore sufficient if "the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Id.* at 134; *see United States v. Darby*, 312 U.S. 100, 121 (1941).

In assessing the breadth of Congress's authority to regulate activities that substantially affect interstate commerce, the Supreme Court has distinguished between laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000), and laws that have "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 613.  The Court has also distinguished regulations of commercial activity from regulations that would address inactivity by requiring individuals to engage in commercial transactions in which they would prefer not to engage.  *NFIB*, 567 U.S. at 553 (op. of Roberts, C.J.).  Supreme Court precedent thus "provides two recognized and historically rooted means of congressional regulation under the commerce power: (1) whether the activity is any sort of economic enterprise, however broadly one might define those terms; or (2) whether the activity exists as an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Groome Res. Ltd., L.L.C. v. Par. of Jefferson*, 234 F.3d 192, 205 (5th Cir. 2000).

### B.  The CTA Permissibly Effectuates Prohibitions on Harmful Economic Activities

1.     The CTA's reporting requirements form a critical part of the federal government's comprehensive anti-money laundering regime.  "[M]oney laundering is a quintessential economic activity." *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997).  The same is true of fraud, drug

11

trafficking, and other financial crimes targeted by the CTA.  *See United States v. McClaren*, 13 F.4th 386, 402 (5th Cir. 2021) (drug trafficking is economic activity); *see also Groome Res. Ltd.*, 234 F.3d at 208 (discussing breadth of "economic activity").  "Indeed, it is difficult to imagine a more obviously commercial activity than engaging in financial transactions involving the profits of unlawful activity." *Goodwin*, 141 F.3d at 399.  Plaintiffs cannot dispute that Congress may, pursuant to the Commerce Clause, prohibit these harmful forms of economic activity.  18 U.S.C. §§ 1956, 1957 (prohibiting money laundering); *id.* § 2339C (terrorism financing); 26 U.S.C. § 7201 (tax evasion).

Various economic crimes are made easier to commit, and harder to discovery, through the formation of corporate entities that may conduct economic transactions in their own names without disclosing beneficial ownership information.  NDAA § 6402(2).  By definition, a corporate entity has legal authority to conduct economic transactions in its own name, including by "[m]ak[ing] contracts," "borrow[ing] money[,]" "incur[ring] liabilities," and transferring "real or personal property." *E.g.*, Del. Code Ann. tit. 8, § 122.  But state law generally does not require "corporations, limited liability companies, [and] other similar entities" to report "information about the[ir] beneficial owners." NDAA § 6402(2); *see* Compl. ¶¶ 59, 69, 91.  As Congress determined, "malign actors" can thus "conceal their ownership of corporations" and use them to conduct illicit transactions without detection.  NDAA § 6402(3).  "This lack of transparency" has been "a primary obstacle to tackling financial crime in the modern era."  H.R. Rep. 116-227, at 10; *see* 87 Fed. Reg. at 59,504-05.  Many criminals, both foreign and domestic, exploit this knowledge gap. *E.g.*, 87 Fed. Reg. at 59,503.

Congress passed the AMLA in response to these concerns.  The AMLA, of which the CTA is a part, aims "to modernize" existing federal legislation seeking to combat "money laundering and counter[] the financing of terrorism," among other financial crimes.  NDAA §§ 6001, 6002(2), 6401. The CTA fills an important gap in Congress's comprehensive regime to prevent money laundering by facilitating the uniform collection of beneficial ownership information.  *Id.* § 6002(5).  In particular,

the statute requires legal entities—that is, those entities that have the ability to engage in commercial transactions in their own name—to disclose the identities of the individuals who created the entities and have authority to direct their operations.  The statute contemplates that the reported information will be used for law enforcement and related activities. 31 U.S.C. § 5336(c)(2).  For instance, FinCEN may share information with federal agencies when it would be "in furtherance" of "national security, intelligence, or law enforcement activity," *id.* § 5336(c)(2)(B), and with state or local agencies when a court "has authorized the law enforcement agency to seek the information in a criminal or civil investigation," *id.*  The reporting requirements enable investigators to trace "the flow of illicit funds" into and through corporations and thus detect and prosecute financial crimes.  NDAA § 6002(5)(A).

Congress thus determined that this information "is needed" to "protect interstate and foreign commerce" and "counter money laundering, the financing of terrorism, and other illicit activity[.]" NDAA § 6402(5).  Congress further determined such information would "discourage the use of shell corporations as a tool to disguise and move illicit funds" and "assist national security, intelligence, and law enforcement agencies with the pursuit of crimes." *Id.* § 6002(5).  These findings rest on an extensive record demonstrating that "efforts to investigate corporations and limited liability companies suspected of committing crimes have been impeded by the lack of available beneficial ownership information." H.R. Rep. 116-227, at 2; *see also Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 276 (1981).  By contrast, failure to include the CTA in the AMLA would have left a "gaping hole" in Congress's efforts to curb illicit financial activity.  *Raich*, 545 U.S. at 22.

As these provisions illustrate, the CTA effectuates legitimate prohibitions on harmful forms of economic activity.  The reporting requirements enable investigators to trace "the flow of illicit funds" into and through corporations and thus to detect and prosecute financial crimes.  NDAA § 6002(5)(A).  The CTA is therefore "rationally related to the implementation" of valid prohibitions, *Comstock*, 560 U.S. at 134, and it accordingly falls within the established scope of Congress's authority

under both the Commerce and Necessary and Proper Clauses.

