**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., ET AL.,<br>　　　Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES,<br>ET AL.<br>　　　Defendants. | CIVIL ACTION NO.: 4:24-CV-00478-ALM<br><br>**REPLY IN SUPPORT OF PLAINTIFFS' MOTION**<br>**FOR PRELIMINARY INJUNCTION** |

**I. PLAINTIFFS FACE IRREPARABLE HARM ABSENT THE INJUNCTION**

Unless Defendants are enjoined from enforcing the CTA, Plaintiffs will soon suffer irreparable injuries from nonrecoverable compliance costs and injury to constitutional rights. *See* Pl. Br. at 28. In response, though, the Government says, "Plaintiffs' delay in seeking preliminary relief following passage of the CTA weighs heavily against any argument that they might suffer imminent, irreparable injury absent emergency relief," on *the same page* that it says the request is *premature* because "[n]o Plaintiff is required to comply with the CTA until January 1, 2025." Def. Br. at 8. Both cannot be true. This pre-enforcement challenge has been brought as soon as practicable and before the looming deadline.

Without mentioning *Rest. Law Ctr. v. DOL*, 66 F.4th 593 (5th Cir. 2023), the Government next says, "Plaintiffs have not shown that their own alleged compliance costs are more than *de minimis*," because they rely on "wholly conclusory" declarations. Def. Br. at 9. But in *Rest. Law Ctr.* the Fifth Circuit rejected the same argument as "meritless." 66 F.4th at 598. That case also involved a preliminary challenge to a federal regulation, and the plaintiffs had argued they suffered irreparable injuries from unrecoverable compliance costs. *Id.* at 597. The plaintiffs "point[ed] out that the Department concedes that some businesses will incur ongoing costs to comply with the rule," and "produced uncontested evidence that ... project precisely those kinds of ongoing management costs." *Id.* at 597-98. Even though "Plaintiffs did not convert each allegation of harm into a specific dollar amount," they had amply shown irreparable harm. *Id.* at 599-600.

The proof presented here is of the same type involved in that case, and likewise demonstrates significant costs that cannot be recovered. The Government incorrectly says that the only evidence presented by Plaintiffs "consist[s] of a single statement in the non-associational Plaintiffs' declarations." Def. Br. at 9. In fact, Plaintiffs presented six declarations in which each of the plaintiffs averred that they would need to spend time and effort to make the required filings, and incur legal costs in the process. *See* Pl. Br., Ex. A-F.

While the Government glibly says that the compliance costs won't be significant, Def. Br. at 9, just as in *Rest. Law Ctr.*, the Government ignores the points made by each plaintiff as well as FinCEN's own analysis. As each declarant averred, the compliance costs include not only filing the reports, but the cost of legal services to make sure that the information is comprehensive and accurate. *See* Pl. Br. at 9. FinCEN itself estimated the *initial* burden on entities like Plaintiffs would be 126.3 million hours, for a total cost of

approximately $22.7 billion. *See* 87 Fed. Reg. 59498, 59585-86. These costs arise for filing initial reports, reviewing information, and complying with ongoing duties to update them when information changes. *Id*. at 59581. FinCEN also recognized that entities face different regulatory burdens depending on their "beneficial ownership structure," with "simple," "intermediate" and "complex" structures facing differing obligations, with the burden on each filer to file *initial* reports as $85.14, $1,350, and $2,614.87 respectively, and the burden to *update* the reports for each filer as $37.84, $299.33, and $560.81. *Id.* at 59574, 59576. Thus, FinCEN says that each named plaintiff, assuming they are the simplest of filers, would incur more than $100 in compliance costs in the first year; if any were complex, that number rises to well over $3,000 each. *See id.* Many of the plaintiffs, such as the Libertarian Party of Mississippi (MSLP), have complex structures that make compliance difficult. *See, e.g.*, Ex. E at ¶¶ 16-20. The National Federation of Independent Business (NFIB)'s significant number of members range from very complex to very simple structures, each requiring some level of compliance costs. Ex. F at ¶¶ 5-7. This Court should therefore accept FinCEN's concession that the CTA "will have a significant economic impact on a substantial number of small entities." 87 Fed. Reg. at 59550.

