UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| **TEXAS TOP COP SHOP, INC.** *et al.*, <br>     *Plaintiffs*, <br> v. <br><br> **MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES,** *et al.*, <br>     *Defendants*. | § § § § § § § § § § | **CIVIL ACTION NO. 4:24-CV-00478** |

### BRIEF FOR THE STATE OF TEXAS AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS

This case involves a Constitutional challenge to the Corporate Transparency Act ("CTA"). The CTA packs a regulatory punch and requires most entities incorporated under state law to disclose personal stakeholder information to the U.S. Department of the Treasury's criminal enforcement arm—the Financial Crimes Enforcement Network ("FinCEN"). But the Constitution does not give Congress the power to regulate millions of entities—including benefit corporations, non-profits, holding companies, political organizations, and many more—that have been granted formal corporate status by the States, simply because they obtained that status from a state. The CTA regulates corporate formation—which is governed by state law—not interstate commerce. Therefore, this Court should find the CTA unconstitutional.

### STATEMENT OF *AMICUS* INTERESTS

The CTA unconstitutionally inserts the federal government into a quintessentially state-controlled area—corporate law. And the costs from this unlawful act are staggering for Texas (and

all States) and for the people who live and work here. Texas takes seriously its longstanding and primary role in regulating corporations that are "entities whose very existence and attributes are a product of state law." *CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 89 (1987). Texas is also concerned with Congress's usurpation of power it does not have under the Commerce Clause. The CTA regulates activity—corporate formation—that is not "Commerce … among the several States." U.S. Const. Art. I, § 8, cl. 3. And Texas is also sensitive to the ways burdensome legislation and its implementing regulations hurts Texans and Texas small businesses. The CTA implicates all three of these concerns. Plaintiffs have already explained the CTA's many problems. In this brief, Texas further explains how the CTA disrupts the balance of federalism—on which our constitutional system depends—and burdens too many Texans (and all Americans) along the way.

## BACKGROUND

The CTA requires most entities incorporated under state law to disclose personal stakeholder information and other "sensitive information" to FinCEN. The CTA regulates "reporting compan[ies]," defined as "corporation[s], limited liability compan[ies], or similar entit[ies]" that are either "(i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States…." 31 U.S.C. § 5336(a)(11)(A). The CTA exempts twenty-four kinds of entities from its reporting requirements, including banks, insurance companies, and entities with more than twenty employees, five million dollars in gross revenue, and a physical office in the United States. 31 U.S.C. § 5336(a)(11)(B)—in other words, it targets and imposes costs on small businesses. FinCEN estimates that the CTA will apply to

approximately 32.6 million currently existing entities and 5 million new entities formed each year from 2025 to 2034. Final Rule, Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59549 (Sep. 30, 2022) (codified at 31 C.F.R. § 1010.380) (the "Final Rule").

The reporting requirements are triggered by the act of formation, not by engaging in interstate commerce. They apply to all "reporting entities" whether or not they engage in interstate commerce.

Knowing or willful violations of the CTA's disclosure requirements carry serious civil and criminal penalties. Willfully providing false or fraudulent beneficial ownership information or failure to report "complete or updated beneficial ownership information to FinCEN" by "any person" is punishable by a civil penalty of $500 per day, up to $10,000 in fines, and 2 years in federal prison. 31 U.S.C. § 5336(h)(1), (3)(A). A knowing and unauthorized disclosure or use of beneficial ownership information, by "any person," is punishable by a civil penalty of $500 per day, a $25,000 fine, and 5 years in federal prison. 31 U.S.C. § 5336(h)(2), (3)(B). A knowing and unauthorized use or disclosure while violating another federal law "or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period" by "any person" is punishable by a $500,000 fine and 10 years in federal prison. 31 U.S. C. § 5336(h)(3)(B)(ii)(II).

Importantly, these severe penalties can only apply to individuals and not reporting entities because, for one, a corporate entity cannot be sentenced to prison. Further, the CTA does not define "person." But it does define "United States person" (U.S.C. § 5336(a)(14)) and "Foreign person" (U.S.C. § 5336(a)(7)) to include corporations, partnerships, and trusts and it uses those terms in other provisions. *See e.g.,* 5336(a)(11)(B)(xx). Yet the CTA does not use those defined terms in its penalty provisions, so the statute can only be read to penalize individuals, not entities.

