IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*, <br><br> *Defendants*. | No. 4:24-cv-478-ALM |

**DEFENDANTS' MOTION TO STAY PRELIMINARY INJUNCTION
PENDING APPEAL**

Defendants have filed an appeal from this Court's amended order granting Plaintiffs' motion for a preliminary injunction, ECF No. 33 ("Am. Order"). *See* Amended Notice of Appeal, ECF No. 34. Defendants hereby move the Court to stay the preliminary injunction pending a decision from the Fifth Circuit on Defendants' appeal. As explained below, Defendants respectfully submit that they have satisfied the requirements for obtaining a stay of the Court's injunction pending appeal. Defendants intend to seek relief from the Fifth Circuit on Thursday, December 12 or Friday, December 13, if this Court has not granted relief by then, in order to allow the motion to be fully briefed in time for the Fifth Circuit to resolve it, and will report to the Fifth Circuit if this Court rules while the government's motion is pending there.[1]

**BACKGROUND**

On May 28, 2024, Plaintiffs filed this suit challenging the constitutionality of the Corporate

---

[1] While the United States recognizes that the arguments in this motion overlap significantly with the issues addressed in this Court's Amended Order, Federal Rule of Appellate Procedure 8 requires the United States to first move for a stay of preliminary injunction in the district court.

1

Transparency Act ("CTA").  Compl. ECF No. 1.  Plaintiffs moved for a preliminary injunction on June 3, 2024.  ECF No. 6.  The Court heard argument on the motion on October 9, 2024.  Minute Entry (Oct. 9, 2024).  On December 3, 2024, the Court issued a memorandum opinion and order granting Plaintiffs' motion.  ECF No. 30.  The Court held that Plaintiffs sufficiently demonstrated a threat of immediate and irreparable harm given "unrecoverable compliance costs absent emergency relief," as well as a substantial threat to their constitutional rights.  *Id.* at 23-32.  The Court also determined that Plaintiffs established a substantial likelihood of success on the merits of their facial challenge to the CTA.  *Id.* at 32-73.  In doing so, the Court held that the CTA was likely not authorized by the Commerce Clause directly, *id.* at 35-53, or by Congress's domestic and foreign commerce, foreign affairs, or taxing powers in conjunction with the Necessary and Proper Clause, *id.* at 53-73.  As to the balance of equities, the Court recognized the government's "interest in ferreting out financial crime, protecting foreign commerce and national security, and bringing the United States' money laundering laws into compliance with international standards[.]" *Id.* at 73-74 (citing Pub. L. No. 116-283, div. F, 134 Stat. 6402 (2021)).  Nevertheless, the Court held that the balance favored Plaintiffs given the Court's view that the statute is likely unconstitutional.  *Id.* at 73-74.

Finding that Plaintiffs carried their burden for preliminary relief, the Court then turned to the scope of the injunction.  *Id.* at 74-78.  Although it recognized the controversial nature of nationwide injunctions, *id.* at 76, it "determine[d] that the injunction should apply nationwide," *id.* at 77.  The Court therefore enjoined the CTA, as well as the final rule implementing the CTA's reporting requirements, Financial Crimes Enforcement Network, Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59,498 (Sept. 30, 2022).  *Id.* at 77-79.  The Court also stayed the rule's compliance deadlines pursuant to 5 U.S.C. § 705.  *Id.*

The government filed a notice of appeal on December 5, 2024.  ECF No. 32.  The Court issued its Amended Order that same day, though did not alter its conclusions or the scope of its

injunction. *See generally* Am. Order. The government filed an amended notice of appeal on December 6, 2024. ECF No. 34.

## DISCUSSION

### A.    Standard of Review

Courts typically consider four factors in evaluating a request for a stay pending appeal: (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant will be irreparably harmed if the stay is not granted; (3) whether issuance of a stay will substantially harm the other parties; and (4) whether the granting of the stay serves the public interest. *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th Cir. 2013); *see also CFTC v. Hudgins*, No. 6:08-CV-187, 2009 WL 3645053, at *2 (E.D. Tex. Nov. 2, 2009). When the government is a party, its interests and the public interest overlap in the balancing of harms. *See Nken v. Holder*, 556 U.S. 418, 420 (2009).

### B.    Defendants Will Be Irreparably Harmed Absent a Stay

First, an injunction against the government's enforcement of the CTA, "enacted by representatives of its people," is itself "'a form of irreparable injury.'" *United States v. Texas*, 97 F.4th 268, 295 (5th Cir. 2024) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *see Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State[.]" (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)).

