# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| TEXAS TOP COP SHOP, INC., *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND, ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,<br><br>*Defendants*. | No. 4:24-cv-478-ALM |

**DECLARATION OF ANDREA GACKI**

I, Andrea Gacki, declare the following to be a true and correct statement of facts:

1. I am the Director of the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury ("Treasury"). I have held that position since September 2023. I previously served in several other leadership roles within Treasury. Prior to joining FinCEN, I served as the Director of the Office of Foreign Assets Control, another component of Treasury (within Treasury's Office of Terrorism and Financial Intelligence), for approximately five years and, from January 2021 to December 2021, I performed the duties of the Under Secretary for Terrorism and Financial Intelligence. In my official capacity as the Director of FinCEN, I supervise all aspects of FinCEN's operations, including FinCEN's implementation of the Corporate Transparency Act ("CTA").

2. Due to the nature of my official duties, I am familiar with FinCEN's implementation of the CTA's requirements, including FinCEN's development of implementing regulations as well as

FinCEN's promulgation of guidance regarding the CTA and its implementing regulations. I am also familiar with FinCEN's expansive campaign to spread public awareness of the CTA's requirements.

3. I make this declaration in support of a motion to stay the district court's order pending appeal. The statements I make in this declaration are based on my personal knowledge, on information made available to me in my official capacity, and on conclusions reached and determinations made in accordance therewith.

4. FinCEN was created in 1990 and became a bureau of Treasury by virtue of the USA PATRIOT Act of 2001, Pub. L. 107-56. The Director of FinCEN is appointed by the Secretary of the Treasury and reports to Treasury's Under Secretary for Terrorism and Financial Intelligence.

5. FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence. FinCEN primarily exercises regulatory functions under the legislative framework commonly referred to as the "Bank Secrecy Act" ("BSA"),[1] which includes the Currency and Foreign Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001, the Anti-Money Laundering Act of 2020 (including the CTA) and other legislation. The BSA is the nation's first and most comprehensive federal anti-money laundering and countering the financing of terrorism ("AML/CFT") statute. The Secretary of the Treasury has delegated to the Director of FinCEN the authority to implement, administer, and enforce compliance with the BSA and associated regulations. *See* Treasury, Treasury Directive 180-01 (Jan. 14, 2020).

---

[1] The BSA is codified at 12 U.S.C. §§ 1829b, 1951-1960 and 31 U.S.C. §§ 5311-5314, 5316-5336, including notes thereto. Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

2

6.     The CTA, enacted as part of the Anti-Money Laundering Act of 2020 in the National Defense Authorization Act for Fiscal Year 2021 and codified, in relevant part, at 31 U.S.C. § 5336, amended the BSA to, among other things, require certain entities to report information to FinCEN about their beneficial owners and the individuals who created or registered them. The CTA—enacted on an overwhelming and bipartisan basis in 2021—is vital to protecting the U.S. and international financial systems from illicit finance threats, such as terrorist financing, corruption, human smuggling, drug and arms trafficking, and money laundering. Congress designed the CTA to advance important national security, intelligence, and law enforcement efforts to counter money laundering, the financing of terrorism, tax evasion, and other illicit activity through information-sharing. Specifically, access to beneficial ownership information ("BOI") reported under the CTA would significantly aid efforts to impede illicit actors' ability to use legal entities to conceal proceeds from criminal acts that undermine U.S. national security and foreign policy interests and to protect the U.S. financial system from illicit use by, for example, adding critical data to financial analyses in law enforcement and tax investigations and providing essential information to the intelligence and national security professionals who work to prevent terrorists and other illicit actors from raising, hiding, or moving money in the United States through anonymous shell or front companies. Broadly, and critically, BOI is crucial to identifying linkages between potential illicit actors and opaque business entities, including shell companies. Implementing the law has been a central pillar of the United States' anti-corruption strategy, as well as ongoing efforts to raise the United States up to international standards for corporate transparency.

7.     The CTA directed FinCEN to implement its reporting requirements and certain other aspects of statute by regulation. In September 2022, FinCEN issued a final rule implementing

the reporting requirements of the CTA. *See* 87 Fed. Reg. 59,498 (codified at 31 C.F.R. § 1010.380, as amended by 88 Fed. Reg. 83,499). That rule describes who must file a BOI report, what information must be reported, and when a report is due. Specifically, the rule requires reporting companies to file reports with FinCEN that identify two categories of individuals: (1) the beneficial owners of the entity; and (2) the applicants of the entity. The rule, as later amended, also establishes the deadlines by which reporting companies must comply with the CTA's reporting requirements. For businesses created or registered before 2024, compliance is required by January 1, 2025. *See* 31 C.F.R. § 1010.380(a)(1)(iii). For businesses created or registered during 2024, compliance is required within 90 days of their formation. *See id.* § 1010.380(a)(1)(i)(A). However, for businesses created or registered after 2024, compliance will be required within 30 days of their formation. *See id.* § 1010.380(a)(1)(i)(B).[2]

8.　　FinCEN began accepting such BOI reports on January 1, 2024. As of December 2, 2024, FinCEN had received nearly 10 million BOI reports. In parallel, FinCEN began providing authorized government agencies with access to BOI reported under the CTA for law enforcement purposes.