Defendants recognize that one district court has concluded that the CTA is not an essential part of Congress's comprehensive, anti-money laundering regulatory regime. *See Nat'l Small Bus. United v. Yellen* ("*NSBU*"), 2024 WL 899372, at *17 (N.D. Ala. Mar. 1, 2024), *appeal filed*, No. 24-10736 (11th Cir. Mar. 11, 2024).[3]  Defendants respectfully submit that the district court's order and opinion, from which the government has appealed, erred in concluding that the CTA was an isolated, "single-subject statute" such that the "'comprehensive regulatory scheme' framework" did not apply, *id.* at *17, particularly given the CTA's role as an important part of the AMLA.  Further, the *NSBU* court erred in holding that the "CTA is far from essential" on the basis that some financial institutions are required to retain certain beneficial owner information about their customers pursuant to a 2016 rule. *See id.* (citing 31 C.F.R. § 1010.230(a)).  Rather, two aspects of that rule led Congress to reasonably determine, on an extensive record, that the CTA's disclosure requirements were "needed" to combat economic crimes, notwithstanding the 2016 rule.  NDAA § 6402(5); *see also* 87 Fed. Reg. at 59,548 (explaining how Congress addressed relationship between the CTA and the 2016 rule).  First, the 2016 rule applies only to entities that choose to become customers of a comparatively narrow set of financial institutions. *See* 31 C.F.R. § 1010.605(e).  Second, the rule required those institutions to retain, but not transmit to the government for law enforcement purposes, certain customer information.  The elected Branches determined that the CTA is critical to the government's larger efforts to combat financial crime, and there is no basis for second-guessing that judgment. *See Hodel*, 452 U.S. at 283.

Nor can Plaintiffs advance their argument by asserting, without any supporting authority, that "[t]he CTA is not part of a larger regulatory scheme, and Congress did not identify any such regulatory scheme in passing it." Pls.' Mot. at 15.  Congress in fact did so by making the CTA part of the AMLA.

---

[3] In another case challenging the constitutionality of the CTA, a district court has denied a motion for preliminary relief.  Order, *Small Bus. Ass'n of Mich. v. Yellen*, No. 1:24-cv-00314 (Apr. 26, 2024).

Plaintiffs contend that "[a] vague goal of 'protecting commerce' or 'deterring money laundering' is not such a scheme."  Pls.' Mot. at 15.  But the Fifth Circuit has never required the incantation of certain words before finding that a statute survives a Commerce Clause challenge.  *See GDF Realty Invs., Ltd. v. Norton*, 326 F.3d 622, 638-41 (5th Cir. 2003) (upholding Endangered Species Act provision regulating Cave Species).  Moreover, Congress plainly identified the regulatory scheme as one aimed at curbing illicit financial activity and incorporated it into the government's signature anti-money laundering statute.  NDAA §§ 6001, 6002(2), 6401.[4]

2.      The CTA is separately authorized by the Commerce Clause because it regulates economic activity with a substantial effect on interstate commerce.  After all, the CTA applies to corporations and other entities legally authorized to conduct commercial transactions, and it excludes from its reach many non-profits and domestically owned entities that are no longer "engaged in active business" or "otherwise hold[ing] any kind or type of assets."  31 U.S.C. § 5336(a)(11)(xix), (xxiii).

Plaintiffs allege that the CTA impermissibly applies to corporate entities "irrespective of the presence or absence of any commercial activity."  Pls.' Mot. at 15.  This assertion misconstrues the CTA as having nothing to do with commercial activity, as if the act of incorporation bears no rational connection to such activity.  But it is hardly speculative that entities that incur the trouble and expense of filing papers to obtain authority to conduct commercial transactions in their own name go on to engage in commercial activity.  This point is illustrated by the reporting companies at issue here.  Texas Top Cop Shop is a retail commercial enterprise, selling equipment, uniforms, and firearms.  Decl. of Linda Schneider ¶¶ 4, 7, ECF No. 6-2  Data Comm for Business "provides technical support, information technology, and communications products and services to other small businesses and individuals."  Decl. of Russell Straayer ¶ 4, ECF No. 6-3.  Mustardseed operates a dairy farm and sells

---

[4] Congressional focus on this class of commercially organized entities to report information under the CTA is far afield of Plaintiffs' suggestions that validating the CTA here would mean any person who ever registered with the government for any reason could be regulated by Congress.  Pls.' Mot. at 16.

"directly to customers[.]"  Decl. of Tony Goulart ¶ 6.  And even MSLP—which leaves unclear why it does not qualify for an exemption from the definition of "reporting company" as a tax-exempt political organization, *see* 31 U.S.C. § 5336(a)(11)(B)(xix)(II)—holds assets in its own name and transfers money derived from donations.  Decl. of Glen Lewis ¶¶ 14-15, ECF No. 6-6.[5]

In light of the documented misuse of anonymous corporations to facilitate money laundering and similar activities, the CTA reasonably applies to a class of entities that can be used to conduct and conceal illicit transactions.  *See* 31 U.S.C. § 5336(a)(11).  The universe of entities subject to the CTA's reporting requirements—which excludes many trusts, political organizations, and non-profits, as well as many entities that are no longer "engaged in active business" or "otherwise hold[ing] any kind or type of assets," *id.* § 5336(a)(11)(B)(xix), (xxiii)—confirms that the statute is a constitutional, commercial regulation.  The reporting requirements thus govern entities with both the power and the purpose of conducting the types of commercial transactions that concerned Congress.