## II. PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS

In its response, the Government first applies the wrong standard to the relevant claims, saying that Plaintiffs "have not 'clearly demonstrated' that Congress lacked the constitutional authority to pass the CTA," and that they failed to "establish that no set of circumstances exists under which the Act would be valid." Def. Br. at 10 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012)). But neither presents the correct standard.

At this stage, Plaintiffs need only show "a substantial likelihood of success" on one merits argument. *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022). The *Salerno* "no set of circumstances" language "is correctly understood not as a separate test applicable to facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." *Club Madonna Inc. v. Miami Beach*, 42 F.4th 1231, 1256 (11th Cir. 2022). Each claim must pass "the relevant constitutional test," and the Government cannot simply "conjure up just one hypothetical factual scenario" to justify its position. *Id.*; *see also Am. for Prosp. v. Bonta*, 594 U.S. 595, 615-16 (2021) (rejecting *Salerno* in facial First-Amendment challenge because of overbreadth that created *risk* of chilled speech).

**A. The CTA Exceeds Congress' Enumerated Powers**

The CTA is unlawful because it exceeds the limited, enumerated, powers given to the federal government.[1] The Government's attempts to justify the statute under the federal commerce power, augmented by the Necessary and Proper Clause, must fail. *See* Def. Br. at 10-11.

There are "three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995).

The CTA applies to "reporting companies," defined (with a list of exceptions) as entities "created by the filing of a document" "with a secretary of state or a similar office." 31 U.S.C. § 5336(a)(11). The CTA then mandates that those entities report information about their beneficial owners and applicants to FinCEN. *Id*. § 5336(b)(1)-(2)(A). The CTA thus applies irrespective of financial or commercial activity, much less interstate or international activity. The Government even conceded in prior litigation that the Act's application to merely "filing [] a document" with a registrar is not a direct regulation of interstate commerce, and it has not disavowed that concession here. *See NSBU v. Yellen*, No. 5:22-cv-1448-LCB, 2024, U.S. Dist. LEXIS 36205, at *39 (N.D. Ala. Mar. 1, 2024). "Because the CTA does not regulate commerce on its face, contain a jurisdictional hook, or serve as an essential part of a comprehensive regulatory scheme, it falls outside Congress' power to regulate non-commercial, intrastate activity." *Id.* at *55.

The Government insists that the CTA is justified by all three categories from *Lopez*. But its argument concerning the first two categories is obviously wrong. The Government says that the CTA lawfully regulates "the channels of, and entities in, interstate commerce," but then only asserts that "[e]ntities constituting CTA

---

[1] The Government feigns confusion on this issue, noting that "Plaintiffs' Complaint appears to assert a claim under the Tenth Amendment," but then insisting that "Plaintiffs do not brief this claim in their motion." Def. Br. at 23 n. 7. As Plaintiffs argued in their opening brief, though, "The Tenth Amendment *confirms* that the federal Constitution reserves all 'powers not delegated to the United States by the Constitution, nor prohibited by it to the States,' 'to the States respectively, or to the people'" and, "[a]n individual plaintiff may challenge federal action as exceeding Congress's limited, enumerated, powers." Pl. Br. at 10 (citing *Bond v. United States*, 564 U.S. 211, 222 (2011)) (emphasis added).

reporting companies utilize the channels of interstate commerce, including telecommunications and electronic bank routing systems." See Def. Br. at 19. It doesn't say that *Plaintiffs* do so, it simply argues that *some* corporations do. The Government then says, "Congress's power to regulate interstate commerce extends beyond directly regulating such networks, and includes the power to regulate those entities who seek to misuse those channels to commit economic crimes." *Id.* But the CTA does not *regulate* channels or instrumentalities, and it applies regardless of whether an entity uses them. Accordingly, it cannot be justified by the first two classes of permissible commerce regulation. *See Lopez*, 514 U.S. at 549. Even a cursory review of the examples the Court gave in *Lopez* of regulating "channels" and "instrumentalities" (*id.* at 558-59) demonstrate that the CTA simply cannot be shoehorned into those regulatory categories.