Ultimately, the CTA results in tens of millions of Americans ("beneficial owners" of "reporting entities") either disclosing their personal information (full legal name, date of birth, current address, and identification from a driver's license, ID card, or passport, along with an image of the identifying document) to FinCEN or risk years of imprisonment and thousands of dollars in civil and criminal fines.

The CTA also mandates that each State shall take the following actions: (1) the secretary of state shall periodically (including at initial formation, assessment of an annual fee, or renewal of any license to do business in the U.S.) (a) notify filers of their requirements as reporting companies and (b) provide filers with a copy of the reporting form created by the Secretary of the Treasury, (2) the secretary of state shall update the websites, forms relating to incorporation, and physical premises of the office to notify filers of their requirements as reporting companies, including providing an internet link to the reporting form created by the Secretary of the Treasury; and (3) the notifications under the above provisions "shall explicitly state that the notification is on behalf of the Department of the Treasury for the purpose of preventing money laundering, the financing of terrorism, proliferation financing, serious tax fraud, and other financial crime by requiring nonpublic registration of business entities formed or registered to do business in the United States." 31 U.S.C. § 5336(e)(2).

On September 29, 2022, FinCEN issued the Final Rule. It has an effective date of January 1, 2024. *Id.* Covered entities formed prior to January 1, 2024, must report to FinCEN by January 1, 2025; covered entities formed on or after January 1, 2024, must report to FinCEN within 90

days of formation; and covered entities formed after January 1, 2025, will have 30 days to report to FinCEN.[1] *Id.*

## ARGUMENT

### I. The CTA Regulates Corporate Formation, but no Enumerated Power Allows that Regulation.

Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several [S]tates, and with the Indian Tribes." U.S. Const. art. 1, § 8, cl. 3. That is, Congress does not have the power to regulate commerce simpliciter, but interstate commerce, foreign commerce, and commerce within the Indian Tribes. As a result, even if the rules regarding incorporation are in some way related to "commerce," that does not make them within the powers of Congress. According to the federal government, "The CTA falls within Congress's authority for two independent reasons. First, the statute regulates commercial entities and is thus directly authorized by the commerce power. Second, corporate ownership reporting requirements effectuate a number of powers vested in the federal government, including the commerce, tax, and national-security powers, and are therefore authorized by the Necessary and Proper Clause." ECF 18 at 10. Neither reason works.

The first stated reason uses the undefined term "commercial entities." The federal government also says that "the CTA applies to corporations and other entities *legally authorized to conduct commercial transactions*." *Id.* at 15 (emphasis added). So maybe a "commercial entity" is an entity "legally authorized to conduct commercial transactions." But the fact that an entity—or an

---

[1] https://www.fincen.gov/boi-faqs

individual, for that matter—is legally authorized to conduct commercial transactions is irrelevant to the question of whether the federal government can regulate its activities under the Commerce Clause. For instance, in *United States v. Lopez*, 514 U.S. 549 (1995), the issue was whether the challenged activity—carrying a firearm near schools—was commerce that Congress could regulate, not whether Mr. Lopez was "legally authorized to conduct commercial transactions." Of course Mr. Lopez was "legally authorized to conduct commercial transactions," but that had nothing at all to do with whether Congress could regulate his carrying of a firearm near a school. Likewise, the fact that covered entities are "legally authorized to engage in commercial transactions" has nothing to do with whether Congress can require them to report information when they form under state law.

Courts "have never permitted Congress to anticipate [economic] activity itself in order to regulate individuals not currently engaged in commerce." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 557 (2012). The Commerce Clause does not allow Congress to "dictate the conduct of an individual today because of prophesied future activity," *id.* and "is not a general license to regulate an individual from cradle to grave, simply because he will predictably engage in particular transactions," *id.*

While asserting that the CTA regulates commerce, the federal government also denies that the CTA regulates creating a corporate entity, yet the CTA itself states that it "set[s] a clear, Federal standard for incorporation practices." National Defense Authorization Act, Pub. L. No. 116-283, § 6402(5)(a), 134 Stat. 3388, 4604 (2021). The CTA regulates the formation of covered entities under state law, rather than commercial activities (if any) of covered entities, and it applies

whether the covered entities engage in commerce or not. Contrary to the federal government's assertion, it is not "directly authorized by the commerce power."