Second, the injunction would significantly disrupt FinCEN's implementation of the CTA, and FinCEN would not be able to fully remediate that disruption even if the injunction were lifted at the conclusion of the appeal. *See Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 399 (5th Cir. 2013) (recognizing irreparable harm to State where "immediate implementation of the injunction . . . would frustrate the State's program thereby causing harm to it[,]" and "the injunction causes further direct

irreparable harm against the State as it deprives the State of the opportunity to implement its own legislature's decisions"); Decl. of Andrea Gacki, attached hereto as Ex. A, ¶¶ 10–22. For most companies covered by the CTA, the deadline for filing disclosures is January 1, 2025. 87 Fed. Reg. at 54,498. By that date, most covered companies, including all covered companies formed before 2024—a total estimated 32 million businesses nationwide—must submit the required information to FinCEN. *See* 31 C.F.R. § 1010.380(a)(1)(iii). FinCEN has expended significant resources to educate these previously established companies of the new reporting requirements. Gacki Decl. ¶¶ 9, 12, 18, 25. For example, FinCEN is engaged in an ongoing multimedia, nationwide public service announcement ("PSA") campaign, including obligating more than $4.3 million dollars in PSAs that cannot now be recouped if the campaign is suspended. *Id.* ¶ 18. Tens of millions of Americans have seen, heard, or read these PSAs across television, radio, newspaper, direct mail, and digital media. *Id.* ¶ 14. FinCEN officials have dedicated thousands of hours at over more than 200 outreach events, and FinCEN has established a dedicated contact center to address questions from potential filers. *Id.* ¶ 18.

These efforts have been bearing fruit, with an exponential increase in reporting since the multimedia campaign began. *Id.* ¶¶ 9, 18. In the last two months, FinCEN has more than doubled the number of beneficial ownership information reports it had received over the prior eight months, with nearly one-third of all reports submitted in the three weeks preceding the injunction. *Id.* ¶ 15. FinCEN increased the filing rate to nearly 1 million per week in those weeks, received approximately 10 million reports altogether, and had anticipated continued exponential growth through the January 1, 2025 deadline. *Id.* The injunction negates those outreach efforts at a critical juncture in implementation.

Even if the injunction were ultimately vacated on appeal, the harm it would cause while in effect could not be fully remediated. The injunction has already created—and will continue to

engender—widespread confusion among the public, including regulated parties. *Id.* ¶ 19. Such confusion harms the public and FinCEN. *Id.* If CTA implementation is suspended for a significant length of time, FinCEN would have substantial practical difficulty resuming implementation, re-educating the public about the reporting requirements, and effectively enforcing compliance. *Id.*

Additionally, the injunction would prevent the United States from fulfilling international standards for countering money laundering and terrorist financing. *Id.* ¶ 21. The United States is currently preparing for its upcoming Financial Action Task Force ("FATF")[2] mutual evaluation, with its written technical submission currently due mid-2025. *Id.* The United States' last FATF mutual evaluation report was issued in December 2016 and identified the lack of beneficial ownership information reporting requirements at that time as one of the fundamental gaps—due to the scale of misuse of legal entities by criminals in the United States and abroad—in the U.S. anti-money laundering regime, with the United States rated as non-compliant with these requirements. *Id.* ¶¶ 20-21; *see also* FATF, Mutual Evaluation of the United States at 4, 222-226 (Dec. 2016), available at https://www.fatf-gafi.org/content/dam/fatf-gafi/mer/MER-United-States-2016.pdf. Earlier this year, FATF upgraded the United States' rating on the FATF standard related to transparency and beneficial ownership of legal persons, frequently referencing the CTA in its follow-up report. Gacki Decl. ¶ 21; FATF, United States: 7th Enhanced Follow-up Report at 3-12 (Mar. 2024), available at https://www.fatf-gafi.org/content/dam/fatf-gafi/fur/USA-FUR-2024.pdf.coredownload.inline.pdf. By enjoining enforcement of the CTA, the injunction risks causing the United States to receive negative ratings on related portions of its upcoming FATF evaluation. Gacki Decl. ¶ 21. Such ratings, reflecting a continued failure by the United States to address what FATF has identified as the United States' most fundamental gap in its anti-money laundering regime for nearly a decade after the last

---

[2] The United States is a founding member of FATF, "the international standard-setting body for anti-money laundering/combatting the financing of terrorism[.]" H.R. Rep. No. 116-227, at 11 (2019).

5

mutual evaluation of the United States, could damage U.S. national security interests in two ways. *Id.* First, the ratings would increase the chances that the United States could be added to the FATF grey list, a public list of countries with significant failings in their regimes to combat money laundering and terrorist financing. *Id.* Second, they would undermine the United States' ability to push other countries to make fundamental reforms to their regimes (in order to protect the global financial system) when the United States has failed to rectify significant deficiencies in its own regime, thereby damaging U.S. credibility and its ability to affect positive reforms in other nations. *Id.*

### C. Defendants Have a Strong Likelihood of Success on the Merits

Recognizing that this Court has reached a contrary conclusion, Defendants nonetheless respectfully submit that a stay pending appeal is further warranted because Defendants are likely to prevail on appeal for the reasons set out in their opposition to Plaintiffs' motion for a preliminary injunction. Defs.' Resp. in Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 18 ("Defs.' Opp."). Defendants maintain that Congress was authorized to enact the CTA for two independent reasons. As explained in Defendants' opposition, the CTA is directly authorized by the Commerce Clause because the statute regulates commercial entities. Defs.' Opp. at 10-19. Additionally, the CTA is necessary and proper for executing other federal powers, including the commerce, foreign affairs and national security, and taxing powers. *Id.* at 19-23.