9.　　On December 3, 2024, the district court in this matter issued an order preliminarily enjoining—nationwide—the CTA, including, expressly, enforcement of the CTA and its reporting requirements, as well as staying all associated reporting deadlines. By curtailing FinCEN's CTA implementation efforts at this juncture, the district court's order fundamentally undermines U.S.

---

[2] In December 2023, FinCEN issued a final rule implementing the CTA's access procedures and safeguards, 88 Fed. Reg. 88732, with an effective date of February 20, 2024. That rule describes the circumstances under which BOI may be disclosed to authorized recipients (*e.g.*, Federal agencies engaged in national security, intelligence or law enforcement activity and state, local and tribal law enforcement agencies with court authorization) and how it must be protected.

anti-corruption efforts. The CTA and its implementing regulations require most covered entities—an estimated 32.6 million businesses nationwide—to file their BOI reports under the CTA by January 1, 2025. Treasury has devoted significant resources in advance of this deadline to raise awareness about that obligation and promote compliance. Treasury's efforts have been bearing fruit, with exponential growth in reporting rates in the weeks leading up to the injunction. The order voids this deadline for all entities, nullifies the filing obligations mandated under the CTA and its implementing regulations, and broadly enjoins any enforcement of the law. It thereby cripples Treasury's efforts to implement the law and sows confusion among entities regarding their reporting obligations. If the order is not stayed, the resulting harms to U.S. anti-corruption efforts—and, ultimately, the U.S. financial system as a whole—would likely be severe.

### FinCEN's CTA Implementation and Outreach Efforts

10. On December 8, 2021, building on an earlier advance notice of proposed rulemaking, FinCEN published a Notice of Proposed Rulemaking ("NPRM"), 86 Fed. Reg. 69920, to give the public an opportunity to review and comment on a proposed rule implementing the CTA's provisions requiring entities to report to FinCEN information about their beneficial owners and the individuals who created or registered the entities. FinCEN's final rule implementing these requirements, 87 Fed. Reg. 59498, was published September 30, 2022, and became effective January 1, 2024.

11. On December 22, 2023, FinCEN published a final rule implementing the CTA's access procedures and safeguards, 88 Fed. Reg. 88732, with an effective date of February 20, 2024. The CTA also requires FinCEN to amend certain existing customer due diligence regulations,

5

codified at 31 C.F.R. § 1010.230, to bring them into conformance with the CTA. FinCEN anticipated publishing an associated NPRM in 2025.

12. FinCEN has also published a range of guidance materials to assist the public with complying with the CTA's reporting requirements. These materials may be accessed through FinCEN's website at https://www.fincen.gov/boi, a webpage that has been viewed over 14 million times. Among other resources, these materials include a small entity compliance guide (available in more than 10 languages), an education and outreach toolkit, instructional videos, and over one hundred answers to frequently asked questions ("FAQs"). These FAQs are found at https://www.fincen.gov/boi-faqs. In addition, FinCEN has a dedicated Beneficial Ownership Contact Center that has resolved over 200,000 inquiries relating to the CTA's reporting requirements.

13. FinCEN has also engaged in over 200 outreach events regarding the CTA's obligations, including meetings, conferences, and webinars with members of the public, as well as through industry associations, secretaries of state's offices, and partner agencies. I have participated in many of these events. Through these outreach events, FinCEN has responded to questions from a variety of stakeholders, including industry and trade groups, congressional offices, professional communities of interest, business owners, and the general public.

14. Additionally, FinCEN has engaged in an expansive public service announcement ("PSA") campaign to increase public awareness about the CTA's reporting obligations, including highlighting the January 1, 2025, deadline. Since September 2023, FinCEN has invested over 4.3 million dollars in that campaign. Tens of millions of Americans have seen, heard, or read these PSAs across television, radio, newspaper, direct mail, and digital media. FinCEN has also prepared

roughly 1.5 million postcards to mail directly to businesses across five states with lagging reporting rates to remind them of their CTA obligations.

15. FinCEN has estimated that roughly 32.6 million companies are required to file BOI reports by January 1, 2025, under its regulations. As of the date of the district court's order, nearly ten million reports had been filed with FinCEN. The pace of filing, however, had recently increased. In the last two months, FinCEN has more than doubled the number of BOI reports it had received over the prior eight months, with nearly one-third of all reports submitted in the three weeks preceding the injunction, with continued growth in the filing rate expected through the January 1, 2025, deadline for companies created or registered before 2024, *i.e.*, most companies required to report under the CTA.