Plaintiffs improperly focus on edge cases and possible exceptions.  Pls.' Mot. at 15.  The Supreme Court has "never required Congress to legislate with scientific exactitude."  *Raich*, 545 U.S. at 17.  Rather, "when 'a general regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual instances arising under that statute is of no consequence.'"  *Id.*  That is especially so where, as here, the "'total incidence' of a practice"—the formation of entities that may engage in commercial activity while hiding the identities of their beneficial owners—"poses a threat to a national market[.]"  *Raich*, 545 U.S. at 17; *see id.* at 23 ("[W]e have often reiterated that 'where the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class.'"); *see also* 87 Fed. Reg. 59,501.

---

[5] For these and other reasons, Plaintiffs' "as-applied" challenge fails.  Pls.' Mot. at 18 (incorrectly suggesting that Commerce Clause reaches only "entities with *significant* . . . commercial activities" or more than "very few assets[,]" and acknowledging Plaintiffs' economic activity) (emphasis added).  Further, Plaintiffs appear to concede that the statute may be constitutional as applied to other entities, *see id.*, thus dooming their facial challenge.

Finally, Plaintiffs argue that the CTA improperly "regulates the act of registration under state law[.]"  Pls.' Mot. at 15.  But the CTA does not purport to override or preempt any state-law incorporation provisions.  The reporting requirements apply to "corporation[s]" and "similar entit[ies]" authorized to do business in the United States, without regard to where, when, or how those businesses are incorporated.  31 U.S.C. § 5336(a)(11)(A).  For example, reporting companies that were formed or registered before the effective date are subject to the reporting requirements.  *See id.* § 5336(b)(1)(B).  Requiring a decades-old business to report its ownership at the time the CTA takes effect bears no resemblance to regulating the act of incorporation.

The same understanding is confirmed by other provisions of the CTA.  Businesses subject to the CTA must report changes in ownership on an ongoing basis, without regard to whether they take any new action relating to incorporation.  *See id.* § 5336(b)(1)(D).  And some businesses covered by the CTA never incorporate in the United States at all: a business incorporated in a foreign country is subject to the CTA if it is "registered to do business in the United States."  *Id.* § 5336(a)(11)(A)(ii).  Conversely, the reporting requirements do not extend to various categories of businesses—such as banks, insurers, and certain utilities—that are incorporated but are subject to other federal reporting requirements or are otherwise less likely to be used for financial crimes.  *See id.* § 5336(a)(11)(B).[6]

In short, Congress prevented certain anonymous transactions by requiring entities with the capacity to engage in commerce to identify the natural persons behind the corporate form.  Had Congress defined the relevant class of entities in terms of their capacity to engage in commercial transactions in their own name, presumably Plaintiffs would not argue this burdened state corporate organization.  Congress's decision to identify those entities in a precise and administrable way, in terms of the incorporation or registration that is a prerequisite to engaging in such transactions, does not

---

[6] This fact refutes Plaintiffs' claim that the CTA "irrationally[] excluded business . . . such as money transmitters, public companies and large private businesses."  Pls.' Mot. at 15.

transform the CTA into a regulation of incorporation or registration.

3.      The CTA is thus a fundamental part of Congress's regulation of commerce and bears no resemblance to the enactments that the Supreme Court has held to exceed Congress's authority. *See* Pls.' Mot. at 14, 16.  Unlike in *Lopez* or *Morrison*, "inference upon inference" are not needed to connect the CTA with commerce.  *Lopez*, 514 U.S. at 561, 567; *Morrison*, 529 U.S. at 613.  And unlike this case, neither *Lopez* nor *Morrison* "involved the power of Congress to exert control over intrastate activities in connection with a more comprehensive scheme of regulation[.]"  *Raich*, 545 U.S. 1 at 39 (Scalia, J., concurring in the judgment).  The reporting requirements also differ from the statutory provision at issue in *NFIB*, which "requir[ed] that individuals purchase health insurance."  *NFIB*, 567 U.S. at 548 (op. of Roberts, C.J.).  That requirement "primarily affects healthy, often young adults[,] who are less likely to need significant health care," and thus targets "a class whose commercial inactivity rather than activity is its defining feature."  *Id.* at 556.  Here, however, the CTA regulates a class of entities—primarily active, for-profit businesses—whose defining feature is their ability to conduct commercial transactions without disclosing their real parties in interest.  For the same reason, Plaintiffs' reliance on *BST Holdings, L.L.C. v. OSHA*, is misplaced.  *See* 17 F.4th 604, 617 (2021) (discussing vaccine mandate).