The Government thus attempts to justify the CTA as a means to "effectuate[] legitimate prohibitions on harmful forms of economic activity," Def. Br. at 13, rather than a direct regulation of interstate commerce. In other words, the Government says the CTA is valid "because it regulates economic activity with a substantial effect on interstate commerce." Def. Br. at 15.

When a statute relies on the third *Lopez* category the question is whether the statute regulates "an economic class of activities" or "non-economic activity." *Gulf Coast Hotel-Motel Ass'n v. Miss. Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 505 (5th Cir. 2011). Only when the regulated activities "are part of an economic 'class of activities' that have a substantial effect on interstate commerce," may a court consider their aggregate interstate consequences. *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).

The Government assumes the CTA regulates economic activity, and accuses Plaintiffs of "improperly focus[ing] on edge cases and possible exceptions." Def. Br. at 16. But the CTA doesn't regulate an economic class of activity *at all* because filing a paper with a state to create an entity is not an economic activity, even if some of the entities will eventually engage in commerce. *See* Pl. Br. at 15. Regulating the filing of a paper is not an "edge" case, but the very essence of the CTA.

The Government says that Plaintiffs' argument "misconstrues the CTA as having nothing to do with commercial activity, as if the act of incorporation bears no rational connection to such activity." Def. Br. at 15. A "connection" is not enough or the result in *Lopez* and *Morrison* would have been different. The statute must *regulate* commercial activity. The Government can't aggregate *non-economic* activity simply because many

4

regulated parties might also engage in commercial conduct. *See Taylor v. United States*, 579 U.S. 301, 306 (2016). For instance, the Government insists that MSLP's wholly intrastate activities are similar to interstate commerce, because the party "holds assets in its own name and transfers money derived from donations," Def. Br. at 16, even though the CTA does nothing to regulate the small sums it uses for political expenditures within Mississippi. *See* Ex. E at ¶¶ 14-15. If the Government was correct, then it could regulate any person in any manner, simply because that person will likely engage in interstate commerce in other instances throughout his life. *Cf. NFIB*, 567 U.S. at 557 ("The Commerce Clause is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions.").

The Government's further reliance on findings about money laundering and international terrorism errs. The Government points to lofty statements made by Congressional committees that a "'lack of transparency' [in state law] has been 'a primary obstacle to tackling financial crime in the modern era,'" and Congressional findings in the Act's preamble suggesting that "[v]arious economic crimes are made easier to commit, and harder to discover, through the formation of corporate entities that may conduct economic transactions in their own names without disclosing beneficial ownership information." Def. Br. at 12. Tellingly, the Government omits the operative language of the CTA and its operation broadly to a class of noneconomic activity—the filing of a document with a state registrar. "Simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so." *Morrison*, 529 U.S. at 614. Whatever the goals, "No matter how inherently integrated" an activity regulated (or mandated) by a law is with commerce, "they are not the same thing: They involve different transactions, entered into at different times, with different" parties. *NFIB*, 567 U.S. at 558.

The Government next says the CTA forms "a critical part of the federal government's comprehensive anti-money laundering regime" because it "is a part" of the Anti-Money Laundering Act of 2020 (AMLA), and that "failure to include the CTA in the AMLA would have left a 'gaping hole' in Congress's efforts to curb illicit financial activity." Def. Br. at 11-13. The CTA was one of hundreds of laws rolled into an end-of-year defense budget statute. *See* National Defense Authorization Act (NDAA) for Fiscal Year 2021, Pub. L. 116-283. AMLA was divided into divisions within the NDAA, with four sections amending the Bank Secrecy Act, and the final

constituting the CTA. *See id.*, Section 6002. The CTA was the only stand-alone statute, and there is nothing to indicate it is "integral" to the rest of the omnibus law or AMLA. *See id.*