The Necessary and Proper argument does not work either. The Necessary and Proper Clause "gives Congress authority to 'legislate on that vast mass of incidental powers which must be involved in the constitution,'" but "it does not license the exercise of any 'great substantive and independent power[s]' beyond those specifically enumerated." *NFIB*, 567 U.S. at 559 (opinion of Roberts, C.J.) (quoting *McCulloch v. Maryland*, 17 U.S. 316, 411, 421 (1819)). The power to require registration of covered entities whether or not they engage in commerce or taxable activity is not a power incidental to the commerce power or the taxing power. It is a substantive and independent power—independent of the commerce power and the taxing power.

The federal government's assertion that the CTA is necessary and proper for some unspecified "national-security powers" rests on nothing more than its assertion that Russians, the Russian government, and the Iranian government "have attempted to use U.S. and non-U.S. shell companies to evade sanctions." ECF 18 at 13. The federal government does not even try to connect this vague assertion to a power incidental to an enumerated power to impose the reporting requirements. This argument has no limiting principle. If accepted, the federal government can regulate anything.

Because Congress lacks the power to require covered entities to comply with the reporting requirements when they (or after they) form, that power remains with the States. U.S. Const. amend. X.

## II. The CTA Regulates an Activity That the Constitution Leaves to the States.

The Constitution grants "broad powers to Congress," but "our federalism *requires* that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation." *Alden v. Maine*, 527 U.S. 706, 748 (1999) (emphasis added). States have always had the power to regulate corporations, including their formation. "A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law." *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636 (1819). That means a corporation "possesses only those properties which the charter of its creation confers upon it, either expressly, or as incidental to its very existence." *Id.* And it is *state* law that does the creating. *See*, *e.g.*, *Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 99 (1991) ("state law" "is the font of corporate directors' powers" (quoting *Burks v. Lasker*, 441 U.S. 471, 478 (1979))). So as the Supreme Court has long recognized, when States pass "corporate governance" laws, they are regulating "entities whose very existence and attributes are a product of state law." *CTS Corp.,* 481 U.S. at 89.

Part and parcel with federalism principles and the States' traditional powers is that the States are "laboratories for experimentation with various regulatory regimes." Carl W. Mills, *Breach of Fiduciary Duty as Securities Fraud:* SEC v. Chancellor Corp., 10 FORDHAM J. CORP. & FIN. L. 439, 447 (2005). In other words, under federalism, different States can and do make different choices when it comes to corporate law. Corporations, in turn, "can shop around for attractive corporate domiciles" by comparing those different "legal regimes." *Id.*; *see also* Jens Dammann & Matthias Schündeln, *The Incorporation Choices of Privately Held Corporations*, 27 J.L. ECON. & ORG. 79, 79 (2011) (corporations "choose the corporate law applicable to their internal affairs by incorporating in the state of their choice"). And the States can benefit (or not) from the

8

consequences of their decisions. *See* Mills, *supra*, at 447 (describing benefits that flow to the States when corporations set up shop, including "franchise taxes," "fee revenues," and "patronage").

Whether this sort of competition creates a "race to the bottom," a "race to the top," or something in between is a matter of "heated debate." Mills, *supra*, at 448. But that doesn't change the reality that the States get to choose their own course. Nor does the fact that our constitutional system assumes that the States' ability to adopt "alternative solutions to the many difficult regulatory problems that arise in corporate law" is valuable—and "cannot be adequately replaced by a uniform federal standard." *Id.* at 498 (quoting Stephen M. Bainbridge, *The Creeping Federalization of Corporate Law*, 2003 Regulation 26, 27–28 (Apr. 1, 2003). It remains just as true now as at the Founding that incorporation specifically is a state function. *E.g.*, Mills, *supra*, at 445 (explaining how States "set the rules for incorporation," have "the ability to create corporations" in the first place and keep "primary responsibility for regulating internal corporate affairs"). In short, "[n]o principle of corporation law and practice" has been "more firmly established than a State's authority to regulate domestic corporations." *CTS Corp.*, 481 U.S. at 89.