Defendants respectfully submit that the Court erred in reaching a conclusion to the contrary. For example, although the Court found that the CTA does not address any "activity at all," Am. Order at 42-43, the statute in fact regulates businesses whose defining feature is their authority and propensity to engage in commercial transactions, *see* Defs.' Opp. at 18. Likewise, Defendants respectfully submit that the Court's Amended Order is inconsistent with the "very high bar" for supporting a facial challenge that the Supreme Court reiterated in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024), and that the Fifth Circuit has repeatedly applied, *see, e.g.*, *United States v. Connelly*, 117 F.4th 269, 282

(5th Cir. 2024). As the government has explained, and as multiple district courts have recognized, plaintiffs come nowhere near establishing "that no set of circumstances exists under which the [CTA] would be valid"—as would be required to justify their facial attack on an Act of Congress. Defs.' Opp. at 10 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see Firestone v. Yellen*, No. 24-1034, 2024 WL 4250192 (D. Or. Sept. 20, 2024) (declining to enter a preliminary injunction and determining that the CTA is authorized by multiple enumerated powers); *Cmty. Associations Inst. v. Yellen*, No. 1:24-cv-1597, 2024 WL 4571412 (E.D. Va. Oct. 24, 2024) (same). Moreover, the Court did not give sufficient weight to Congress's findings, including Congress's assessment that the CTA's reporting requirements are necessary to protect commerce and will in fact deter tax evasion and result in the collection of more tax revenue. Am. Order at 66-73; *see* 134 Stat. 6402(3); 31 U.S.C. §§ 5336(a)(11)(xxiv)(ii), (c)(5)(B)). That error is particularly significant given the Court's finding that "it is rational for Congress to believe that registered entities, in their natural state of anonymous existence, and whatever operations they may carry out, would substantially impact interstate commerce." Am. Order at 52.

Further, Defendants respectfully submit that the Court erred in enjoining the CTA and reporting rule on a nationwide basis. *Id.* at 75. "Whether framed as injunctions of 'nationwide,' 'universal,' or 'cosmic' scope, these orders share the same basic flaw—they direct how the defendant must act toward persons who are not parties to the case." *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring); *see Trump v. Hawaii*, 585 U.S. 667, 712-21 (2018) (Thomas, J., concurring). Here, such preliminary relief was particularly unwarranted given that "Plaintiffs suggested that they sought an injunction on behalf of only the Plaintiffs before the Court," Am. Order at 75, and because it grants the very relief to non-parties that other courts have specifically denied, *see Firestone*, 2024 WL 4250192 at *14; *Cmty. Associations Inst.*, 2024 WL 4571412, at *10.

### D. The Balance of Harms and Public Interest Favor a Stay

As explained in Defendants' opposition, any harm to Plaintiffs from the minimally burdensome reporting requirements would be substantially outweighed by the irreparable harm imposed on the government. Defs.' Opp. at 29; *see Virginian Ry. Co. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937) (statutory scheme "is in itself a declaration of public interest and policy which should be persuasive" to courts).

### E. The Court Should, at a Minimum, Stay Application of the Injunction to Non-Parties

As discussed above and in Defendants' opposition, a nationwide injunction is not warranted. Given the skepticism expressed by multiple Justices about the increasingly prevalent practice of nationwide injunctions, and that courts in other jurisdictions have rejected efforts to enjoin the CTA and reporting rule, this Court should at a minimum stay the impact of its injunction beyond the named parties or identified members of the Plaintiff organizations. *Cf. Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) ("As a general principle, 'injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979))). And again, such a stay is warranted to ensure that the relief does not exceed Plaintiffs' own request. Am. Order at 75; *see E.T. v. Paxton*, 19 F.4th 760, 769 (5th Cir. 2021) ("Injunctions must be narrowly tailored within the context of the substantive law at issue to address the specific relief sought. This means that an injunction cannot 'encompass more conduct than was requested or exceed the legal basis of the lawsuit.'" (quoting *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016))).

## CONCLUSION

For the foregoing reasons, Defendants' motion to stay the preliminary injunction pending appeal should be granted.

Dated: December 11, 2024            Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JOSEPH E. BORSON
Assistant Branch Director

*/s/ Stuart J. Robinson*
STUART J. ROBINSON
Senior Counsel
FAITH E. LOWRY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20530
Tel: (415) 436-6635
E-mail: stuart.j.robinson@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2024, I electronically filed the foregoing document with the Clerk of Court using this Court's CM/ECF system, which will notify all counsel of record of such filing.

*/s/ Stuart J. Robinson*
Stuart J. Robinson
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch

## CERTIFICATE OF CONFERENCE

The parties conferred about the foregoing motion, and Plaintiffs oppose the relief requested therein.

*/s/ Stuart J. Robinson*
STUART J. ROBINSON