16. FinCEN had also begun providing access to BOI reported under the CTA to federal law enforcement agencies, with FinCEN itself and five federal law enforcement agencies receiving access as of the date of the injunction, and numerous other agencies engaged in law enforcement, intelligence, and national security activities had expected to receive access in the near future.

### Harm to Treasury's Anti-corruption Efforts and the U.S. AML/CFT Regime from the Court's Order

17. The district court's order significantly disrupts FinCEN's implementation of the CTA in advance of its January 1, 2025, reporting deadline, and FinCEN would not be able to fully remediate that disruption even if the injunction were lifted at the conclusion of the appeal.

18. FinCEN has expended significant resources over the past year—and particularly last few months—to educate previously established companies of the new reporting requirement. As described above, FinCEN has been engaged in a multimedia, nationwide PSA campaign, including obligating more than $4.3 million in PSAs—money that cannot now be recouped—that has

7

informed tens of millions of people about their CTA obligations.  FinCEN officials have dedicated thousands of hours at over more than 200 outreach events and through a dedicated contact center to addressing questions from potential filers.  These efforts have been successful, with an exponential increase in reporting since the multimedia campaign began, increasing the filing rate to nearly one million reports filed per week in recent weeks.  The district court's injunction negates those outreach efforts three weeks before the January 1, 2025, reporting deadline.

19.     Even if the injunction were ultimately overturned on appeal, the harm it would cause while in effect could not be fully remediated.  The injunction has already created—and will continue to engender—widespread confusion among the public, including regulated parties.  Such confusion harms the public and FinCEN.  Reporting companies must clearly understand and have certainty about their compliance obligations for a reporting regime to be effective.  On-again, off-again reporting requirements would significantly sink compliance rates; halting efforts just as there has been a significant increase in compliance would undermine the long-term success of the CTA and the BOI reporting program.  If CTA implementation is suspended for a significant length of time, FinCEN would have substantial practical difficulty resuming implementation, re-educating the public about the reporting requirements, and effectively enforcing compliance.

20.     The injunction also prevents the United States from fulfilling international AML/CFT standards.  The United States is currently preparing for its upcoming Financial Action Task Force ("FATF") mutual evaluation, with its written technical submission currently due mid-2025.  The United States is a founding member of FATF, which is the leading international, inter-governmental task force whose purpose is the development and promotion of international standards and the effective implementation of legal, regulatory, and operational measures to combat

money laundering, terrorist financing, the financing of proliferation, and other related threats to the integrity of the international financial system.  Among other things, FATF has established standards on transparency and BOI of legal persons, intended to deter and prevent the misuse of corporate vehicles.

        21.      FATF last issued a mutual evaluation report on the United States in December 2016 and identified the lack of beneficial ownership information reporting requirements at that time as one of the fundamental gaps—due to the scale of misuse of legal entities by criminals in the United States and acting from overseas—in the U.S. AML/CFT regime, with the United States rated as non-compliant with these requirements.  Earlier this year, FATF upgraded the United States' rating on the FATF standard related to transparency and beneficial ownership of legal persons, frequently referencing the CTA in its follow-up report.  By enjoining enforcement of the CTA, the injunction risks causing the United States to receive negative ratings on related portions of its upcoming FATF evaluation.  Such ratings, reflecting a failure by the United States to address what FATF has identified as the United States' most fundamental gap in its AML/CFT regime for nearly a decade after the last mutual evaluation of the United States, could damage U.S. national and security interests in two ways.  First, the ratings would increase the chances that the United States could be added to the FATF grey list, a public list of countries with significant failings in their AML/CFT regimes.  Second, they would undermine the United States' ability to push other countries to make fundamental reforms to their AML/CFT regimes (in order to protect the global financial system) when the United States has failed to rectify significant deficiencies in its own regime, thereby damaging U.S. credibility and its ability to impact positive reforms in other nations.

22.     In sum, the CTA is a critical component of FinCEN's efforts to combat corruption, terrorist financing, money laundering, and other criminal activities. It is a linchpin of the U.S. AML/CFT regime and needed to enable the United States to comply with international AML/CFT standards. FinCEN, and Treasury more broadly, have devoted major resources over several years to ensure the CTA is implemented effectively, in particular by educating the public about its requirements through guidance materials, outreach events, PSAs, and other methods in recent months in preparation for the January 1, 2025, filing deadline. If the injunction remains in place for any significant length of time, these resources will have been largely squandered, and the U.S. AML/CFT regime may never fully recover from the resulting public confusion about the CTA's beneficial ownership reporting requirements. In FinCEN's judgment, the Court's order thus risks causing significant and irreparable harm to U.S. anti-corruption efforts and broader AML/CFT regime and thereby to the U.S. financial system as a whole.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 11, 2024.

_____
Andrea Gacki
Director
Financial Crimes Enforcement Network