Unlike where Congress asserts unprecedented and "extraordinary" powers, *NFIB*, 567 U.S. at 560 (op. of Roberts, C.J.), "[r]egulation requiring the submission of information" is a "familiar category" of federal legislation, *Elec. Bond & Share Co. v. SEC*, 303 U.S. 419, 437 (1938); *see, e.g.*, 26 U.S.C. § 6012 (tax returns); 31 U.S.C. § 5311 (bank reports about transactions); 52 U.S.C. § 30104 (political campaign contributions).  And more generally, the CTA continues Congress's long and extensive history of regulating businesses.  *E.g.*, 15 U.S.C. § 1 et seq. (Sherman Act); 29 U.S.C. § 201 et seq. (FLSA); 15 U.S.C. § 45 (FTCA); *see N. Am. Co. v. SEC*, 327 U.S. 686, 706 (1946).  The CTA's reporting requirements are thus a conventional legislative response to enforcement challenges.

4.      The CTA is further authorized by the Commerce Clause because it regulates the channels of, and entities in, interstate commerce.  "Congress, of course, has undoubted power under the [C]ommerce [C]lause to impose relevant conditions and requirements on those who use the channels of interstate commerce so that those channels will not be conduits for promoting or perpetuating economic evils." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 99 (1946); *see also N. Am. Co.*, 327 U.S. at 705-06.  "Thus to the extent that corporate business is transacted through such channels, affecting commerce in more states than one, Congress may act directly with respect to that business to protect what it conceives to be the national welfare[,]" and "[i]t may prescribe appropriate regulations and determine the conditions under which that business may be pursued." *Am. Power & Light Co.*, 329 U.S. at 99-100.  Entities constituting CTA reporting companies utilize the channels of interstate commerce, including telecommunications and electronic bank routing systems.  NDAA §§ 6002, 6402; 166 Cong. Rec. at S7310 (statement of Sen. Brown); 166 Cong. Rec. at H6932 (statement of Rep. McHenry).  As the foregoing cases explain, Congress's power to regulate interstate commerce extends beyond directly regulating such networks, and includes the power to regulate those entities who seek to misuse those channels to commit economic crimes.  The CTA's reporting requirements are thus an authorized use of Congress's power.

5.      The CTA is also necessary and proper for carrying into execution other powers.  First, the CTA effectuates Congress's power "[t]o regulate Commerce with foreign Nations."  U.S. Const. art. I, § 8, cl. 3.  "The plenary authority of Congress to regulate foreign commerce, and to delegate significant portions of this power to the Executive, is well established." *Shultz*, 416 U.S. at 59.  The "Founders intended the scope of the foreign commerce power to be . . . greater" than the interstate commerce power. *Japan Line, Ltd. v. Cnty. of Los Angeles*, 441 U.S. 434, 448 (1979).  Congress expressly found that the CTA "is needed to . . . protect . . . foreign commerce."  NDAA § 6402(5)(C).  The legislative record also confirms that foreign actors are engaging in illicit activity by exploiting lax

19

beneficial ownership reporting requirements within the United States. *E.g.*, 166 Cong. Rec. at S7310 (statement of Sen. Brown); 166 Cong. Rec. at H6932 (statement of Rep. McHenry); *Beneficial Ownership: Fighting Illicit International Financial Networks Through Transparency: Hearing before the Senate Judiciary Comm.*, 115th Cong. (2018) (statement of Sen. Grassley).

The CTA additionally aids the enforcement of prohibitions designed to protect U.S. foreign policy and national security interests. "Congress has broad power under the Necessary and Proper Clause to enact legislation for the regulation of foreign affairs." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963); *see also Hernandez v. Mesa*, 589 U.S. 93, 103-04 (2020). The same is true of matters pertaining to national security, which "is the prerogative of the Congress and President." *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Ullmann v. United States*, 350 U.S. 422, 436 (1956). The already "strong presumption of constitutionality due to an Act of Congress," *United States v. Di Re*, 332 U.S. 581, 585 (1948), is heightened where a statute "implicates sensitive and weighty interests of national security and foreign affairs[,]" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).

Congress found that "malign actors seek to conceal their ownership of corporations, limited liability companies, or other similar entities in the United States to facilitate illicit activity, . . . harming the national security interests of the United States and allies of the United States[.]" NDAA § 6402(3). And Congress concluded that collecting beneficial ownership information "is needed to . . . protect vital Unite[d] States national security interests"; "better enable critical national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit activity"; and "bring the United States into compliance with international anti-money laundering and countering the financing of terrorism standards[,]" *id.* § 6402(5). The Executive Branch agrees with that assessment. *See, e.g.*, 87 Fed. Reg. at 59,498. The elected Branches' foreign affairs and national security powers, as amplified by the Necessary and Proper Clause, thus authorize the CTA.