To be sure, "Congress can regulate purely intrastate activity that is not itself 'commercial,' . . . if it concludes that failure to regulate that class of activity would undercut the regulation of the [relevant] interstate market." *Raich*, 545 U.S. at 18. But *Raich*'s lesson was that the historical regulation of the entire market of illicit drugs might be undermined by individual exemptions for home-grown marijuana. *See id*. at 41-42. FinCEN's role in combatting financial crime in no way *depends* on the *upcoming* CTA registration regime. (If it did, it is hard to understand why Congress made it effective four years after passage; money laundering has not been on hiatus during the interim.) The CTA isn't constitutional just because it might make things easier for FinCEN as a financial regulator. Nor can Congress issue any law with no apparent connection to an enumerated power simply because it has already entered a permissible subject area. If that were the case, then Congress' longstanding regulation of the healthcare market would have authorized the Affordable Care Act under the commerce power. *Cf. NFIB*, 567 U.S. at 560 ("No longer would Congress be limited to regulating under the Commerce Clause those who by some preexisting activity bring themselves within the sphere of federal regulation. Instead, Congress could reach beyond the natural limit of its authority and draw within its regulatory scope those who otherwise would be outside of it.").

The Government finally relies upon the Necessary and Proper Clause, which the Supreme Court has labelled the "last, best hope of those who defend *ultra vires* congressional action." *Printz v. United States*, 521 U.S. 898, 923 (1997). Specifically, it leans on Congress' ability to conduct foreign affairs and lay and collect taxes, and while never directly claiming these enumerated powers support the CTA, it insists that the statute is a necessary and proper means of effectuating them. *See* Def. Br. at 19-23.

The Clause "does not license the exercise of any great substantive and independent powers beyond those specifically enumerated." *NFIB*, 567 U.S. at 559. So, even though it might prefer not to, the Government must still show the CTA is both "necessary" *and* "proper" to serve an enumerated power. *Id.* at 560.

Neither the power over foreign affairs nor the taxing power justify the CTA. For the former, the Government insists, vaguely, that "the CTA is necessary to prevent interstate and international money laundering, terrorism financing, and tax evasion." Def. Br. at 21. Yet foreign entities wishing to do business

6

in this country are only a small subset of the entities that must register under the CTA. *See* 31 U.S.C. § 5336(a)(11). A *possible* international application of a domestic statute is not a magic escape valve for all limits on federal authority. *See Bond*, 572 U.S. at 883 (Scalia, J., concurring).

The taxing power likewise fails, because the CTA is not a "tax," which is an "exaction" that "produces at least some revenue for the Government." *See NFIB*, 567 U.S. at 564. Allowing Congress to rely on the taxing power here, through some derivative application of the Necessary and Proper Clause, would mean that any act that could conceivably lead the federal government to someday gather revenue would be permissible. Such broad federal power is hardly "narrow in scope" or "incidental" to the taxing power, and thus cannot justify the CTA. *See NFIB*, 567 U.S. at 560.

**B. The CTA Impermissibly Chills Protected First Amendment Activities**

The Court's decision in *Americans for Prosperity v. Bonta*, 594 U.S. 595 (2021) shows that the CTA violates First Amendment scrutiny. There, as here, a law mandating disclosure of the identities of people who influence the actions of expressive associations violated exacting First Amendment scrutiny. Running headlong into this precedent, the Government insists, however, that the CTA is constitutional because it doesn't implicate expressive interests at all and isn't subject to *any* constitutional scrutiny. Def. Br. at 23-24.

But the CTA mandates disclosure of the identities of members of organizations that engage in expressive activities. *See* Pl. Br. at 21-22. The relevant threshold question is thus whether Plaintiffs engage in "expressive association." *See McDonald v. Longley*, 4 F.4th 229, 245 (5th Cir. 2021).

Despite the Government's flippant view that the CTA's mandates are insubstantial, the statute sweeps expressive conduct into its orbit, such as the identities of those associated with the political advocacy of NFIB (such as Data Comm for Business, Inc.) and the identities of MSLP's control persons. *See* Pl. Br. at 21-23. The Government also does not dispute that the CTA was intended in part to allow the government to determine "the identities behind big political spending." *See* Congressional Record, Vol. 163, No. 101 at S3469.[2] The CTA thus plainly applies to expressive association.