Congress's ability to "legislate in areas traditionally regulated by the States" is an "extraordinary power in a federalist system," so courts "must assume Congress does not exercise [that power] lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Courts instead adopt non-federalism-erasing constructions unless Congress deployed "unmistakably," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989) (cleaned up), or "exceedingly" clear language "to place [its] intent beyond dispute," *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n,* 590 U.S 604, 621-22 (2020). Short of that, statutes "will not be deemed to have significantly changed" the

constitutional "balance" favoring the States' traditional zones of authority. *United States v. Bass*, 404 U.S. 336. 349 & n.16 (1971) (collecting cases).

The CTA is an example of "overly punitive" federal lawmaking that strips corporations of the ability to "check excessive regulation by opting out of federal regulation and selecting a different jurisdiction for incorporation." Mills, *supra*, at 498. So, the CTA lands with the blunt force of federal overreach. And this Court should treat the federal government's claimed bases of authority with skepticism because of it. Cutting away the States' space for "social and economic experiments" in their zones of traditional authority gets the Constitution's fondness for "more local and more accountable" government backward. *West Virginia v. EPA*, 597 U.S. 697, 739 (2022) (Gorsuch & Alito, JJ., concurring) (cleaned up). In a constitutional case like this, the federal-state asymmetry a statute leaves behind matters.

Here, the CTA's attempt to usurp Texas's role by regulating entities at the time they incorporate and before they engage in commerce of any stripe—intra- or interstate—is wrong. Allowing Congress to regulate incorporation in this manner would blur the distinction between what is local and what is national in a way the Constitution and its federalism framework discussed above does not allow. Holding the line on Congress's enumerated power to regulate interstate commerce matters precisely because erasing it also erases the States' constitutional power to regulate what is truly local.

## III. The CTA's reporting requirements would hurt Texas's economy.

### A. The CTA's costs are massive.

Complying with the CTA's demands will cost billions of dollars and tens of millions of personnel hours. First, consider the time demands for small businesses across the country.

10

FinCEN estimates the burden to file initial reports will range between 90 minutes for reporting companies with a "simple structure," to 370 minutes for those with an "intermediate structure," to 650 minutes for those whose structure is "complex." 87 Fed. Reg. 59,498, 59,573 (Sept. 30, 2022). Those estimates translate to 118,572,335 hours nationwide filing reports in the CTA's first year—followed by another 18,204,421 hours in its second. *Id.* at 59,581.

Bad enough as those admitted numbers are on their own, they are likely underestimates. For example, the time FinCEN allots for a reporting company with a "simple structure" presumes that a single employee will handle the task and will spend a mere 90 minutes to read and "understand" the statutory and regulatory requirements and definitions; "[i]dentify, collect, and review information about beneficial owners and company applicants"; and "fill out and file [the] report." *Id.* at 59,573. Expecting all that to happen well before lunch on a single day is unrealistic—especially when a botched rush job could have severe consequences.

Indeed, when it came to its rule implementing the CTA, FinCEN had many public comments explaining how its "estimated time burden … for filing initial reports was unrealistically low given the complexity of the requirements." 87 Fed. Reg. at 59,553. As the U.S. Chamber of Commerce explained, for instance, "FinCEN should not underestimate the significant burden that will be caused by simply trying to understand beneficial ownership requirements. Disclosure of beneficial ownership is *an entirely new federal requirement*, from an agency that *most businesses are unfamiliar with*." Comment of U.S. Chamber of Commerce, Dkt. No. FINCEN-2021- 0005, at 3 (May 7, 2021)[2] (emphases added). Another commenter explained, reasonably enough, "that the

---

[2] https://www.regulations.gov/comment/FINCEN-2021-0005-0168

20[-]minute allotment to read the form and understand the requirement from the initial report time estimate should be increased to no fewer than 4.5 hours per report." 87 Fed. Reg. at 59,553. Still another explained how FinCEN's estimates "are off by at least 400 percent and quite likely several times that." *Id.* at 59,554.