Plaintiffs' argument to the contrary largely depends on the incorrect premise that the CTA

intrudes on states' authority to regulate corporate formation.  Pls.' Mot. at 11-12.  Moreover, the Necessary and Proper Clause empowers Congress to carry into execution not only the powers delineated in Article I, but also "all other Powers vested by this Constitution in the Government of the United States," including "Powers vested . . . in any Department or Officer."  U.S. Const. art. I, § 8, cl. 18.  That includes Congress's powers over foreign affairs and national security, *see United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 318 (1936), as well as the President's powers to conduct "law enforcement[,]" gather "intelligence," prevent "terrorism," and safeguard "national security," NDAA § 6402(5)(D).  Nor can Plaintiffs support their theory by citing *Bond v. United States*, 572 U.S. 844 (2014), Pls.' Mot. at 11-12, which is far afield.  First, *Bond* involved statutory interpretation, and did not involve the constitutional question of Congress's broad foreign affairs and national security powers.  *See id.* 572 U.S. at 856.  Second, *Bond* involved a "purely local crime" (theft), described by the Supreme Court as an "unremarkable local offense."  *See id.* at 848.  Here, as Congress explained in enacting the AMLA, the CTA is necessary to prevent interstate and international money laundering, terrorism financing, and tax evasion.

Plaintiffs fare no better in complaining about the scope of the CTA.  Insofar as it regulates a corporate entity "formed under the law of a foreign country," 31 U.S.C. § 5336(a)(11)(A)(ii), it is not "a purely domestic statute," Pls.' Mot. at 11, and in any event, Congress can regulate U.S. persons in furtherance of national security and foreign policy interests, *Worthy v. United States*, 328 F.2d 386, 393 (5th Cir. 1964) (recognizing congressional authority "to require passports and to impose reasonable restrictions upon foreign travel").  Nor can Plaintiffs rely on *Dunbar v. Seger-Thomschitz*, 615 F.3d 574 (5th Cir. 2010), cited in Pls.' Mot. at 12; that case not only involved a preemption claim (not present here), but also affirmed the importance of allowing the political branches to effectuate U.S. foreign policy.  *Dunbar*, 615 F.3d at 579.  Finally, Plaintiffs' "as-applied" challenge incorrectly assumes that Congress's exercise of its foreign affairs powers must be grounded in a "compelling international

interest[,]"*see* Pls.' Mot. at 18; rather, Congress may enact laws rationally related to this power and need not show that every entity subject to the law poses a threat to national security.

The reporting requirements are also a necessary and proper exercise of the government's authority to lay and collect taxes.  U.S. Const. art. I, § 8, cl. 1.  Pursuant to that authority, Congress may pass laws "in aid of a revenue purpose[,]" *see Sonzinsky v. United States*, 300 U.S. 506, 513-14 (1937), and to facilitate tax collection, *see Helvering v. Mitchell*, 303 U.S. 391, 399 (1938).  Indeed, Congress has given the IRS "broad power to require the submission of tax-related information that it believes helpful in assessing and collecting taxes." *CIC Servs., LLC v. IRS*, 593 U.S. 209, 212 (2021); *see Shultz*, 416 U.S. at 26.  The reporting need not be "coupled with a concurrent tax" but can be "designed to aid the collection of tax [in the] future." *United States v. Matthews*, 438 F.2d 715, 717 (5th Cir. 1971). Here, Congress determined that the lack of beneficial ownership information allows criminals to obscure their income and assets and thus "facilitate[s] . . . serious tax fraud."  NDAA § 6402(3). Congress found that the new reporting requirements would be "highly useful" in detecting tax fraud, 31 U.S.C. § 5336(a)(11)(xxiv)(ii), and improving "tax administration" generally, *id.* § 5336(c)(5)(B). The requirements are thus authorized by Congress's authority to take all steps necessary and proper to preserve the government's ability to lay and collect taxes.  *See Jinks v. Richland Cnty.*, 538 U.S. 456, 462 (2003) (statute need not be "absolutely necessary" to regulatory regime); *Comstock*, 560 U.S. at 133-34 (sufficient if law is "convenient, or useful").

The extent of Plaintiffs' misunderstanding of controlling cases is exemplified by their claim that the Necessary and Proper Clause does not "provide an independent source of power" and instead "merely allows [the] execution of existing powers, and, at most, forgives borderline questions concerning 'individual applications of a concededly valid statutory scheme.'" Pls.' Mot. 17 (quoting *Raich*, 545 U.S. at 72).  To the contrary, the Supreme Court has long recognized that the Clause vests Congress with broad authority to adopt measures to effectuate its powers.  *See M'Culloch v. Maryland*,

22

17 U.S. (4 Wheat.) 316, 421 (1819).  The Court has accordingly upheld many significant exercises of federal authority under the Necessary and Proper Clause, including the creation of a national bank, the establishment of the federal prison system, and the enactment of large portions of the federal penal code.  With those benchmarks in mind, the limited reporting requirements at issue here represent a particularly appropriate exercise of Congressional authority under the Clause.

Nor can Plaintiffs contend that the CTA is an invalid exercise of the tax power because it permits the same information to also be used for other non-tax purposes.  "[A] law does not stop being a valid tax measure just because it also serves some other goal."  *United States v. Bolatete*, 977 F.3d 1022, 1032 (11th Cir. 2020); *see Sonzinsky*, 300 U.S. at 513-14.  Here, ownership reporting requirements play a significant role in preventing tax evasion.  That they further other important government objectives supports, rather than undermines, Congress's power to enact them.  Plaintiffs' "as-applied" challenge likewise fails, Pls.' Mot. at 18, as individualized suspicion is not needed to require tax reporting, and Congress reasonably determined that existing tax laws were not adequate.[7]

### C.  The CTA's Disclosure Requirements Do Not Violate the First Amendment

Plaintiffs next assert that the CTA, on its face, unduly burdens "expressive associational right[s]."  Pls.' Mot. at 19.  Here, Plaintiffs appear to present an "overbreadth" First Amendment challenge, pursuant to which Plaintiffs must show that "a substantial number of [the CTA's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021).