---

[2] Perhaps because it realizes that MSLP has such profound expressive interests at stake, the Government insists that the MSLP has no basis to complain about the CTA's burdens because the CTA provides an exemption for *other* political parties. *See* Def. Br. at 25-26. It does not dispute that MSLP must comply.

7

The Government ignores each of the expressive activities outlined by Plaintiffs, choosing instead to note that the regimes in *AFP* and *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449 (1958), differed somewhat from the CTA's. *See* Def. Br. at 25. As the CTA's disclosures implicate expressive concerns, the Government's point speaks only to the application of constitutional scrutiny.

As the Court said in *AFP*, "disclosure requirement imposes a widespread burden on donors' associational rights. And this burden cannot be justified on the ground that the regime is narrowly tailored to investigating charitable wrongdoing, or that the State's interest in administrative convenience is sufficiently important." 594 U.S. at 618. Ignoring the relevant test, the Government never explains why there is "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *See id.* at 611. But the CTA fails scrutiny in part because it applies to Plaintiffs' expressive activities while it exempts many other entities involved in financial transactions. *See* 31 U.S.C. § 5336(a)(11)(B).

The Government's arguments next focus on whether the Act censors protected speech, saying that "Plaintiffs offer no evidence that someone would hesitate to become an owner of a company because the fact of their ownership would become known to the federal government[.]" Def. Br. at 25. The Government also claims that none of Plaintiffs' expressive interests are meaningful, because some information about some of the plaintiffs is already publicly available. *Id.*

These arguments are both irrelevant and incorrect. The CTA's unlawful demands "*might* chill association." *See AFP*, 594 U.S. at 615 (emphasis added). Plaintiffs need not "show[] that [individuals connected to a] substantial number of organizations will be subjected to harassment and reprisals," because the *risk* of chilled association outweighs the Government's interest in its overbroad regime. *Id.* at 617. Plaintiffs have also averred that they have yet to comply with the CTA because of its intrusion into protected interests. *See* Pl. Br. at 6-7. And while some associational information has already been disclosed by some of the plaintiffs, much more undisclosed information relates to expressive concerns. *See id.*

### C. The CTA Invades Fourth Amendment Interests with Insufficient Oversight

The decision in *City of L.A. v. Patel*, 576 U.S. 409, 421 (2015), demonstrates that the CTA facially violates the Fourth Amendment. Faced with this precedent, the Government relies heavily on *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), to justify its widespread practice. *See* Def. Br. 26-27.

8

A careful examination of *Shultz*, which dealt with mandated reports from banks to the government about their customers' transactions, shows the limits of that case. *See* 416 U.S. at 25-26, 66-67. The Court held that the "requirements for the reporting of domestic financial transactions abridge no Fourth Amendment right of the banks themselves." *Id.* at 66. As to a more significant challenge raised by the accountholders, the Court avoided the issue because of the third-party doctrine—customers had voluntarily disclosed this information and given up their privacy interests in it. *Id.* at 69. But Plaintiffs have done no such thing here, as they must compile and disclose the relevant information because of the CTA. As the Government does not contest, Plaintiffs also have a reasonable expectation of privacy in the information at issue because it is concededly confidential and reveals information that touches on associational rights. *See* Pl. Br. at 27.

As more recent cases have explained, the outcome in most Fourth Amendment cases relies on the presence or absence of a reasonable expectation of privacy in the target of a search. *See Carpenter v. United States*, 585 U.S. 296, 310 (2018). While *Shultz* showed that the "government may require businesses to maintain records and make them available for routine inspection when necessary to further a legitimate regulatory interest," that holding was tempered by the requirements that the demand be "'sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome.'" *Patel v. City of L.A.*, 738 F.3d 1058, 1064 (9th Cir. 2013) (en banc) (citing *Shultz*, 416 U.S. 21, 45-46, and quoting *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09 (1945)), *aff'd* 576 U.S. 409 (2015). The Court has since explained that *Shultz* was a case involving "requests for evidence implicating diminished privacy interests or for a corporation's own books," and rejected the view that "the Government may subpoena third parties for records in which the suspect has a reasonable expectation of privacy." *Carpenter*, 585 U.S. at 317-18, 318 n. 5.[3]