FinCEN's already-faulty initial numbers do not even include the time needed to apply for and update FinCEN identifiers—the "unique identifying number[s] that FinCEN will issue to individuals or reporting companies upon request, subject to certain conditions." 87 Fed. Reg. at 59,507. Here, FinCEN estimates an additional time burden of 110,553 hours in year one and 21,091 hours in year two. *Id.* at 59,581. Then add to that the time to update initial filings after circumstances like name and address changes, identification number expirations, beneficial owners who pass away, or "management decision[s] resulting in a change in beneficial owner." *Id.* at 59,574. Companies must file updates within 30 calendar days of each of these triggering circumstances, *id.* at 59,592, requiring (again, under FinCEN's own and questionably low estimates) yet another 7,657,096 hours in year one, *id.* at 59,581. And unlike the other burdens, this one goes up in future years: FinCEN estimates 16,826,105 hours will be needed the second year. *Id.*

Second, the financial toll of all this is severe. FinCEN estimates each reporting company will incur between $85.14 and $2,614.87 to file an initial report. 87 Fed. Reg. at 59,559. "If all 32,556,929 existing reporting companies have to incur [that expense] in the same single year, the aggregate cost … is approximately $21.7 billion for Year 1" and $3.3 billion after. *Id.* at 59,559, 59,581. FinCEN thinks updating reports will cost another $3.3 billion the first two years. *Id.* at 59,581. Put another way, complying with the CTA will impose "undoubtedly significant costs of

12

approximately *$22.8 billion* in the first year and *$5.6 billion each year thereafter*." *Id.* at 59,582 (emphases added).

Here too, FinCEN's figures are incomplete. They include employee wages (based on the too-low hour estimates discussed above) and costs to engage professionals like attorneys and CPAs—but only for "intermediate structure" and "complex structure" reporting companies. 87 Fed. Reg. at 59,573. The idea that no "simple structure" companies will need help navigating the CTA and completing their filings is irresponsible. After all, "any person"—not just the company itself—who fails to report "complete or updated beneficial ownership information" faces civil penalties of $500 per day, up to $10,000 in fines, and 2 years in federal prison. 31 U.S.C. § 5336(h)(1), (h)(3)(a). To mitigate that risk, most reporting companies will likely seek legal counsel and perhaps other expert help for "navigating their FinCEN reporting responsibilities while safeguarding against potential risks and fraudulent practices." Matthew Edwards, D. Parker Baker III, *The Basic Ins and Outs of the Corporate Transparency Act*, 35 S.C. LAWYER 24, 29 (Sept. 2023)

And the financial costs don't end even there. The time to apply for and update FinCEN identifiers will carry associated wage costs—FinCEN is willing to admit at least another $6.2 million for that in the first year and around $950,000 afterward. 87 Fed. Reg. at 59,577. Commenters also pointed out that FinCEN missed the "cost of securing data" for reports, "including images of identification documents, as well as the harms should such information not be kept secure." *Id.* FinCEN acknowledged these "potentially significant costs to businesses for securing the data and in increased identity theft risk to individuals in the event of a data breach." *Id.* But curiously, it neglected any "estimates for these costs." *Id.*

13

Third, Texas (and all States) will incur direct costs on top of what their residents and businesses will suffer. The CTA requires relevant state and tribal agencies (as determined by the Secretary of the Treasury) to "cooperate with and provide information" FinCEN requests to create and maintain a database of sensitive personal information. 31 U.S.C. § 5336(d)(2). It also requires States to notify filers about their reporting obligations; give them copies of the Treasurer's reporting company form; and update forms, websites, and physical premises with CTA reporting information. *Id.* § 5336(e)(2)(A). This all takes time and money, too—resources Texas will be required to divert from other enforcement and regulatory priorities.

True, subsection 5336(j) authorizes an appropriation that FinCEN can funnel to the States to help cover compliance costs. 31 U.S.C. § 5336(j). But that relief is only potential, and incomplete. The CTA merely "authorize[s]" Congress to appropriate funds to FinCEN; it doesn't guarantee Congress will come through. *Id.* Any funds will dry up after three fiscal years. *Id.* FinCEN will also control any money—if it is dissatisfied with Texas's protocols, for instance, it could withhold reimbursement. It could also determine that Texas's receipts are not "reasonable" costs "necessary to carry out" the CTA. *Id.* In short, the States remain on the hook for the time and money the CTA requires, not just their resident businesses.