But the limited ownership reporting requirements at issue here raise no First Amendment concern.  As an initial matter, the CTA does not restrict the expression of any entity.  Instead, it merely requires that certain businesses report their applicants and beneficial owners to FinCEN.  The

---

[7] Count I of Plaintiffs' Complaint appears to assert a claim under the Tenth Amendment.  Compl. ¶¶ 127-28.  As Plaintiffs do not brief this claim in their motion, Defendants do not respond to it here. *Cf. Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003).

government routinely requires entities to report similar information.  For example, taxpayers must disclose detailed information on their tax returns, *see* 26 U.S.C. § 6012; political campaigns must report contributions and expenditures, *see* 52 U.S.C. § 30104; and corporations involved in federal litigation must generally disclose their owners, *see*, *e.g.*, Fed. Reg. Civ. P. 7.1(a).  These and other disclosure requirements have long been understood as constitutional, and Plaintiffs identify no basis for treating the CTA differently.  That is fatal to their First Amendment claim.

Fifth Circuit case law also confirms that the CTA readily passes muster under the First Amendment.  As the court recently reaffirmed, requirements that regulated entities disclose "factual and uncontroversial" information at most implicate a "deferential standard of review, under which the [disclosures] must be 'reasonably related to the State's interest' and not 'unjustified or unduly burdensome.'"  *RJ Reynolds Tobacco Co. v. FDA*, 96 F.4th 863, 882 (5th Cir. 2024); *see also Chamber of Commerce of United States v. SEC*, 85 F.4th 760, 767 (5th Cir. 2023) (SEC's stock buy-back rationale disclosure requirement did not impermissibly compel speech).  There can be no dispute that the disclosures at issue here, which involve basic information regarding an entity's beneficial owners, are "factual and uncontroversial."  *RJ Reynolds*, 96 F.4th at 882.  And Plaintiffs make no attempt to argue that the "deferential standard" applicable to factual and uncontroversial information would not be satisfied here.  That is unsurprising given Congress's finding that the CTA is needed to advance law enforcement and national security interests of the highest order, *see* NDAA § 6402(5), and the CTA's tailored focus on those entities that can be used to perpetrate financial crimes.

The cases Plaintiffs cite only serve to underscore that their First Amendment claim is meritless.  In *NAACP v. Alabama ex rel Patterson*, 357 U.S. 449, 463 (1958), the Court invalidated a state statute that compelled an advocacy group to disclose its members "because NAACP members faced a risk of reprisals if their affiliation with the organization became known" and because the government "had demonstrated no offsetting interest 'sufficient to justify'" the disclosure.  *Bonta*, 594 U.S. at 606-607

(summarizing *NAACP*).  Here, the CTA does not require the disclosure of individuals who are merely associated with regulated entities through run-of-the-mill membership; rather, it only requires the disclosure of those "beneficial owners" who own or control regulated entities.   31 U.S.C. § 5336(a)(3)(A).  Nor do Plaintiffs assert—let alone show—that they face any "risk of reprisal" as a result of the CTA's reporting requirements.  *Bonta*, 594 U.S. at 606-07.

Plaintiffs offer no evidence that someone would hesitate to become an owner of a company because the fact of their ownership would become known to the federal government, and the government may later use that information for a limited set of legitimate purposes.  Their speculative, conclusory assertions that their companies' advocacy "could be threatened if the members of each business were required to reveal their identities," Pls.' Mot. at 22, are insufficient, *see Citizens United v. FEC*, 558 U.S. 310, 370 (2010); *Laird v. Tatum*, 408 U.S. 1, 13 (1972); *Ala. State Fed'n of Tchrs., AFL-CIO v. James*, 656 F.2d 193, 197 (5th Cir. 1981).  Indeed, the record is to the contrary: Data Comm for Business has both disclosed the identity of its leadership and publicly advocated for the repeal of the CTA.  Straayer Decl. ¶¶ 2, 11.  So have Mustardseed and MSLP.  Goulart Decl. ¶¶ 2, 14; Lewis Decl. ¶¶ 3, 10.  Plaintiffs have not "made [any] showing that on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility."  *NAACP*, 357 U.S. at 462.  There is no reason to credit Plaintiffs' conclusory assertion that confidentially reporting information in accordance with the CTA would chill expressive conduct.