*Shultz*, as well as *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984), actually demonstrate the flaw in the CTA. Both cases applied the *Oklahoma Press* standard for government demands for private records. *See Donovan*, 464 U.S. at 414; *Shultz*, 416 U.S. at 67. That was the same standard at issue in *Patel*,

---

[3] The Government's invocation of other disclosure laws that it claims might be threatened by limits on the CTA falls flat. *See* Def. Br. at 27. These laws are not at issue here, and demand much different information from much different entities, often implicating the third-party doctrine. Anyway, just because they have long been "understood to be constitutional" by the Government, and apparently not challenged in court, this is not proof that they are valid. *See id.*

9

which imposes two requirements: (1) individualized suspicion and (2) precompliance review. *See Donovan*, 464 U.S. at 415; *Patel*, 738 F.3d at 1064. Both safeguards are absent in the CTA.

The Government argues that the Supreme Court's decision in *Patel* is inapposite, because it involved "an ordinance that permitted police officers to enter hotels and inspect their guest registers at any time of the day or night, as often as they liked," rather than the CTA's "reporting requirement," Def. Br. at 28, but it otherwise makes no attempt to address that case's broader application. The decision in *Patel* makes clear that if a government cannot force a hotel to compile information about its guests and disclose it on demand absent specific precompliance measures and targeted suspicion, the government surely cannot force Plaintiffs to compile even more invasive information and be forced to disclose it without even being asked.[4]

The Government next says, "Any asserted privacy interest would in any event be minimized by detailed statutory safeguards that Plaintiffs do not address." Def. Br. at 27. The Fourth Amendment limits government *collection* of information, so Defendants' reliance on safeguards that deal with how it will use the information it has already collected is completely irrelevant. *See Patel*, 576 U.S. at 421.

Finally, the Government says that there is no constitutional problems because "the CTA falls within the 'special needs' exception." Def. Br. at 28. The Court already rejected that argument in *Patel*, concluding that even if the exception applied, without precompliance review, mandatory disclosure rules would not "provide a constitutionally adequate substitute for a warrant," which is required even in closely-regulated industries. 537 U.S. at 426 (citation omitted).[5]

## CONCLUSION

This Court should preliminarily enjoin Defendants from enforcing the CTA and its implementing regulations.[6]

---

[4] Of course, Plaintiffs also addressed reporting statutes in their opening brief, noting that some courts have reviewed such laws under the Due Process Clause under "intermediate scrutiny." *See* Pl. Br. at 26 n. 4 (citing *Statharos v. NYC Taxi & Limo. Comm'n*, 198 F.3d 317, 322-23 (2d Cir. 1999)). The Government doesn't bother to address that authority or show the CTA meets that level of scrutiny. The CTA thus likely violates due process, if nothing else.

[5] Moreover, the Fifth Circuit has said, "Because this exception is narrow, federal courts must not define the industry at issue at too high a level of generality[,]" and has refused to create new exceptions absent extremely pervasive regulation. *Mexican Gulf Fishing Co. v. DOC*, 60 F.4th 956, 968 (5th Cir. 2023). The CTA's novel application to every industry, including political parties like MSLP, family farms like Mustardseed Livestock LLC, or any of the hundreds of thousands of small businesses comprising NFIB's members, is not a mere extension of pervasive oversight of a discrete and uniquely dangerous industry.

[6] The Government insists that any injunction should be limited to the parties in this case. *See* Def. Br. 29-30. But Defendants are the only entities who could enforce the CTA, so the requested relief hardly threatens to bind non-parties.

DATED: July 3, 2024.

        Respectfully submitted,

        */s/ Caleb Kruckenberg*
        **CALEB KRUCKENBERG***
        Center for Individual Rights
        1100 Conn. Ave. N.W., Suite 625
        Washington, D.C. 20036
        DC Bar No. 1617890
        202-833-8401
        kruckenberg@cir-usa.org
        *Lead Attorney for Plaintiffs*

        *Admitted *Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully submitted,

*/s/ Caleb Kruckenberg*
**CALEB KRUCKENBERG***

*Admitted *Pro Hac Vice*