### B. The CTA harms Texas and its residents.

Apart from its legal flaws, the CTA also significantly injures Texas (and all States) and its residents and Texas small businesses. From hefty compliance costs that business owners shoulder directly to regulatory burdens that Texas (and all States) will have to incur, the CTA's effects will be felt far and wide. It creates more harms than it purports to solve—making the federalism intrusion even more concrete.

14

This forced re-direction of small company labor and state resources will strain Texas's economic development. It all takes a direct hit on small businesses' productivity, for starters. Businesses that employ 20 or fewer employees—that is, those subject to the CTA, 31 U.S.C. § 5336(a)(11)(A) and(B)(xxi)—rely heavily on each individual employee, so disrupting their workflow matters. Companies will inevitably pass on the costs of tying up significant percentages of their workforces to comply with the CTA's onerous reporting requirements in the form of higher prices for their products and services. FinCEN does not say otherwise. Instead, it pleads ignorance, saying it "does not have accurate estimates that are reasonably feasible regarding the effect of the rule on productivity, economic growth, full employment, creation of productive jobs, and international competitiveness of U.S. goods and services." 87 Fed. Reg. at 59,579.

Let's add a few of the numbers FinCEN was not interested in confronting. Some estimate that federal regulations cost the U.S. economy over $1.9 trillion a year. CLYDE WAYNE CREWS, JR., COMPETITIVE ENTER. INST., TEN THOUSAND COMMANDMENTS: AN ANNUAL SNAPSHOT OF THE FEDERAL REGULATORY STATE 6, 33 (2022). Small businesses like those the CTA and FinCEN's implementing rule target already bear a heavy share of that staggering figure—63% of the total cost by one estimate. *See* Jeffrey J. Polich, *Judicial Review and the Small Business Regulatory Enforcement Fairness Act*, 41 WM. & MARY L. REV. 1425, 1432 (2000). Costs like these often scare away investors by the prospect of "reduce[d] or eliminate[d] … returns" from "[r]adical and vacillating changes in [the] law." Richard J. Pierce, Jr., *The Combination of Chevron and Political Polarity Has Awful Effects*, 70 DUKE L.J. ONLINE 91, 92, 99 (2021). And consumers face nearly 1% price increases for every 10% rise in overall federal regulation. DUSTIN CHAMBERS, ET AL., HOW DO FEDERAL

15

REGULATIONS AFFECT CONSUMER PRICES? AN ANALYSIS OF THE REGRESSIVE EFFECTS OF REGULATION, 29 (2019).[3]

Consider, too, that the CTA's burdens are not limited to for-profit, commercial entities. Just like their for-profit corporate cousins, any "nonprofit that meets the definition of a reporting company" and that doesn't qualify for one of the statutory exemptions "will have to file" with FinCEN. Sandra Feldman, *Nonprofit Organization Considerations for FinCEN Beneficial Ownership Information Reporting Requirements*, WOLTERS KLUWER (Feb. 27, 2024).[4] And some estates and trusts will be required to comply as well. *See* Christine Fletcher, *Navigating the Corporate Transparency Act: Estate Plan Implications*, FORBES (Mar. 4, 2024, 3:49 PM).[5] Even everyday Americans and organizations that do not have commercial ends, then, will feel the statute's sting.

So the CTA's requirements are no mere inconvenience. Apart from being illegal, they hurt Texas and the people that do business in Texas and otherwise add value to this State in real and lasting ways. And it should be invalidated.

## CONCLUSION

This Court should grant Plaintiffs' motion for preliminary injunction.

---

[3] https://core.ac.uk/download/pdf/111216976.pdf
[4] https://www.wolterskluwer.com/en/expert-insights/nonprofit-organization-considerations-for-fincen-boi-reporting-requirements
[5] https://www.forbes.com/sites/christinefletcher/2024/03/04/navigating-the-corporate-transparency-act-estate-plan-implications/?sh=38d375f73a53

Dated: December 2, 2024        Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

**CHARLES K. ELDRED**
Chief, Legal Strategy Division

*/s/ Christina Cella*
**CHRISTINA CELLA**
Special Counsel for Legal Strategy
Texas Bar No. 24106199

Office of the Attorney General
Legal Strategy Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 461-6494
christina.cella@oag.texas.gov

**COUNSEL FOR *AMICUS* STATE OF TEXAS**