Nor can Plaintiffs advance their argument by highlighting MSLP, "a political party[.]"  Pls.' Mot. at 21.   Again, MSLP's Executive Committee is publicly available online, https://perma.cc/UZY8-KV3X, undercutting the notion that disclosure to FinCEN would chill any of MSLP's advocacy work.  And although MSLP states that (but does not explain why) it is "not currently regarded as a political organization pursuant to Section 527 of the Internal Revenue Code,"

Lewis Decl. ¶ 11; Pls.' Mot. at 22 (MSLP "could potentially qualify for federal exemption"), the CTA provides an exemption for such entities, 31 U.S.C. § 5336(a)(11)(B)(xix)(II), further detracting from Plaintiffs' ability to show that the CTA would likely chill protected speech or association.[8]

### D.  The CTA Does Not Violate the Fourth Amendment

Plaintiffs' Fourth Amendment claim is equally meritless.  The Supreme Court has long-recognized that reporting requirements of the kind at issue here raise no Fourth Amendment concern.  In *Shultz*, the Court upheld a statute requiring banks to report transactions over a specified dollar amount to the government.  416 U.S. at 67; *see* 31 U.S.C. § 5313.  For each covered transaction, a bank must disclose the "name," "address," and "social security or taxpayer identification number" of "the individual presenting [the] transaction."  *See e.g.*, 31 C.F.R. § 1010.312.  Congress explained that this information would be "highly useful" in "criminal, tax, or regulatory investigations."  31 U.S.C. § 5311(1).  Because the relevant "information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type," the Court concluded that the reporting requirements were reasonable and therefore sustained them under the Fourth Amendment.  *Shultz*, 416 U.S. at 67.  That conclusion reflects the well-established principle that where the government does not seek to make "non-consensual entries into areas not open to the public," and instead merely requires regulated entities to divulge certain records, the Fourth Amendment is more readily satisfied.  *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Consistent with these precedents, Congress has routinely enacted reporting requirements.  For example, federal law requires taxpayers to file tax returns and various entities to file tax information returns, 26 U.S.C. §§ 6012, 6031-60; employers to collect and make available information about new

---

[8] Indeed, given all of the activities it says it engages in (soliciting and accepting donations, and providing donations to political candidates, Lewis Decl., ¶¶ 13, 14), it is unclear why the MSLP is not registered as a political organization with the IRS.  Its decision not to do so, when the choice is available to it, should not be held against FinCEN.

employees' eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104.  As the Supreme Court has explained, "reporting requirements are by no means *per se* violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States."[9] *Shultz*, 416 U.S. at 59-60.

The CTA falls comfortably within the category of reasonable reporting requirements that have long been understood to be constitutional.  As with the statute at issue in *Shultz*, the CTA directs the disclosure of information that Congress identified as "highly useful" to combatting serious crimes.  *See* NDAA § 6402(8)(C); 31 U.S.C. § 5311(1).  And with respect to the CTA in particular, Congress found that corporate ownership reporting requirements were "needed" to combat "the financing of terrorism" and to "protect vital United States national security interests."  NDAA § 6402(5)(B), (D).  The CTA therefore serves government interests of the highest order.

Any asserted privacy interest would in any event be minimized by detailed statutory safeguards that Plaintiffs do not address.  When FinCEN receives beneficial ownership information, it can only disclose that information to law enforcement and other entities in specified circumstances that sometimes require court authorization.  *See* 31 U.S.C. § 5336(c)(2).  And entities that receive ownership information from FinCEN must restrict access, implement security measures, and comply with many similar protocols.  *See id.* § 5336(c)(3).  Any individual who violates those protocols is subject to criminal and civil penalties.  *See id.* § 5336(c)(4).  Moreover, Congress exempted 23 types of entities from the beneficial ownership reporting requirements.  *See supra* at 5.  Thus, Plaintiffs are simply

---

[9] Tellingly, Declarant Russell Straayer is publicly identified on Illinois's Business Entity Search system in connection with Data Comm for Business.  And Data Comm for Business concedes that the information sought by the beneficial owner reporting requirement "is duplicative of information available in personal and corporate tax returns, FinCEN from Form 104 reporting, [and] publicly available incorporation information."  ECF No. 6-3 at p.8.  Plaintiffs thus cannot demonstrate either a subjective or objective expectation of privacy in this information.

incorrect to say that the "CTA provides no limitations."  Pls.' Mot. at 27.

Plaintiffs make no attempt to reconcile their Fourth Amendment argument with *Shultz* or with the many reporting requirements that have long been understood as constitutional.  Instead, Plaintiffs insist that there exists an ironclad requirement for a warrant or "opportunity to obtain pre-compliance review before a neutral decisionmaker" prior to disclosure.  *See* Pls' Mot. at 26.  This type of requirement is out of step with the Supreme Court's admonition that "'[t]he touchstone of the Fourth Amendment is reasonableness."  *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). Under this theory, vast swathes of state and federal law would be subject to Fourth Amendment challenges, and *Shultz* itself would be wrongly decided.  That is fatal to Plaintiffs' argument.  But rather than grapple with cases addressing reporting requirements, Plaintiffs chiefly rely (Pls.' Mot. 25-27) on *City of Los Angeles v. Patel*, which addressed an ordinance that permitted police officers to enter hotels and inspect their guest registers at any time of the day or night, as often as they liked, 576 U.S. 409, 421 (2015).  This case casts no doubt on the constitutionality of a statute that requires certain businesses to self-report their beneficial owners.

Alternatively, even as to cases that establish a warrant requirement in some contexts, the CTA falls within the "special needs" exception to such a requirement.  *Skinner v. Ry. Lab. Execs.' Ass'n*, 489 U.S. 602, 619 (1989).  The CTA addresses a need "beyond the normal need for law enforcement," *id.*—that is, the advancement of U.S. national security and foreign policy interests, *see Klayman v. Obama*, 805 F.3d 1148, 1149 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc). The compelling need to address threats to "U.S. national security and foreign policy interests," 87 Fed. Reg. at 59,500, outweighs any privacy interest in the limited disclosures required by the CTA.  *Cf. United States v. Gordon*, 2016 WL 11668976, at *3 (D. Mass. Aug. 30, 2016).[10]

---

[10] Insofar as Plaintiffs' APA claim simply recasts their constitutional challenges, Pls.' Mot. at 28, it fails for the reasons discussed above.  Defendants reserve the right to argue that the APA challenge fails

III.    **The Balance of Equities and the Public Interest Disfavor a Preliminary Injunction**

The remaining two preliminary injunction factors—the balance of the equities and the public interest—"merge when the Government is the opposing party" and weigh sharply in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  As an initial matter, because Plaintiffs cannot establish the first two factors necessary to obtain an injunction, "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009); *see Mayo Found. for Med. Educ. & Rsch. v. BP Am. Prod. Co.*, 447 F. Supp. 3d 522, 535 (N.D. Tex. 2020).

But even if Plaintiffs could satisfy one or both of the first two factors, the remaining factors tip decisively in Defendants' favor.  The speculative risk of harm to Plaintiffs' asserted interests must be weighed against the obstruction of legitimate government functions that could result if the Court entered Plaintiffs' proposed injunction.  *See Winter*, 555 U.S. at 24; *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 459 (5th Cir. 2016).  Indeed, "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up).  An injunction would interfere with Congress's judgment about how best to combat "money laundering," "the financing of terrorism," and "serious tax fraud," and its ability to do so.  NDAA § 6402(3).  These compelling interests weigh heavily against granting an injunction.

IV.    **Plaintiffs' Proposed Injunction Is Improper**

Even if the Court disagrees with Defendants' arguments, any preliminary relief granted must be no broader than necessary to remedy any demonstrated irreparable harms of the Plaintiffs in this case.  *See Gill v. Whitford*, 585 U.S. 48, 73 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765

---

on other grounds, including that the rule constitutes agency action committed to agency discretion by law, 5 U.S.C. § 701(a), or involves a foreign affairs function of the United States, *id.* § 553(a)(1).

(1994) (citation omitted).  The Court should, therefore, decline Plaintiffs' invitation to enjoin the CTA's reporting requirements across the board.[11]  "Both the Fifth Circuit and the Supreme Court have suggested that nationwide injunctions are, at best, reserved for extraordinary circumstances." *Second Amend. Found. v. ATF*, No. 3:21-cv-0116, 2023 WL 4304760, at *3 (N.D. Tex. June 30, 2023)). "Because plaintiffs generally are not bound by adverse decisions in cases to which they were not a party, there is a nearly boundless opportunity to shop for a friendly forum to secure a win nationwide." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 601 (2020) (Gorsuch, J., concurring); *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018).  This concern is particularly acute where, as here, the Eleventh Circuit is simultaneously considering the legality of the same challenged provisions.  *See Nat'l Small Bus. United, et al. v. U.S. Dept. of the Treasury, et al.*, No. 24-10736 (11th Cir.).  This Court should therefore follow the Fifth Circuit's mandate "to avoid rulings which may trench upon the authority of sister courts," *W. Gulf Mar. Ass'n v. ILA Deep Sea Loc. 24*, 751 F.2d 721, 729 (5th Cir. 1985), and decline to issue the broad relief that Plaintiffs request.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

---

[11] Plaintiffs first state that the "Reporting Rule Must Be Vacated As Well," but conclude by saying that "this Court should also enjoin the rule." Pls.' Mot. at 28.  Regardless of how Plaintiffs seek to set aside the rule, any relief afforded by the Court should be limited in accordance with the APA and equitable principles, including that the "relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also, e.g., Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir.) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *cert. granted*, 144 S. Ct. 374 (2023); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand).  Although Defendants recognize that the Fifth Circuit has previously accepted the argument that 5 U.S.C. § 706(2) authorizes vacatur of an agency action, *see Data Mktg. P'ship LP v. U.S. Dep't of Labor*, 45 F.4th 846, 851 (5th Cir. 2022), Defendants respectfully contend that it does not. Section 706(2) is merely a rule of decision directing the reviewing court to disregard unlawful agency action in resolving the case before it; it does not dictate any particular remedy. *See* Samuel L. Bray, Multiple Chancellors: Reforming the National Injunction, 131 Harv. L. Rev 417, 451-52 (2017); *see id.* at 438, n. 121.  The Court should thus not issue any preliminary relief that extends beyond Plaintiffs.

Dated: June 26, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director
Federal Programs Branch

*/s/ Stuart J. Robinson*
STUART J. ROBINSON
Senior Counsel
FAITH E. LOWRY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (415) 436-6635
Email: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

On June 26, 2024, I electronically submitted this document to the clerk of court of the U.S.

District Court for the Eastern District of Texas using the court's electronic case filing system.  I certify

that I have served all parties electronically or by another manner authorized by Federal Rule of Civil

Procedure 5(b)(2).

*/s/ Stuart J. Robinson*
STUART J. ROBINSON